Case 83

DICKPACIFIC
GHEMM
JV

*Bassett Hospital Replacement*
*Fort Wainwright, Alaska*
*Contract No. DACA85-02-C-0004*

January 3, 2005

BASSETT RESIDENT OFFICE
U.S. Army Engineer District, Alaska
P.O. Box 35067
Fort Wainwright, AK 99703-0067

SERIAL NO. 75-2600-00009-01227

Attention: Rolf O. Ness

Reference: Contract No. DACA85-02-C-0004
Bassett Hospital Replacement, Ft. Wainwright, Alaska

Subject: W.A. Botting – EPA Wage Escalation – Contracting Officer's Decision

Dear Rolf:

Dick Pacific/GHEMM, JV respectfully requests the Contracting Officer to render a decision under the Dispute Clauses of the Contract, FAR 52.233-1, based on the Department of the Army's letter dated October 26, 2004 denying our subcontractor W.A. Botting's request for EPA labor escalation reimbursement.

Based on the documentation submitted by W.A. Botting Company per the attached transmittal dated December 29, 2004 in regards to labor escalation adjustment under the Contract FAR Provision 52.216-4, Dick Pacific/GHEMM, JV duly certifies that the claim is made in good faith; that the supporting data are accurate and complete to the best of our knowledge and belief; that the amount accurately reflects the Contract adjustment for which the contractor believes the Government is liable; and that I duly certify the claim on behalf on the Contractor.

Below is the breakdown of costs associated with this claim. Please be advised Dick Pacific/GHEMM, JV reserves the right to pursue additional costs for the schedule and disruption impacts associated with this dispute that cannot be determined at this time.

| | |
|---|---|
| W.A. Botting EPA Labor Reimbursement Page 17 Conclusion | $1,492,106.05 |
| Dick Pacific/GHEMM, JV Administration Fee @ 5% | $ 74,605.32 |
| Total Claim Amount | $1,566,711.37 |



P.O. Box 35490 Ft. Wainwright, AK 99703-0490 Ph: (907) 356-3174 / Fax: (907) 356-3176

DOF_000026

DICKPACIFIC GHEMM JV

BASSETT RESIDENT OFFICE
January 3, 2005
Page 2

If you have any further questions, please contact this field office.

Very truly yours,

DICK PACIFIC/GHEMM, JV

Ronald Young
Project Executive

RY:kji
Enclosure

| | | |
|---|---|---|
| Cc: | K. Moatz | C. McDonald – Contracting Officer |
| | B. Bell | Issue 00042 |
| | L. Kawamoto | File |

W.A. BOTTING COMPANY
MECHANICAL CONTRACTOR
FULL SERVICE SINCE 1911 wabotting.com

December 29, 2004

Dick Pacific / Ghemm JV.
P.O. Box 35490
4077 Neely Road
Fairbanks, AK 99701
ATT: Ron Young

Project: **Bassett Hospital Replacement**
**Contract No.DACA85-02-C-0004**
**WAB Project No. 8903, WAB PCO #51**

Re: Additional Costs Incurred Due to Increased Rate of Pay for Labor

Dear Mr. Young:

Please find enclosed W.A. Botting Company's Request for Contracting Officer's Decision on Economic Price Adjustment of its Subcontract. Attached to that Request, and made a part thereof, are the Declaration of Peter Botting, the Declaration of Michael Burrus, and the Certification of the W.A. Botting Company.

Sincerely,
W.A. BOTTING COMPANY

John R. Solem
Project Executive

Cc: Rob Crick
Pete Botting

**W.A. Botting Company
Request for Contracting Officer's Decision
on Economic Price Adjustment of its Subcontract
on the Bassett Hospital Replacement, Fort Wainwright, Alaska
Project No. DACA85-02-C-0004**

## I. INTRODUCTION

### A. The Parties and the Project

Dick Pacific/Ghemm, JV ("Dick Pacific") is the prime contractor to the United States Government ("Government") on the construction project known as the Bassett Hospital Replacement ("Project"), Contract No. DACA85-02-C-0004, located at Fort Wainwright, Alaska.

W.A. Botting Company ("Botting") subcontracted the mechanical portion of the project from Dick Pacific.

The U.S. Army Corps of Engineers ("COE") designed the Project for the Government and is responsible for administration of the Project as well.

