IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company, Plaintiff, | No. 05-462C |
| vs. | (Judge Baskir) |
| UNITED STATES OF AMERICA, Defendant. | |

**AFFIDAVIT OF ROBERT H. CRICK IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

STATE OF WASHINGTON)
: ss.
County of Spokane )

ROBERT H. CRICK, being first duly sworn on oath, deposes and states as follows:

1. I am counsel for plaintiff in the above named matter, have first-hand knowledge of the matters set forth in this Affidavit, and am competent to testify thereto.

2. Attached as Exhibit A is a true and correct copy of Findings of Fact and Contracting Officer's Decision dated March 11, 2005, regarding Botting's EPA Wage Escalation Claim.

3. Attached as Exhibit B is a true and correct copy of minutes of the Pre-Bid Conference taken October 31, 2001.

4. Attached as Exhibit C are true and correct copies of Pages 1, 18, 19, 21, and 36 from the deposition of Claudette McDonald, taken on January 31, 2006 in this matter.

5. Attached as Exhibit D is a true and correct copy of FAR 52.216-4.

6. Attached as Exhibit E are true and correct copies of Pages 1, 18, 19, 56, 57, 60, 61, 68, 69, 82 and 83 from the deposition of Kevin Williams, taken on March 30, 2006 in this matter.

7. Attached as Exhibit F are true and correct copies of Pages 1, and 18-21 from the deposition of Ken Larson, taken on January 30, 2006 in this matter.

ROBERT H. CRICK
Attorney for Plaintiff

SUBSCRIBED AND SWORN to before me this 29th day of June, 2006.

EMILY B. HAMILTON
COMMISSION EXPIRES
NOTARY
PUBLIC
JULY 29, 2007
STATE OF WASHINGTON

Notary Public in and for the State of Washington, residing at Greenacres
My appointment expires: 7-29-07

CERTIFICATE OF FILING

I hereby certify that on this 29th day of June, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

//s//

ROBERT H. CRICK
1900 Bank of America Financial Center
601 West Riverside Avenue
Spokane, WA 99201
(509) 838-6131 telephone
(509) 838-1416 facsimile

DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 6898
ELMENDORF AFB, ALASKA 99506-6898

REPLY TO ATTENTION OF:

RECEIVED

MAR 1 6 2005

DICK PACIFIC/GHEMM, JV

**CERTIFIED MAIL**

March 11, 2005

Office of Counsel

(FTW171B-2130)

Ronald Young, Project Executive
Dick Pacific/GHEMM, JV
P.O. Box 35490
Fort Wainwright, AK 99703-0490

Re: Contract DACA85-02-C-0004, EPA Wage Escalation Claim for Botting (Case 83)

Dear Mr. Young:

Enclosed are my Findings of Fact and Contracting Officer's Decision (COD) regarding your claim for EPA Wage Escalation Claim for Botting (Case 83), DACA85-02-C-0004, Bassett Hospital Replacement, Fort Wainwright, Alaska.

If you have any questions about the enclosed COD, please contact Mr. Gregory Vanagel of our Office of Counsel at (907) 753-2532.

Sincerely,

Claudette M. McDonald
Contracting Officer

Enclosure

- [ ] PROJECT EXECUTIVE
- [ ] SUPERINTENDENT
- [ ] QC MANAGER
- [ ] MEP MANAGER
- [ ] SAFETY MANAGER
- [ ] CONTRACT ADMIN.
- [ ] SCHEDULER
- [ ] SR. PROJECT ENGINEER
- [ ] OFFICE MANAGER
- [ ] JV EXECUTIVE COMMITTEE
- [ ] OTHER
- [ ] OTHER 00042

WAB 0171

EXHIBIT A

# FINDINGS OF FACT TO ACCOMPANY CONTRACTING OFFICER'S DECISION

## Case 83, W.A Botting – EPA Wage Escalation Claim

**CONTRACT NUMBER:** DACA85-02-C-0004

**NAME AND ADDRESS OF CONTRACTOR:** Dick Pacific/GHEMM JV.
P.O. Box 35490
Ft. Wainwright, AK 99703-0490

**DATE OF CONTRACT:** 19 February 2002

**CONTRACT DESCRIPTION:** Bassett Hospital Replacement
Ft. Wainwright, Alaska

Construct a 32-bed, approximately 25,000 square meter multi-story replacement hospital to support the military, dependent and retiree population of Fort Wainwright, Fort Greely, Eielson AFB, and remote military sites north of the Alaska range. The project includes health care facilities for internal medicine, general surgery, EENT, orthopedics and gynecology, pediatrics and family practice. Other departments include emergency services, radiology, pathology, food service, physical therapy, pharmacy, labor and delivery, dental treatment, and staff administration. The work includes construction of the facility including offices, briefing rooms, storage, maintenance areas, restrooms, shower rooms, life support, mechanical rooms, landscaping, parking lots and site utilities.

**ORIGINAL CONTRACT AMOUNT:** $178,289,000.00

**AMOUNT OF DISPUTE:** $1,566,711.37

**THE DISPUTE:**

Prime contractor, Dick Pacific/Ghemm, JV (DPG) submitted a claim on behalf of their mechanical subcontractor W.A. Botting Company (Botting). Botting contends entitlement to an economic price adjustment for labor in the amount of $1,492,106.05. Botting contends this amount represents escalation of labor wage rates encountered to date and anticipated to be encountered in the future. DPG has added a 5% administration fee bringing the total claim to $1,566,711.37.

. The Government contends Botting included a contingency for labor escalation in their bid estimate for work under this contract and is therefore precluded from an economic price adjustment (EPA) under FAR 52.216-4, Economic Price Adjustment—Labor and Material.