The Project is a 32-bed, multi-story replacement hospital intended to serve the needs of the military, dependent, and retiree population of Fort Wainwright, Fort Greely, Eielson AFB, and remote military sites north of the Alaska Range. The Project includes health care facilities for internal medicine, general surgery, EENT, orthopedics, obstetrics and gynecology, pediatrics, and family practice.

### B. The Basis of the Request for Economic Price Adjustment

This Request for Economic Price Adjustment is being made by Botting because it has encountered, and is continuing to encounter, an escalation of labor wage rates during the course of construction, which escalation is compensable under FAR 52.216-4, which is incorporated (as modified) into the construction contract.

### C. <u>The Amount of the Request</u>

Botting requests that its subcontract be modified in the amount of $1,492,106.05 as compensation for the escalation of labor wage rates. Botting so requests because Botting has incurred, and is continuing to incur, additional labor costs due to wage rate escalation. This request includes only the additional cost of wages (including fringe benefits) paid to persons performing labor on the Project. It does not include any indirect costs, mark-up, inefficiency costs, or extended duration costs. This request includes actual costs incurred through December 2004 of $1,224,266.05 and an estimate of $267,840.00 of additional costs to be incurred through December 2005.

## II. FACTUAL BACKGROUND

### A. <u>The Contract</u>

1. <u>The Specification involved in the Request</u>

This dispute primarily involves FAR 52.216-4 ECONOMIC PRICE ADJUSTMENT—LABOR AND MATERIAL (JAN 1997), ("EPA clause") which is incorporated (as modified) into the contract. (Exhibit 1)

2. <u>Explanation and context of the specification at issue</u>

The purpose of the EPA clause is to eliminate the need for contractors to include a contingency for wage escalation in their bid prices when a Government project is anticipated to last for a number of years. The contingency is eliminated because the Government agrees to adjust the contractor's price in the event, and to the extent, that the contractor experiences an escalation in wage rates over the course of construction.

## B. The Issue

1. Description of the issue

The issue is whether Botting is entitled to a price adjustment due to the escalation of labor wage rates during the course of construction.

2. Botting's position on the issue

Botting's position is that FAR 52.216-4 is clear and unambiguous that the Government is obligated to reimburse Botting for labor escalation costs incurred. Botting did not include such escalation costs in its sub-bid in reliance on the contract specifications and the Government's pre-bid representations. Botting incurred the type of labor escalation costs that the EPA clause was intended to reimburse, and Botting is entitled to an adjustment for the increased labor wage rates paid by Botting over the course of construction.

3. The Government's position on the issue

The Government's position is that Botting is not entitled to an economic price adjustment under FAR 52.216-4 because the Government contends that Botting included a contingency in its sub-bid pricing for the escalation of base labor wage rates, and that by including such a contingency, Botting forfeited its right to adjustment for the increased labor wage rates paid by Botting over the course of construction.

4. Botting's response to the Government's position

The Government's position is based on a misinterpretation of the information reflected in Botting's sub-bid estimate and on pure speculation or misinformation about Botting's estimating process. Simply, the Government is incorrect in its assertion that Botting included a contingency in its sub-bid pricing for the escalation of base labor wage rates. Botting did not include a contingency for labor escalation.



COE_000033

The Government promised to compensate Botting for any increase in field installation labor it might incur. Botting relied on the Government's promise and accordingly submitted a sub-bid that was priced lower than it otherwise would have submitted had there been no EPA clause in the specifications.

During the life of the contract, Botting has incurred, and will continue to incur, additional labor costs due to wage rate escalation for which it has not been compensated but is due remuneration. The Government now is simply trying to avoid paying a just obligation that it created when it inserted the EPA clause into the specifications for the contract.

## C. <u>The History of Relevant Events</u>

### 1. <u>Botting's estimate and relevant Project events</u>

This is a twice-bid project. That is, the Project was bid once, but the bids were higher than the Government was able to, or at least wanted to, pay. Thus, the first set of bids was rejected. The Government went back to the drawing board, made several modifications to the contract requirements, and later re-bid the Project under a second solicitation. The subject contract was awarded subsequent to that second bid as it was then within the Government's budget.