**PERTINENT CORRESPONDENCE:**

1. Reserved
2. Reserved
3. Contractor Serial Letter No. 75-2600-00009-01227, dated January 3, 2005.
4. Government Serial Letter No. FTW171B-1940, dated October 26, 2004.
5. Contractor Serial letter No. 75-2600-00009-01059, dated September 20, 2004.
6. Government Serial Letter No. FTW171B-1870, dated September 3, 2004.
7. Contractor Serial Letter No. 75-2600-00009-01038, dated August 26, 2004.
8. Government Serial Letter No. FTW171B-1847, dated August 19, 2004.
9. W.A. Botting Unserialized Letter to DCAA, dated July 19, 2004.
10. Contractor Serial Letter No. 75-2600-00009-00954, dated July 8, 2004.
11. Government Serial Letter No. FTW171B-1745, dated July 1, 2004.
12. Contractor Serial Letter No. 75-2600-0009-00947, dated June 28, 2004.
13. Government Serial Letter No. FTW171B-1723, dated June 23, 2004.
14. Contractor Serial Letter No. 75-2600-00009-00680, dated December 30, 2003.
15. Contractor Serial Letter No. 75-2600-00009-00664, dated December 16, 2003.
16. Government Serial Letter No. FTW171-1238, dated November 24, 2003.
17. Contractor Serial Letter No. 75-2600-00009-00462, dated May 8, 2003.
18. Contractor Serial Letter No. 75-2600-00009-00165, dated August 13, 2002.
19. Government Serial Letter No. FTW171B-126, dated July 17, 2002.

20. Contractor Serial Letter No. 001, dated March 4, 2002.

**PERTINENT CONTRACT CLAUSES AND SPECIFICATIONS:**

21. Federal Acquisition Regulation (FAR) 16.203, Fixed-Price Contracts with Economic Price Adjustment.

22. Federal Acquisition Regulation (FAR) 22.401, Definitions.

23. Federal Acquisition Regulation (FAR) 52.216-4, Economic Price Adjustment—Labor and Material (Jan 1997)

24. Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES (Dec 1998).

25. Solicitation, Offer and Award (SF1442), dated 19 February 2002 and attached Proposal Schedule

26. Contract Section 0100, Instructions, Conditions and Notice to Offerors; Paragraph 13, Volume III Price Proposal.

27. Contract Section 0700A, Davis-Bacon General Wage Decision Nos. AK010001 and AK010006, dated 10/19/01.

**PERTINENT CONTRACT DRAWINGS:**

None.

**OTHER PERTINENT DOCUMENTS:**

28. Memorandum for Record, dated 4 November 2004.

29. Electronic mail (email) message from Kevin Williams (DCAA) to John Solem (Botting), dated July 9, 2004; Subject: Receipt of W.A. Botting Information.

30. Electronic mail (email) message from Kevin Williams (DCAA) to John Solem (Botting), dated June 29, 2004; Subject: W.A. Botting Baseline Audit Request.

31. Dick Pacific/Ghemm Subcontract Agreements with W.A. Botting Company, dated May 16, 2002.

32. W.A. Botting Bid Estimate, printed 2/21/02.

33. Transcript of Pre-Bid Conference on October 31, 2001.

**FINDINGS OF FACT:**

The Government entered into a contract with Dick Pacific/Ghemm JV (DPG) on February 19, 2002 to construct the Bassett Hospital Replacement on Fort Wainwright, Alaska. Notice to Proceed was issued on March 14, 2002 and the original contract completion date was June 17, 2006.

The Government had issued two solicitations for this project. The first solicitation was for a normal firm fixed-price contract and did not contain an economic price adjustment clause. Due to the high prices received from the offerors, the first solicitation was cancelled. In the second solicitation, the contract type was revised to a fixed-price contract with an economic price adjustment for labor. CLIN 0011 of the Proposal Schedule included in the solicitation and the awarded contract states:

> Base line items 0001 and 0002 are subject to clause 52.216-4, Economic Price Adjustment—Labor and Material. Established labor rates and fringes as set forth for laborers and mechanics in Davis-Bacon General Wage Decision Number AK010001 and AK010006, dated 10/19/01, in section 0700A are subject to Adjustment. The quantities of labor allocable to each line item shall be established during the pre-award DCAA audit. Government evaluated EPA adjustments will be reflected as sub-line item under 0011 after contract award.

Per FAR 22.401, "laborers or mechanics" includes workers whose duties are manual or physical in nature, as distinguished from mental or managerial; apprentices and trainees; working foremen and any person performing the duties of laborer or mechanic regardless of any contractual relationship alleged to exist between the contractor and the individual.

Contract Section 0100, Instructions, Conditions and Notice to Offerors, Paragraph 13, Volume III Price Proposal, advises the contractor that cost information will be required in order to assist the Defense Contract Audit Agency (DCAA) in the establishment of a baseline quantity of labor for future economic price adjustments. Paragraph 13.A.3, Subcontracts and Other Direct Costs, extends the requirement for a labor breakdown to subcontractors.

FAR 52.216-4, Economic Price Adjustment—Labor and Material is included in the contract. Per paragraph (c)(1):

> Any adjustment shall be limited to the effect on unit prices of the increases and decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) Changes in rates or unit prices other than those shown in the Schedule, or (ii) Changes in the quantities of labor of those established in the baseline pre-award audit.

FAR 16.203, Fixed-Price Contracts with Economic Price Adjustment, is the prescription for FAR 52.216-4 and provides guidance regarding the contracting officer's administration of fixed-price contracts with EPA clauses. FAR 16.203-2(a) states:

> In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

A pre-bid conference was held on October 31, 2001 and the EPA clause was discussed (page 29-30 of transcript). As indicated by the Government, "the intent of that [the inclusion of the EPA clause] is to allow contractors to bid competitively for labor rates initially, with the understanding that if rates increase in the future, that he will have a mechanism for getting additional funds to cover those increases in labor costs. That way when you have a five-year duration project or a four-year duration project, you don't have to try to project out for anticipated increases.".