Consequently, Botting submitted two separate sub-bids on the Project, under two different sets of specifications, since the Government had issued two separate solicitations. Botting submitted its first sub-bid on January 19, 2001 and its second sub-bid on December 11, 2001. Botting's first sub-bid included, in accordance with the specifications for that solicitation, a contingency for labor escalation. (Exhibit 2, Recap Sheets for original estimate[1]) Botting's second sub-bid, in accordance with the modified specifications for that solicitation and

[1] During the DCAA audit to establish the baseline for the wage escalation, Botting was not able to locate a copy of the first estimate. After further investigation, Botting only recently discovered this copy of its first estimate for the Project.

representations made by Government officials, did not include such a contingency. (Exhibit 3, Recap Sheets for second estimate)

When preparing its first sub-bid for the Project, Botting utilized its standard estimating software to develop its estimated cost for performing its proposed subcontract work on the Project. When estimating its labor cost, Botting developed its anticipated field installation manhours for the Project and then applied the baseline wage rate that it expected to pay at the beginning of the Project. Next, because the first solicitation did not contain an EPA clause and because Botting accordingly needed to include a contingency for wage escalation, Botting created six distinct estimate line items to account for the anticipated escalation of labor wage rates over the duration of construction. These estimate line items were labeled "ESCAL. 7/02-7/03" and "ESCAL. 7/03-7/04" respectively, and they were assigned code numbers 160 and 161 (for plumbing), 217 and 218 (for HVAC), and 274 and 275 (for process piping). In Botting's first sub-bid, these estimate line items included contingencies in the total amount of $306,575 for labor wage escalation.[2] This escalation was based upon the historical costs from the most recent union contract.

These historical costs were:

| | |
|---|---|
| 1998 to 1999 | $1.20 per hour |
| 1999 to 2000 | $1.24 per hour |
| 2000 to 2001 | 0 |

Historical costs were all that Botting had to use as a method of predicting future costs since the unions had not yet agreed to a new contract for the time period of the Project. Such was the case at the time Botting estimated both its first sub-bid and its second sub-bid for the Project. Accordingly, neither Botting nor the Government at either time knew exactly how much

[2] In its original estimate, Botting anticipated a project completion date of September, 2004. As a result, Botting's original estimate included escalation line items for only two years: 7/02-7/03 and 7/03-7/04. (Exhibit 2)



DE_000035

escalation would be applicable to the Project under either solicitation. As such, Botting reasonably based its first sub-bid estimate for field labor escalation costs for July 2002 to June 2003 at $1.25 per hour and for the period July 2003 to June 2004 at $2.50 per hour. Botting's $306,575 estimate in its first sub-bid was based upon a forward projection of what the past union contract had required.

When the Government elected to issue a second solicitation for the Project, the Government also elected to include an EPA clause in the revised solicitation, thereby taking on the risk of labor escalation and relieving Botting of that risk. The Government drafted its own modified version of FAR 52.216-4, which requires the Government to issue a price adjustment if the contractor's "rate of pay for labor (including fringe benefits)" increases during contract performance.

In addition to inserting an EPA clause into the second solicitation documents, the Government also highlighted the existence of the clause at the pre-bid conference on October 31, 2001. The program manager for the Project, Richard Hancock, conducted the pre-bid conference. Marie McDonald also provided information to bidders at the conference.

Ms. McDonald advised the bidders that there was an economic price adjustment in the contract documents stating: "We intend to award a firm fixed-price contract with an economic price adjustment under this solicitation." (Exhibit 4, Transcript, p. 26, l. 20-22) Ms. McDonald elaborated on the significance of the EPA clause stating:

> For price, we ask for a price breakdown from all offers. We will do an audit of the successful offer, and there are some detailed – the details that we would require to do the audits are in the solicitation. And the purpose of that audit is to establish a baseline for the economic price adjustment to establish the Davis-Bacon rates that you are using to formulate your price. And this will be used to determine the future economic price adjustments as those Davis-Bacon rates change over the life of the contract. There are –

> Clause 52.216-4 in the solicitation gives you all the details about the economic price adjustment and how that will be administered. And of course if you have any questions about that, please ask them today or submit a written question to us.
>
> MR. HANCOCK added: Just to talk about that just a little bit more, the economic price adjustment clause is new. It wasn't in our previous solicitation. What that – the intent of that is to allow contractors to bid competitively for labor rates initially, with the understanding that **if rates increase in the future, that he will have a mechanism for getting additional funds to cover those increases in labor costs.** That way when you have a five-year duration project or four-year duration project, you don't have to try to project out for anticipated increases. **You have a mechanism built into the contract to get paid for increases in labor.**" (emphasis added)

(Exhibit 4, Transcript, p. 29, l. 9-25; p. 30, l. 1-10)

Based on the existence of the EPA clause in the second solicitation contract specifications and on the representations of the Government at the pre-bid conference, Botting reasonably concluded that it did not have the responsibility to estimate the amount of wage rate escalation it would incur on the Project. Accordingly, Botting did not include a contingency for wage rate escalation in its second sub-bid.