. The contract was awarded on February 19, 2002. At that point, a pre-award audit to establish a labor quantity baseline had not been completed. On March 4, 2002, in Serial Letter No. 001, the contractor advised the Government that they were still in the process of finalizing subcontract agreements and were unable to "complete this part of the audited items". To allow notice to proceed on the contract, DPG indicated they would submit cost information for subcontractors prior to starting any subcontracting activities. As an example, DPG stated that "we would not start any mechanical work until cost information on the mechanical sub is submitted". Contract notice to proceed was issued on March 14, 2002.

On May 16, 2002, DPG and Botting entered into their initial subcontract for mechanical work from contract notice to proceed (NTP) through 2/28/03 (the first construction season). A separate subcontract agreement for Phase 2, 11/14/03 through project completion, was also dated May 16, 2002. Their scope of work included firestopping, duct fire protection, seismic protection, fuel storage systems, welding pressure piping, thermal insulation, plumbing, hot-water heating systems, steam generating system, refrigerated air conditioning system, air supply-ventilation-exhaust systems, testing and balancing, and commissioning. No cost information for the audit of Botting was submitted at that time.

In Serial Letter No. FTW171B-126, dated July 17, 2002, the Government advised DPG that all subcontracts in excess of $500,000 would be audited to determine the quantities of labor subject to EPA. In response, DPG Serial Letter No. 75-2600-00009-00165, dated August 13, 2002, forwarded some initial audit cost information for Botting. The documents provided were the summary sheets from Botting's bid day labor estimate and the Plumbers and Pipefitters Local 375 Labor Agreement for 1997-2002.

On May 8, 2003, in Serial Letter No. 75-2600-00009-00462, DPG forwarded a notice of wage escalation from Botting. Botting indicated a wage increase of $2.15/hour for an estimated 200,000 plumber and steam fitter labor hours or an estimated $430,000.00 increase to the contract amount.

In Serial Letter No. FTW171B-1238, dated November 24, 2003, Botting was advised that DCAA considered the information submitted by Botting to be sufficient to start the process of establishing baseline labor rates and quantities for adjustment under the EPA clause. DPG Serial Letter No. 75-2600-0009-00664, dated December 16, 2003, forwarded a letter from Botting in which Botting revised their estimated labor wage increase to $980,947.02 and also misconstrued the Government's previous letter as indicating that the information submitted to date was sufficient to *complete* the EPA process. DPG Serial Letter No. 75-2600-00009-00680 (December 30, 2003) forwarded a corrected EPA estimate from Botting in the amount of $942,628.05.

On or about May 19, 2004, DCAA had an entrance conference with Botting regarding their labor audit. DCAA requested access to Botting's complete bid to include lower-tier subcontractor bid documents. On June 23, 2004, the Government advised DPG that several contractors, including Botting, had not responded to DCAA's requests for information. On June 28, 2004, DPG requested that the Government either confirm completion of Botting's audit or send a copy of the outstanding information. In response, DCAA sent an email to Botting on June 29, 2004 and reiterated their request that Botting provide baseline labor hours and rates by labor category for verification against their bid estimate.

Government Serial Letter No. FTW171B-1745, dated July 1, 2004, formally recapped discussions between DCAA and Botting and advised that Botting had still not provided their

local scale, as well as an allowance for food, housing, and the like". Botting maintained that "there was no allowance for escalation included in WAB's bid".

On September 3, 2004, the Government asked Botting to identify the "specialized" labor positions they intended to hire from outside the local area and to provide the calculations to support the additional costs they were estimating.

Botting responded under cover of DPG Serial Letter No. 75-2600-0009-01059, dated September 20, 2004, and indicated that "the amount included within the bid for such costs was a lump sum estimate, based upon years of experience working in the industry and in remote and sparsely populated locations". Botting alleged that examples of the costs are "the additional wages paid to supervisory and other personnel imported from Seattle and Anchorage and other locations, the cost to house and feed those individuals, the cost of transporting them back and forth between their home base and the jobsite, and other similar costs associated with remote locations". Botting stated that the total estimate for these costs was $676,751.00.

A teleconference to discuss the issue of escalation was held on October 4, 2004. Participants included DPG, Botting, counsel for Botting, DCAA and the COE. Mr. Pete Botting alleged that the costs entered under the ESCAL line items represented an amount intended to compensate for an underestimation of the amount required to hire specialized personnel from outside the local area as well as an allowance for subsistence. Mr. Botting alleged that an additional amount of approximately $380,000 had to be incorporated into their bid just as the bid was being finalized for submission. According to Mr. Botting, this amount should have been incorporated into the Other Direct Job Costs (ODJC) but they were unable to make the entries into that estimate sheet due to problems with the estimating software. To get those dollars included, they were entered under the ESCAL lines instead. Mr. Botting alleges that in the last

minutes of bid preparation, they failed to change the title of the ESCAL lines. The total amount added under ESCAL was $315,151.

On October 26, 2004, the Government denied Botting's request for an EPA adjustment based on the inclusion of an apparent contingency for labor. Botting's contention regarding the ESCAL was not supported by their bid estimate and no other contemporaneous documentation to support Botting's allegation had been provided.

A Government Memorandum for Record was generated on November 4, 2004 to document the explanations received from Botting regarding the ESCAL in their bid. Initially Botting verbally told the Government that the ESCAL was for labor rate increases which occurred between the first and second times the Bassett project was bid. In DPG Serial Letter No. 75-2600-0009-01038, Botting indicated that the ESCAL was an additional estimated labor cost that was over and above the raw labor estimates included in the bid for the individual work items for hiring specialized workers from outside the local area. During the teleconference on October 4, 2004, Botting stated that the additional costs were related to the higher wages, subsistence and travel associated with hiring the project manager, project engineer and superintendent from outside the local area.