On the morning of the day that the second sub-bid was due, Mr. Pete Botting, then the president of Botting, began working with the bid team to finalize the second sub-bid. The estimating team had not created new bid sheets when preparing for the second sub-bid. Instead they used the computer model from the first sub-bid and adjusted costs up or down as required by the modified terms of the second bid solicitation. In his review, Mr. Botting saw that sheet No. 7 of the computer model, which includes "Other Direct Job Costs" ("ODJC"), had already been finalized by the estimating team and the amounts had been carried forward from sheet No. 7 to sheet No. 1, the final bid sheet. ODJC is the line item where Botting normally includes its cost estimate for general conditions items, as well as for certain specialty items such as

supervisor per diem, supervisor travel allowance, premium for the cost of supervisors not available in the Fairbanks area, and the like.

When Mr. Botting reviewed the estimating team's worksheets he determined that the amount listed in the estimate for ODJC still did not, in his estimation, have sufficient costs for specialized personnel for supervision and management of the Project, even though due to increased time required to complete the Project and other reasons, the ODJC amount had been increased from the $3,087,893.00 in the first sub-bid bid to $4,171,996.00 in the second sub-bid.[3] Because of the limited labor market in Fairbanks, Mr. Botting anticipated that Botting would need to bring in from the lower states certain specialized personnel for supervision and management of the Project. These specialized personnel would demand higher than scale wage rates and would also require incidental costs (such as travel expenses, subsistence, etc.).

Mr. Botting accordingly instructed his estimating team to add between $300,000 and $400,000 to the sub-bid for these costs. Mr. Botting also found that sheets 3, 4 and 5 of Botting's computer model still included the $306,575.00 amount that had been included in the first sub-bid. Those line items were titled "ESCAL" and were for the 2003 and 2004 periods. Mr. Botting and the team discussed that the amounts in those line items were no longer needed because of the EPA clause in the second solicitation and should therefore be reduced to zero.

Because of time constraints in the final bid preparations, and the fact that Botting had been having trouble with its bidding program carrying forward sheet No. 7 items on prior jobs, the estimating team decided to include these specialized personnel costs in the ESCAL bid line items rather than attempt to create new line items. This was done by adding manhours to the ESCAL items and by leaving the prior rates of $1.25 and $2.50 in the worksheet, which then

[3] One reason for the increase in ODJC costs in the second estimate is the fact that Botting anticipated a completion date in May, 2006, which resulted in a longer contract duration than originally contemplated in the first estimate.



SOE_000038

spread the cost throughout the recap sheets in bid items 160, 161, 217, 218, 274, and 275. The total amount included in these bid items was $315,151.00. Accordingly, the $306,575.00 labor escalation that had been included in the first sub-bid was eliminated and the amount of $315,151.00 was added to the second sub-bid to take care of Mr. Botting's desire to increase the budget for ODJC type of costs. The estimating team did not change the labels of "ESCAL" due to lack of time.

In the end, Botting's pricing for the second sub-bid did not include a contingency for escalation of the labor wage rates over the course of construction. Botting expected to receive an economic price adjustment as compensation for any such escalation, based on FAR 52.216-4.

In accordance with Mr. Botting's bid day instructions, when Botting personnel set up the budget after having been awarded a subcontract on the Project, they did not set up a labor escalation contingency budget item. The budget instead, as was the intent on bid day, reflected an amount to pay the cost of such specialty cost items as supervisor per diem, supervisor travel allowance, premium for the cost of supervisors not available in the Fairbanks area, and the like. (Exhibit 5) Monthly job cost reports throughout the life of the Project identify and measure the performance of these cost items. Further, the hourly labor cost which was included in the first sub-bid was a blended rate of $51.67 per hour, including the $306,575.00 for escalation. The second sub-bid resulted in a blended rate of $50.59 per hour and did not include any cost for escalation, but did include a cost of $315,151.00 per hour for specialized labor, per diem, and the like. When those costs were removed to their proper budget cost category, the hourly rate on the second sub-bid computes to $49.17 per hour.