Botting has requested a Contracting Officer's Decision on their eligibility for an EPA adjustment. The request was submitted by DPG in Serial Letter No. 75-2600-0009-01227, dated January 3, 2005, and was certified by DPG in accordance with the Contract Disputes Act.

**CONCLUSION:**

The purpose of issuing a contract with an EPA clause is to divide the risk of economic uncertainty between the contractor and the Government. Without an EPA clause, a contractor must submit a higher bid that includes a contingency to cover unexpected increases in costs. By

including an EPA clause in the solicitation, the Government is assured of not having to pay a contingency for long-term market fluctuations since the EPA clause provides a mechanism for covering those unanticipated costs separately. However, it does not provide a guarantee that the contractor will receive an adjustment. The FAR prohibits the inclusion of contingencies in both the base contract price and in an adjustment requested under the economic price adjustment clause. FAR 16.203-2(a) specifically requires the contracting officer to ensure that contingency allowances are not duplicated.

This contract contains an EPA clause that has been specifically limited to labor as stated in CLIN 0011 of the proposal schedule. Only base line items 0001 and 0002 are subject to the EPA clause and only the established labor rates and fringes set forth for laborers and mechanics in Davis Bacon Wage Decisions AK010001 and AK010006 are subject to adjustment. Botting's bid estimate includes line items that are labeled ESCAL that apply increases of $1.25/hr and $2.50/hr to their direct labor hours for labor categories classified as laborers or mechanics by FAR 22.401 (lead foreman, journeymen and apprentice). Additionally, each of the bid recap sheets that include the ESCAL lines, also include lines entitled "SPCL PREM", "TRAV EXP" and "SUBSIST" which were not utilized even though the additional cost was presumably for additional wages, costs for housing and food and costs for transportation for employees hired from outside the local area. As such Botting's bid estimate, and therefore DPG's base price for mechanical work, appear to include a contingency for labor on all of Botting's laborer or mechanic hours. Since FAR 16.203-2(a) prohibits the duplication of contingency, the contractor is not entitled to an EPA adjustment on the baseline direct labor hours included in Botting's bid.

For the above stated reasons, I find that this claim must be, and hereby is, denied.

This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

11 Mar 2005
Date

Claudette M. McDonald
Claudette M. McDonald
Contracting Officer

PRE-BID CONFERENCE
REPLACEMENT HOSPITAL
FORT WAINWRIGHT, ALASKA

ORIGINAL

Taken October 31, 2001
Commencing at 10:11 a.m.

Volume I - Pages 1 - 42, inclusive

Taken at
Sheraton Anchorage Hotel
Yukon Room
401 E. 6th Avenue
Anchorage, AK 99501

Reported by:
Mary A. Vavrik, RMR

EXHIBIT
B

have -- and really these are minor issues. I would say 95 percent of the things that we are talking about are either spelling errors or we have a number of drawings where there is Xs through the drawing numbers. It's an oversight. It slipped through at the final. We're going to be reissuing 150 to 200 drawings to clarify those type of minor issues. That's going to be part of our amendment.

And then other issues, like I mentioned, some of the key items that we talked about. The third party commissioning is one of them that will be or may be clarified in the amendment.

That's pretty much the end of my first part of the presentation here. I'm going to let Marie talk about our actual selection process and what we are doing with section 0100 and 0120. Marie is going to talk about that a little bit.

MS. MCDONALD: Okay. I'll try to stand up. Let me know if you can't hear me in the back, please. We intend to award a firm fixed-price contract with an economic price adjustment under this solicitation. This is a best value source selection where price and technical are of equal importance. And we would like you to make note that our review is confined to the proposal that you submit. And when you prepare your

participation, we provide a sample plan in the solicitation. We also give you the Corps' goals. Those are the desirable goals. And we ask you to propose your goals, the goals that you feel are realistic and achievable based on your market survey. We provide a copy of the AFARS appendix also, which is the criteria for grading the subcontracting plan, and it's mandated by Department of the Army.

For price, we ask for a price breakdown from all offers. We will do an audit of the successful offer, and there are some detailed -- the details that we would require to do the audits are in the solicitation. And the purpose of that audit is to establish a baseline for the economic price adjustment to establish the Davis-Bacon rates that you are using to formulate your price. And this will be used to determine the future economic price adjustments as those Davis-Bacon rates change over the life of the contract. There are --

Clause 52.216-4 in the solicitation gives you all the details about the economic price adjustment and how that will be administered. And of course if you have any questions about that, please ask them today or submit a written question to us.

MR. HANCOCK: Just to talk about that just a little bit more, the economic price adjustment clause is

new. It wasn't in our previous solicitation. What that -- the intent of that is to allow contractors to bid competitively for labor rates initially, with the understanding that if rates increase in the future, that he will have a mechanism for getting additional funds to cover those increases in labor costs. That way when you have a five-year duration project or four-year duration project, you don't have to try to project out for anticipated increases. You have a mechanism built into the contract to get paid for increases in labor.

I'm glad Marie highlighted that. That is a new thing from this -- from the previous solicitation.

MS. MCDONALD: Couple of administrative issues. In order to be awarded a contract, you need to be registered in the central contractor registration. If you are organized as a joint venture, you need to be formally organized and registered in CCR as a joint venture.

I think we have talked a little bit about access to the base. The date the proposals are due, I need to give a message to the front gate that you are coming on base, so the day prior if you send me an e-mail or send Dan Werkmeister an e-mail as to the person that's coming on, we can make sure that the base knows that you are coming on and that you can be provided access. There is no guarantee that that is going to work. We have had to go

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DICK PACIFIC/GHEMM, JV,
on behalf of W.A. Botting Company,

Plaintiff,

vs.