2. <u>The Government received timely notice of the economic price adjustment</u>

Botting began construction in May 2002. On May 15, 2002, Dick Pacific notified the Government that an adjustment was due under the EPA clause due to labor wage rate increases, receipt of which the Government acknowledged. (Exhibit 6)

3. <u>Botting provided the required information for audit of its labor costs</u>

On August 6, 2002, Botting transmitted to Dick Pacific the information supporting its wage escalation, including its estimate and its by then negotiated Labor Agreement with the Local 375. (Exhibit 7) The purpose of this information was to provide the Government and the DCAA the information to establish the baseline for any future wage escalation that may occur on the Project.

On May 8, 2003, Botting again provided notice to Dick Pacific that the wages for directly employed plumbers and steam fitters were escalating in accordance with the union agreement and that Botting expected to receive an economic price adjustment due to the escalation. (Exhibit 8) At that time, the estimated escalation cost was $430,000 (or $2.15 per hour for 200,000 hours).

On December 15, 2003, Botting provided updated price adjustment information to Dick Pacific, as requested by the Government. The revised amount for the EPA adjustment was stated at $980,947.25, which covered two separate wage escalation periods. (Exhibit 9) Botting advised that it believed it had submitted all the required information to process the adjustment request. Botting later made an adjustment and resubmitted the information on December 23, 2003, showing the revised amount of $942,628.05. (Exhibit 10)

On March 12, 2004, Botting advised Dick Pacific of Botting's serious concern that the Government was failing to proceed with the EPA adjustments in a timely fashion. Botting



COE_000040

requested that immediate action be taken by the Government to address the lack of adjustment for the wage escalation. (Exhibit 11)

On July 7, 2004, Botting again provided the Government with an additional copy of information previously furnished. (Exhibit 12) Botting also advised that they expected the Government to quit stalling and to process their adjustment as soon as possible.

On July 9, 2004, the DCAA requested that Botting provide baseline labor and hours by category. On July 19, 2004, Botting provided the requested information. (Exhibit 13) The following day, the DCAA acknowledged that the information provided answered the questions posed by the DCAA on July 9th. (Exhibit 14)

During this entire audit process, there were a number of conversations between Botting and the Government or its auditors. The Government raised questions about the bid items in Botting's estimate that were labeled "ESCAL." Botting advised the Government on more than one occasion that these costs relate to specialized personnel hired from outside the local area who command a higher pay rate and other incidental costs like subsistence costs. Botting advised that the amounts in the "ESCAL" rows did not include any contingency for wage rate escalation.

Botting then attended a partnering meeting in July 2004, at which time the Government again acknowledged that it had received all the necessary information from Botting to evaluate the price adjustment. The Government stated that it would only take a couple of weeks and that there was no need to tie Botting's adjustment to any other contractor's adjustments (who may not have provided the necessary information at that point in time). Botting fully expected to receive a change order for its wage escalation costs by the end of August 2004.

4. <u>The Government improperly denied Botting's request for price adjustment</u>

Rather than issuing the expected adjustment, the Government issued a letter on August 19, 2004 denying Botting's request for a price adjustment under the EPA. The Government argued that Botting had included a contingency in its estimate for wage rate escalation in six separate bid items. The Government argued that the contingency resulted in a duplication of escalation costs if an adjustment were made by the Government. (Exhibit 15) At that time, the Government did not deny the request entirely. Rather, the Government asked Botting to explain any duplication and to adjust its request to eliminate any potential duplication. The Government did not take the position that Botting had completely forfeited its right to a price adjustment.

Botting responded to the Government's contentions on August 24, 2004. (Exhibit 16) Botting again advised the Government that the Government had misinterpreted the information in the estimate. Botting again advised that the bid items for "ESCAL" were actually additional costs for specialized personnel that Botting anticipated needing for the Project. These costs relate to personnel hired from outside the local area who command a higher pay rate and other incidental costs like subsistence costs. Botting specifically advised that the "ESCAL" bid items did not include any contingency for wage escalation of field tradespeople.[4]

On October 26, 2004, the Government advised Dick Pacific that it would not proceed with an economic price adjustment for Botting because the Government believed that Botting had included a labor escalation contingency in its estimate for the Project. (Exhibit 17)

[4] If Botting had intended to include a labor escalation contingency in its second estimate, the "ESCAL" line items would have been incomplete because the second estimate contemplated work performed in 2005 and 2006. However, the "ESCAL" line items—which were simply remnants of the earlier estimate—only referenced 2003 and 2004, as was originally anticipated in the first estimate.