THE UNITED STATES,

Defendant.

---

No. 05-462C

DEPOSITION OF CLAUDETTE MARIE MCDONALD

Taken January 31, 2006
Commencing at 10:50 a.m.

Volume I - Pages 1 - 51, inclusive

Taken by the Plaintiff
at
U.S. Army Corps of Engineers
2204 Third Street
Elmendorf Air Force Base
Anchorage, Alaska

Reported by:
Mary A. Vavrik, RMR

EXHIBIT
tabbies
C

the decision that "if offerors included escalation costs in their proposals, then no adjustment would be made"?

A The directions in the Federal Acquisition Regulation for administering EPA.

Q I'd ask you to go to Exhibit No. 26, which is the very bottom one in this pile.

A Okay.

Q If you go to page 5 -- you may want to take a look at what this is. I believe that is your contracting officer's decision on the W.A. Botting claim.

A Yes, it is. Page 5?

Q Page 5.

A Yes.

Q There is a FAR clause quoted in the middle of that, No. 16.203-2(a). Is that the clause that you are relying on?

A Yes, it is.

Q Are you relying upon anything else other than this clause?

A My attorney has advised me that there is case law regarding EPA adjustment and contingency.

Q Have you seen copies of case law?

A No, I haven't.

Q Did you make an independent determination as to the meaning of this clause, or did you rely upon your attorney?
A I made an independent determination.
Q Okay. Then what did you rely upon, just this language in this clause?
A This language.
Q Nothing else?
A Nothing else.
Q Okay. Now, were you at the preconstruction conference?
A I was.
Q Did you advise the contractors that attended the preconstruction clause [sic] that if they included any escalation in their bid, that they would not be able to participate under the wage escalation clause?
A I personally advised the contractors that the clause was included in the contract. It was also mentioned by the project manager the purpose of the clause was to cover wage escalation and that contractors should not include it in the bid. The purpose was so that they didn't have to include it in their bid and make a projection. I don't have the exact wording, but it is in the minutes.

BY MR. SULLIVAN:
Q Is this, the language there on page 12 and 13, what you referred to when you talked about the discussion of this particular clause at the precon?
A Yes, it is.
Q I have looked at all the pages in the precon and don't find anything in addition to this. Do you recall anything other than this?
A No.
Q And I don't see anything in here that warns the contractors that if they put any escalation in their contract, that they are barred from any further escalation costs. Do you see anything in there that would warn them of that?
A That is not specifically stated.
Q Is that specifically stated any place in the contract?
A Not to my knowledge.
Q Based upon your interpretation on the apprentices and foremen, I can eliminate a number of these things if you just give me a couple of seconds here.
A Sure.
Q If you would look at Exhibit 4, please.
A Okay.

him exactly, but per diem and expenses for subsistence, I believe, is what he stated.
Q Do you think Mr. Botting was lying to you?
A I don't believe that the documents presented, that it's reasonable for me to conclude that that is not escalation.
Q Well, in order to make a conclusion such as you did in your final decision, you have to disbelieve Mr. Botting's testimony, don't you?
A I believe that's true.
Q Now, why don't we go to your contracting officer's decision. I'm going to have to jump back here. Okay. Let's start on page No. 9.
"A teleconference to discuss the issue of escalation was held on October 4, 2004. Participants included DPG, Botting, counsel for Botting, DCAA, and the COE. Mr. Pete Botting alleged that the costs entered under the ESCAL line items represented an amount intended to compensate for an underestimation of the amount required to hire specialized personnel from outside the local area, as well as an allowance for subsistence. Mr. Botting alleged that an additional amount of approximately $380,000 had to be incorporated into the bid just as the bid was being finalized for

the Administrative Contracting Officer (ACO) within 30 days.

(2) The Contractor shall also notify the ACO within 30 days whenever changes to asset valuations or any other cost changes have occurred or are certain to occur as a result of a change in ownership.

(b) The Contractor shall–

(1) Maintain current, accurate, and complete inventory records of assets and their costs;

(2) Provide the ACO or designated representative ready access to the records upon request;

(3) Ensure that all individual and grouped assets, their capitalized values, accumulated depreciation or amortization, and remaining useful lives are identified accurately before and after each of the Contractor's ownership changes; and

(4) Retain and continue to maintain depreciation and amortization schedules based on the asset records maintained before each Contractor ownership change.

The Contractor shall include the substance of this clause in all subcontracts under this contract that meet the applicability requirement of FAR 15.408(k).

(End of clause)

52.216-4 ECONOMIC PRICE ADJUSTMENT--LABOR AND MATERIAL (JAN 1997)

(a) The Contractor shall notify the Contracting Officer if, at any time during contract performance, the rate of pay for labor (including fringe benefits) in the Schedule either increases or decreases. The Contractor shall furnish this notice within 60 days after the increase or decrease, or within any additional period that the Contracting Officer may approve in writing, but not later than the date of final payment under this contract. The notice shall include the Contractor's proposal for an adjustment in the contract unit prices to be negotiated under paragraph (b) of this clause, and shall include, in the form required by the Contracting Officer, supporting data explaining the cause, effective date, and amount of the increase or decrease and the amount of the Contractor's adjustment proposal.

(b) Promptly after the Contracting Officer receives the notice and data under paragraph (a) of this clause, the Contracting Officer and the Contractor shall negotiate a price adjustment in the contract unit prices and its effective date. However, the Contracting Officer may postpone the negotiations until an accumulation of increases and decreases in the labor rates (including fringe benefits) and unit prices of material shown in the Schedule results in an adjustment allowable under subparagraph (c)(3) of this clause. The Contracting Officer shall modify this contract (1) to include the price adjustment and its effective date and (2) to revise the labor rates (including fringe benefits) as shown in the Schedule to reflect the increases or decreases resulting from the adjustment. The Contractor shall continue performance pending agreement on, or determination of, any adjustment and its effective date.