5. <u>Botting incurred additional labor costs due to wage escalation</u>

Botting's estimate for labor included in its second sub-bid was based on the wage rate in effect at the time of submitting that sub-bid to Dick Pacific, just as instructed by the specifications. Botting did not include any contingency in its estimate for wage rate increases of field tradespeople during the course of construction. However, Botting has or will experience the following wage rate escalations by the end of this Project:

| | | |
|---|---|---|
| July 1, 2001 to July 1, 2002: | $ 4,858.89 | |
| July 1, 2002 to July 1, 2003: | $ 221,241.49 | |
| July 1, 2003 to July 1, 2004: | $ 744,859.20 | |
| July 1, 2004 to December 24, 2004: | $ 253,306.46 | |
| December 27, 2004 to July 1, 2005: | $ 248,000.00 | (estimated) |
| July 1, 2005 to December 1, 2006: | $ 19,840.00 | (estimated) |
| TOTAL ESCALATION COST: | $1,492,106.05 | |

(Exhibit 18) These amounts are based on Botting's union agreements, which call for annual increases in wage rates. These agreements specify the following increases from the base wage rate that Botting used when bidding the project:

| | |
|---|---|
| July 1, 2001 to July 1, 2002: | $ 2.15 per hour over base rate |
| July 1, 2002 to July 1, 2003: | $ 4.90 per hour over base rate |
| July 1, 2003 to July 1, 2004: | $ 7.90 per hour over base rate |
| July 1, 2004 to July 1, 2005: | $10.90 per hour over base rate |
| July 1, 2005 to July 1, 2006: | $12.40 per hour over base rate |

(Exhibit 19)

Botting has financed a significant portion of this additional cost to date, and if proper adjustment is not made as required by the contract, Botting will have to finance this entire cost, despite the fact that the EPA clause clearly provides for a price adjustment to Botting's contract and despite the fact that, in reliance on the Government's specifications and pre-bid representations, Botting reasonably did not include a wage rate escalation contingency in its bid.

## III. ENTITLEMENT

"EPA provisions in government contracts serve an important purpose, protecting both parties from certain specified contingencies." Transportes Especiales de Automoviles, S.A., ASBCA No. 43,851, 93-2 BCA ¶ 25,745. Under an EPA clause, the contractor is entitled to an adjustment in the contract price if the established baseline price increases during the course of performance. Hettich and Co., GmbH, ASBCA No. 29072, 86-3 BCA ¶ 19043. Where the Government has inserted an EPA clause to cover labor wage rate escalation, then the contractor is entitled to a price adjustment to the extent of the increase in the base wage rate. Id.

In this case, the EPA clause is clear and unambiguous. Botting is entitled to an economic price adjustment because its baseline labor cost has increased over the course of construction.

The only basis on which the Government denies Botting's requested adjustment is the unsupported allegation that Botting inserted a contingency in its estimate for escalation of wage rates. The Government contends that Botting thereby breached the EPA clause and is barred from seeking a price adjustment.

The Government bears the burden of proving that Botting actually included a contingency in its estimate for wage rate escalation. Fermont Div., Dynamics Corp., ASBCA No. 21,949, 79-1 BCA ¶ 13,774. The Government cannot meet its burden. There is simply no

evidence that Botting included such a contingency for field tradespeople wage escalation in its sub-bid. To the contrary, there is clear evidence that Botting's intention at bid time was to include in its sub-bid only an amount to cover the costs needed for specialized personnel that Botting anticipated needing for the Project. Further, when Botting set up its budget for the Project, it included the amounts that the Government cites to into the budget items for specialized personnel costs, not into field labor costs. Then when Botting charged its incurred costs into its job cost accounting throughout the life of the Project, it charged the costs of specialized personnel into the specialized personnel cost items, not into the field labor cost codes. Botting's contemporary actions provide clear evidence as to its intentions when bidding the Project. Lincoln Elec. Co. v. St. Paul Fire and Marine Ins. Co., 210 F.3d 679, 686-87 (6th Cir. 2000) (course of conduct evidence is used to establish a contracting party's intent). The Government is relying solely on speculation and a misinterpretation of the data in Botting's estimate. Without any evidence to contradict Botting's evidence of the content of its estimate, the Government's denial of the price adjustment fails.