(c) Any price adjustment under this clause is subject to the following limitations:

(1) Any adjustment shall be limited to the effect on unit prices of the increases or decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) Changes in rates or unit prices other than those shown in the Schedule, or (ii) Changes in the quantities of labor of those established in the baseline pre-award audit.

(2) No upward adjustment shall apply to supplies or services that are required to be delivered or performed before the effective date of the adjustment, unless the Contractor's failure to deliver or perform according to the delivery schedule results from causes beyond the Contractor's control and without its fault or negligence, within the meaning of the Default clause.

3) There shall be no adjustment for any change in rates of pay for labor (including fringe benefits) which would not result in a net change of at least 0.5 percent of the then-current total contract price. This limitation shall not apply,

EXHIBIT
tabbies
D

however, if, after final delivery of all contract line items, either party requests an adjustment under paragraph (b) of this clause.

(4) The aggregate of the increases or decreases in any contract unit price made under this clause shall not exceed 10 percent of the original unit price.

(d) The Contracting Officer may examine the Contractor's books, records, and other supporting data relevant to the cost of labor (including fringe benefits) and material during all reasonable times until the end of 3 years after the date of final payment under this contract or the time periods specified in Subpart 4.7 of the Federal Acquisition Regulation (FAR), whichever is earlier.

52.217-7 OPTION FOR INCREASED QUANTITY--SEPARATELY PRICED LINE ITEM (MAR 1989)

The Government may require the delivery of the numbered line items 0003 through 0007, identified in the Schedule as an option item, in the quantity and at the price stated in the Schedule. The Contracting Officer may exercise the option by written notice to the Contractor within 3 calendar years of the contractor receiving the notice to proceed with work on the project. Optional items awarded shall be completed within the time period for completion of the base items, as stated in SCR-1. Delivery of added items shall continue at the same rate that like items are called for under the contract, unless the parties otherwise agree.

(End of clause)

52.219-4 NOTICE OF PRICE EVALUATION PREFERENCE FOR HUBZONE SMALL BUSINESS CONCERNS (JAN 1999)

(a) Definition. HUBZone small business concern, as used in this clause, means a small business concern that appears on the List of Qualified HUBZone Small Business Concerns maintained by the Small Business Administration.

(b) Evaluation preference. (1) Offers will be evaluated by adding a factor of 10 percent to the price of all offers, except–

(i) Offers from HUBZone small business concerns that have not waived the evaluation preference;

(ii) Otherwise successful offers from small business concerns;

(iii) Otherwise successful offers of eligible products under the Trade Agreements Act when the dollar threshold for application of the Act is exceeded (see 25.402 of the Federal Acquisition Regulation (FAR)); and

(iv) Otherwise successful offers where application of the factor would be inconsistent with a Memorandum of Understanding or other international agreement with a foreign government.

(2) The factor of 10 percent shall be applied on a line item basis or to any group of items on which award may be made. Other evaluation factors described in the solicitation shall be applied before application of the factor.

(3) A concern that is both a HUBZone small business concern and a small disadvantaged business concern will receive the benefit of both the HUBZone small business price evaluation preference and the small disadvantaged business price evaluation adjustment (see FAR clause 52.219-23). Each applicable price evaluation preference or adjustment shall be calculated independently against an offeror's base offer.

These individual preference amounts shall be added together to arrive at the total evaluated price for that offer.

# COPY

Videoconferencing Videography Trial Presentation Court Reporting
CORPORATION

IN THE UNITED STATES COURT OF FEDERAL CLAIMS



DICK PACIFIC

Plaintiff,

vs. Case No. 05-462

UNITED STATES

Defendant.

---

DEPOSITION OF KEVIN O. WILLIAMS
Taken on behalf of the Plaintiff
March 30, 2006

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of KEVIN O. WILLIAMS was taken before Valerie Allard, a Certified Court Reporter, #3040, on March 30, 2006, commencing at the hour of 9:45 a.m., the proceedings being reported at 14240 Interurban Avenue, South, Suite 156, Seattle, Washington.

EXHIBIT
tabbies
E

appropriate criteria. But I was not part of that process whatsoever.

Q. You do know that the second bid came in lower than the first bid?

A. Actually, I don't know that.

Q. Okay. So at some point in time in the process of while you were doing your audit work, it was determined that Botting was ineligible to participate in the EPA wage escalation process; is that correct?

A. That determination was made, yes.

Q. And did you make that determination?

A. No, that's not my decision.

Q. Did you have any input into that?

A. Yes, I did.

Q. And do you agree with that decision?

A. Yes.

Q. And why?

A. Because, my understanding of the regulation is that escalation costs or any contingencies were not to be included in a contractor's bid. And if it was there, then they would be precluded from participating in the bid.

Q. So your understanding is, if there was any escalation at all then that precludes any adjustment to the contract for that contractor?