This is a twice-bid project. The Government received the first set of bids on the Project but did not award a contract on those bids. The Government wanted to construct the Project, however, and worked hard to get it within budget. The Government performed some re-design and changed some specifications in an effort to save money. One of the specifications that the Government changed in its effort to reduce the amounts that contractors might bid in a second round of bidding was to put into the specifications an EPA clause. The EPA clause provided that the Government would reimburse the bidding contractors for any wage escalation they might encounter during the life of the Project. The EPA clause assured bidders that they would not have to make a guess at what they would be paying for labor some one to four years out in the

future. The EPA clause was not only written into the specifications but was specifically called to the bidders' attention and described by the Government (twice) at the pre-bid meeting held prior to the second bid letting. The contractors were specifically advised that they would not have to include any contingency in their bids for labor escalation like they had done in the first round of bidding, since the Government had elected to take on that risk.

Relying on the Government's representation and the plain meaning of the EPA clause, Botting did not include such a contingency in its second sub-bid. Botting's second sub-bid, then, was lower than it would have otherwise been.

The Government got what it was seeking—a lower Project cost. The Government saved the money it needed to in order to be within budget and it awarded a contract subsequent to the second round of bidding. Now, some four years after receiving the benefit that it bargained for, the Government is trying to get out of paying the burden that it promised to bear. The contract and the law do not allow such actions by the Government. Hettich and Co., GmbH, ASBCA No. 29072, 86-3 BCA ¶ 19043. The final cost may be more than the Government estimated. The current contract administrators for the Government may not have participated in the decision to include the EPA clause in the bidding documents or may not have wanted to include such a specification. There may be some other reason for the denial. Botting does not know what is in the Government's mind. All Botting knows is what was in its mind—that its sub-bid price was lower than it would have otherwise been and that it acted just as it was advised to do in reliance on the Government's promise. Now Botting is being told that it will not be compensated as promised.

Botting has borne the burden of compensating its field labor crew at higher and higher rates than it was instructed to, and did, include in its sub-bid. Botting is being forced by the

Government's inaction to fund the job out of its own pocket. Government contracting should not be that unfair. Southern California Edison v. United States, 58 Fed.Cl. 313, 325 (2003) (Government owes a duty of good faith and fair dealing in its contracts). The Government may not break its promises nor breach its contracts without consequence. The specifications provide that Botting is to be compensated for its field labor cost increases and Botting should be compensated right away. Government officials committed that the Government would timely provide such compensation. Botting relied on the Government, did its part, and now it deserves to be reimbursed. Cibinic & Nash, Administration of Government Contracts, at 250-251 (3d ed. 1995) (stating that the Government is liable if its statements or representations to contractors are not correct or are misleading).

## IV. DAMAGES

Botting has experienced, and continues to experience, a significant escalation in the wage rates of field tradespeople over the course of construction, for which the Government has wrongfully refused to compensate Botting. Botting has expended to date the amount of $1,224,226.05 and anticipates that it will incur an additional $267,840.00, all of which is compensable. Botting is therefore entitled to an economic price adjustment to its contract in the amount of $1,492,106.05 or such amount as may actually be expended on the Project.

## V. CONCLUSION

A. Request for an Economic Price Adjustment in the Amount of $1,492,106.05

In accordance with the contract and because of the showing it has made herein, Botting hereby requests that an economic price adjustment to its subcontract be issued in the amount of

$1,492,106.05 or such amount as may actually be expended on the Project, as compensation for the escalation of labor wage rates encountered by or anticipated by Botting over the course of construction. As noted above, this request includes only the direct cost of labor wage rate increases and does not include any indirect costs, mark-up, inefficiency costs, or extended duration costs.

B. <u>Request for a Contracting Officer's Decision</u>

Botting hereby asks Dick Pacific to request that a Contracting Officer's decision be rendered immediately which finds entitlement and directs the issuance of an economic price adjustment to the contract in the amount of $1,492,106.05, or such amount as may actually be expended on the Project.

the Administrative Contracting Officer (ACO) within 30 days.

(2) The Contractor shall also notify the ACO within 30 days whenever changes to asset valuations or any other cost changes have occurred or are certain to occur as a result of a change in ownership.

(b) The Contractor shall–

(1) Maintain current, accurate, and complete inventory records of assets and their costs;

(2) Provide the ACO or designated representative ready access to the records upon request;

(3) Ensure that all individual and grouped assets, their capitalized values, accumulated depreciation or amortization, and remaining useful lives are identified accurately before and after each of the Contractor's ownership changes; and

(4) Retain and continue to maintain depreciation and amortization schedules based on the asset records maintained before each Contractor ownership change.

The Contractor shall include the substance of this clause in all subcontracts under this contract that meet the applicability requirement of FAR 15.408(k).