A. Yes.

Q. And what do you rely on for that understanding?
A. From the FAR regulation that addresses the EPA clause.
Q. Anything else?
A. No.
Q. Did you make your own independent determination? Did you review the FAR clause and make your own independent determination? Or did you rely on somebody else?
A. No. I reviewed the FAR clause.
Q. So after reading, reviewing, studying that FAR clause, you determined that any escalation means eligibility?
A. Yes.
Q. Even a dollar?
A. Well, it doesn't say specifically a dollar. But I would guess that the intent is just that. If you included escalation, you already recognized that there is a risk, and you've already taken the steps to protect yourself from that risk.
Q. But any escalation at all in your view makes the contractor ineligible for adjustment?
A. When you use the word "any," yes, I would agree with that.
Q. Now, do you have any knowledge of any warning to

Government people that back when we put this into the contract, we thought it was pretty low risk. Now, we're getting these requests, we're surprised to be getting them. We didn't think that the labor rate was going to go up?
A. No.
Q. Nothing like that?
A. There was none.
Q. I'll give you--actually, it's Exhibit Nos. 12 and 13 from the prior deposition, and they're stapled together. They're actually two pages in a row from the contract documents and they're minutes from the Pre-Construction Meeting. Did you ever see these? Anybody ever have you read these before?
A. No, I have not seen these.
Q. Okay. How about, why don't you just start line 9, page 29 and read through oh, say line 12 of the next page.
A. Okay.
Q. So in what you've read, did you find anything in there that tells you that if a contractor includes any amount of escalation, even as little as a dollar that that would then make them ineligible for the EPA clause?
A. No, it does not.
Q. I'm looking specifically at page 29 lines 19 to

21 references the FAR clause 52.216-4. That's the only reference that I find in here for the Contractors to review. Do you know of any other reference?

A. I did not read one.

Q. And is that the only contract clause that you referred to in making your determination?

A. I would have to say, yes.

Q. Okay. This is Exhibit 25 from the prior deposition. Go right down to the bottom, next to the bottom line it says, "Not considered eligible for EPA adjustment." Do you find that?

A. Yes.

Q. What I'm seeing here is that the Department of the Army letter to the prime, informing the prime that Botting is not eligible for EPA adjustment. Have you seen this letter before?

A. Yes, I have.

Q. And did you have any input into the content of the letter?

A. I might have reviewed it, I probably did review it for accuracy. As far as--does it mention anything of DCAA?

Q. I didn't--

A. Does it specifically mention DCAA?

Q. No.

at all.

Q. So you're sticking to if you put any escalation in your bid Mr. Contractor then you are ineligible for this adjustment in total. And I guess what I'm wondering is where it warns the contractor of that?

A. It does not warn the contractor of that.

Q. Okay. Now in Botting's case, my recollection is that their EPA Adjustment Request is in the neighborhood of a million-four; does that ring a bell?

A. I've seen that, yes.

Q. And the ESCAL number that you believe is escalation is somewhere in the neighborhood of 300,000?

A. Probably so. I don't remember the numbers.

Q. So the delta, the million-one, that I guess I would call that a penalty for having--see that's the difference between the escalation you claim is escalation and the real escalation that was experienced, that delta. Would you agree that's a severe penally to lose that million-one?

A. That's a risk, I think, that the contractor takes. And the way the clause should be used is from the standpoint that if it had had an audit before the contract was awarded, they could remove whatever escalation or contingency costs were in there, and we would not be in this position right now.

Q. So that really comes right back to what I just said earlier. If at award time, the Government would have said, Kevin, come in and look at this. Kevin comes in, looks at it and says, oh, there's 300,000 escalation in here. Then the government, presuming from what you said, the Government would reduce Botting's contract by 300,000?

A. I believe that's what would have happened.

Q. Okay. Then moving down the road, then Botting would have incurred escalation of a million-four. Botting would have then been paid the million-four.

A. Yes, I believe that's what would have happened.

Q. So the total amount Botting would have been paid then, they would have had 300,000 less on their base contract, but then they would have added a million-four through the EPA adjustment?

A. I believe that's the way it would work.

Q. So because of the fact that was no pre-award audit, now Botting is losing out on that million-four?

A. I guess I look at it from the understanding of what is the requirement of contractor, and I don't know why the information was never provided by the contractor. So, I can't speak to what happened previously. I don't know what happened.

Q. I'm just looking at the result. Whether it was the Contracting Officer's obligation to get the audit

Q. Okay. What would that be then?

A. If it's--I didn't write this.

Q. I understand. I'm just trying to get if you had any involvement, input, looked at this at the time it was drafted, what your thought process was? What your opinion is at this point?

A. Well, I would not have changed that aspect of it because the Contracting Officer did some research, apparently, and came up with this specific FAR clause. I would have used the intent of the 216, where it says, if you escalated it, we're not going to come back and revisit that issue again. You've already covered yourself for whatever risk that there is. The Government can't come back say in our previous example, if you only experienced $150,000, the Government can't say, well, you have to give us another $150,000 back because you did not experience impact of $300,000. That's a risk that a contractor takes.

So this is coming from a Contracting Officer. She used a contingency. I'm not sure if she put them together. I don't know. But I didn't have any heartburn with that, if you will.

Q. Let me ask you this. Couldn't this clause be read to mean in Botting's situation, Botting actually incurred a million-four, but by your analysis, you

determined that he had 300,000 escalation already in the bid, couldn't this be read to say, in order to avoid a duplication, you take the million-four, subtract the 300 and pay him a million-one, and you have avoided the duplication that is specified?

A. Looking at this one by itself, yes.

Q. Okay.

(Whereupon, Exhibit-33 was marked for identification)

Q. (By Mr. Crick) I'm handing you now Exhibit 33. It says it's an Interim Guidance/Corrective Actions. Do you know who drafted this and approximately when?

A. I don't know when this was drafted exactly. There's a date down there but that probably--I'm not sure what that date corresponds, but I did draft this.

Q. Okay. This is you?

A. Yes.

Q. Do you want to take a minute to review it and get up to speed, go ahead.

A. Okay.

Q. So it appears that you discussed the escalation issue with Paul's superior?

A. Supervisor.

Q. Supervisor. What's Paul's last name?

Q. O'Donnell.

A. I'm taking a no position position because, yeah, we would have liked--I do remember talking about it, and we decided, well, we'll go to Regional and if that needs to, go to Headquarters and let them make the call. It's really a legal, real legal question.