(End of clause)

52.216-4 ECONOMIC PRICE ADJUSTMENT--LABOR AND MATERIAL (JAN 1997)

(a) The Contractor shall notify the Contracting Officer if, at any time during contract performance, the rate of pay for labor (including fringe benefits) in the Schedule either increases or decreases. The Contractor shall furnish this notice within 60 days after the increase or decrease, or within any additional period that the Contracting Officer may approve in writing, but not later than the date of final payment under this contract. The notice shall include the Contractor's proposal for an adjustment in the contract unit prices to be negotiated under paragraph (b) of this clause, and shall include, in the form required by the Contracting Officer, supporting data explaining the cause, effective date, and amount of the increase or decrease and the amount of the Contractor's adjustment proposal.

(b) Promptly after the Contracting Officer receives the notice and data under paragraph (a) of this clause, the Contracting Officer and the Contractor shall negotiate a price adjustment in the contract unit prices and its effective date. However, the Contracting Officer may postpone the negotiations until an accumulation of increases and decreases in the labor rates (including fringe benefits) and unit prices of material shown in the Schedule results in an adjustment allowable under subparagraph (c)(3) of this clause. The Contracting Officer shall modify this contract (1) to include the price adjustment and its effective date and (2) to revise the labor rates (including fringe benefits) as shown in the Schedule to reflect the increases or decreases resulting from the adjustment. The Contractor shall continue performance pending agreement on, or determination of, any adjustment and its effective date.

(c) Any price adjustment under this clause is subject to the following limitations:

(1) Any adjustment shall be limited to the effect on unit prices of the increases or decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) Changes in rates or unit prices other than those shown in the Schedule, or (ii) Changes in the quantities of labor of those established in the baseline pre-award audit.

(2) No upward adjustment shall apply to supplies or services that are required to be delivered or performed before the effective date of the adjustment, unless the Contractor's failure to deliver or perform according to the delivery schedule results from causes beyond the Contractor's control and without its fault or negligence, within the meaning of the Default clause.

(3) There shall be no adjustment for any change in rates of pay for labor (including fringe benefits) which would not result in a net change of at least 0.5 percent of the then-current total contract price. This limitation shall not apply,



CGE_000052

however, if, after final delivery of all contract line items, either party requests an adjustment under paragraph (b) of this clause.

(4) The aggregate of the increases or decreases in any contract unit price made under this clause shall not exceed 10 percent of the original unit price.

(d) The Contracting Officer may examine the Contractor's books, records, and other supporting data relevant to the cost of labor (including fringe benefits) and material during all reasonable times until the end of 3 years after the date of final payment under this contract or the time periods specified in Subpart 4.7 of the Federal Acquisition Regulation (FAR), whichever is earlier.

52.217-7 OPTION FOR INCREASED QUANTITY--SEPARATELY PRICED LINE ITEM (MAR 1989)

The Government may require the delivery of the numbered line items 0003 through 0007, identified in the Schedule as an option item, in the quantity and at the price stated in the Schedule. The Contracting Officer may exercise the option by written notice to the Contractor within 3 calendar years of the contractor receiving the notice to proceed with work on the project. Optional items awarded shall be completed within the time period for completion of the base items, as stated in SCR-1. Delivery of added items shall continue at the same rate that like items are called for under the contract, unless the parties otherwise agree.

(End of clause)

52.219-4 NOTICE OF PRICE EVALUATION PREFERENCE FOR HUBZONE SMALL BUSINESS CONCERNS (JAN 1999)

(a) Definition. HUBZone small business concern, as used in this clause, means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration.

(b) Evaluation preference. (1) Offers will be evaluated by adding a factor of 10 percent to the price of all offers, except--

(i) Offers from HUBZone small business concerns that have not waived the evaluation preference;

(ii) Otherwise successful offers from small business concerns;

(iii) Otherwise successful offers of eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded (see 25.402 of the Federal Acquisition Regulation (FAR)); and

(iv) Otherwise successful offers where application of the factor would be inconsistent with a Memorandum of Understanding or other international agreement with a foreign government.

(2) The factor of 10 percent shall be applied on a line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation shall be applied before application of the factor.

(3) A concern that is both a HUBZone small business concern and a small disadvantaged business concern will receive the benefit of both the HUBZone small business price evaluation preference and the small disadvantaged business price evaluation adjustment (see FAR clause 52.219-23). Each applicable price evaluation preference or adjustment shall be calculated independently against an offeror's base offer.

These individual preference amounts shall be added together to arrive at the total evaluated price for that offer.