Q. So down the road, if the Contracting Officer comes in and says, gees, we have one that went over 10 percent on the labor rate, you're going to say, I take no position?

A. No. It would have been, hey, we need to call the Regional Office and get them on board.

Q. Okay. So if she walks in tomorrow, that's what you'll do. You'll say I take no position, I'm sending it upstairs?

A. Right. Because both sides, I think, have merit.

Q. Okay. That's fair. Let's see. I'm handing you Exhibit 1 from the prior deps. I wonder if you recognize this document?

A. I may have seen it. I do not know, and I don't remember seeing this paper specifically. I may have, but I don't remember.

Q. Okay. You're not the author anyway?

A. No, I'm not.

Q. So what this is a draft Information/Point Paper, Exhibit 1 from the Larson dep. I don't know if we've had

anybody identify who wrote it yet. But, regardless, if you move down to Paragraph 2, it has the number two, Background/Facts. The third paragraph in that section there's a quote out of the specs, "Prior to the award of the contract, the successful offeror will be prepared to furnish cost information to assist DCAA for establishment of a baseline quantity of labor for future economic price adjustments."

Now, as I gather from what you've said earlier, part of your problem with this whole process is that that wasn't done, that there was no pre-award audit and so on?

A. I would agree with that, yes.

Q. Whose obligation do you think that was, to schedule and get that audit completed.

A. The requirement for the request of the audit would have been the Corps. The contractor's part in that would be to provide the information so that an audit could be requested on that--

Q. Oh, I'm sorry. Do you know if the Corps ever asked prior to award, do you know if the Corps asked for that audit information?

A. I don't know specifically. Actually, I thought the requirement was upon the contractor to provide that as part of his solicitation, his bid package, but I don't know that specifically.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DICK PACIFIC/GHEMM, JV,
on behalf of W.A. Botting Company,

Plaintiff,

vs.

COPY

THE UNITED STATES,

Defendant.

---

No. 05-462C

DEPOSITION OF KEN L. LARSON
Taken January 30, 2006
Commencing at 1:20 p.m.

Volume I - Pages 1 - 47, inclusive

Taken by the Plaintiff
at
U.S. Army Corps of Engineers
2204 Third Street
Elmendorf Air Force Base
Anchorage, Alaska

Reported by:
Mary A. Vavrik, RMR

EXHIBIT
F

Page 18

of our initial analysis out of the last ten projects we had, five or six of them were still in claim.

So a couple of the key points we wanted to come out with that we as a project delivery team came up with, one, we'd like to get through it without a massive amount of claims; ergo, cost growth. Two, we wanted to minimize or eliminate claims. Three, we wanted to provide through the best value approach, as opposed to the low bid value, the best value approach to contracting, we wanted to provide the contractors an opportunity to interface with us during the evaluation process to make sure we hadn't blown the technology of the project somewhere. Hence, the best value, you know, the valuation process.

Okay. And also part of that was to do it as a partnered job wherein we had a formal partnering process set up, including all of the stakeholders, including not only the contractor and its subs and the government, but the designer, who was also -- the AE, who was also a hired part of the crew, which we, in turn, actually put him on staff, as it were. So it solved a lot of problems on the design side of the house for answers.

But the partnering process, getting back to

Page 19

your initial question, was our means. Weekly, monthly, quarterly, and annual partnering sessions, formal partnering sessions to try to keep the ship on course and steered in a straight direction, trying to resolve issues before they became combative and claim type issues. By and large, the process worked very well up to a point.

Q Up to what point?

A When the EPA, lack of -- lack of progress on resolving it, it definitely started the ball downhill. And Pete Botting, Ron, myself, we had discussions at a lot of partnering sessions over it. We could see it coming. Pete actually quit coming to our partnering sessions over it. At least that's what he said. It started to flavor the overall character of the job, flavor of the job. And time-wise, this is probably early '04, late -- early '04 when it really -- we were starting to have some Davis-Bacon wages really starting to go up. So there was a cost impact, you know, that was anticipated as a possibility that was not being paid by the government.

Q I assume that it was the government's intention that none of the contractors should put any escalation costs in their bid at all on this second

Page 20

go around.

MR. MAGER: Objection to qualifications. You can answer.

THE WITNESS: That's the way I read the clause. Escalation was not to be included.

BY MR. SULLIVAN:

Q Well, there was a preconstruction conference that was recorded, too, at one time, wasn't there?

A Yes.

Q And the contractors were advised that in the precon that you are not to put any escalation in their bid?

A I'd have to look back at the minutes, but it's in the minutes of the document, yes.

Q Okay.

A Or words to that effect.

Q Were the contractors ever advised, either in the precon or in the words of the contract, that if you do put escalation in your bid, there will be some sort of a sanction or a penalty?

A I personally am not aware of any discussion along those lines, no.

Q If a contractor did put some escalation in its bid, how would you have handled that as a contracting officer in view of the escalation clause

Page 21

in this contract?

A In a perfect world, in Ken Larson's perfect world, in my opinion, I would rely on the auditor, the DCAA auditor, to establish the time frame when, quote, unquote, this escalation may or may not have occurred, quantified it, gotten agreement, if that was possible. And if not possible, there is always the claim mechanism to go by. But assuming we could negotiate it and quantify it, discount it and pay the remainder.

Q So in the situation with Mr. Botting here where he has submitted an escalation claim of some 1.4 million and the Corps of Engineers takes the position that he put $315,000 worth of escalation in his contract, is it your testimony that under those circumstances you would subtract the 315 from the million four and pay the difference?

A In my opinion, under the partnering rules we laid out and the understandings we had throughout the life of the contract, I believe that would be equitable.

Q It would be fair?

A That would be fair, in my opinion. Again, I will emphasize, my contracting officer does not agree with my opinion.