IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company, Plaintiff, | No. 05-462C |
| vs. | (Judge Baskir) |
| UNITED STATES OF AMERICA, Defendant. | |

**PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Dick Pacific/Ghemm, JV ("DPG"), on behalf of W.A. Botting Company ("Botting"), pursuant to RCFC 56(h)(1) submits the following Proposed Findings of Uncontroverted Fact in support of Botting's Motion for Summary Judgment.

1. DPG is the prime contractor to the United States Government ("Government") on the construction project known as the Bassett Hospital Replacement ("Project"), Contract No. DAC85-02-C-0004, located at Fort Wainwright, Alaska. (Contracting Officer's Decision ("COD"), p. 1 attached as Ex. A to Aff. of Robert H. Crick)

2. The Project is a 32-bed, multi-story replacement hospital intended to serve the needs of the military, dependent, and retiree population of Fort Wainwright, Fort Greely, Eielson AFB, and remote military sites north of the Alaska Range. (COD, p. 1)

3. The Government issued two solicitations for the Project. The first solicitation was for an industry standard Firm Fixed-Price Contract and did not contain an economic price adjustment clause. The first solicitation, however, was ultimately cancelled without a contract being awarded. In the second solicitation, the contract type was revised to a Fixed-Price Contract with an Economic Price Adjustment for Labor. (COD, p. 4)

4. Because the Project was bid twice, Botting submitted two separate sub-bids for the mechanical portion of the Project, under two different sets of specifications. (Burrus Aff., ¶6)

5. Botting's standard estimating procedure utilizes computerized estimating software. Typically, the day prior to bid openings, Botting personnel input all labor, material, subcontractors, and other direct job costs ("ODJC") into the estimating software, including all work associated with all pipe, valves, and fittings. This allows Botting to gain a sense of the overall size of the project being estimated and to ensure that the estimate is organized, so that the final modifications required on bid day can be input with minimal change to the overall estimate, thus eliminating many possible bid day mistakes. (Burrus Aff., ¶ 4)

6. Botting followed this typical procedure in submitting both its first and second sub-bids on the Project. (Burrus Aff., ¶ 6)

7. When Botting prepared its estimate for the first solicitation, there was no Economic Price Adjustment clause in the contract, which meant that Botting had to include a contingency in its estimate for any increase in wage rates over the course of construction. Botting did so by inserting six different line items into various parts of the estimate to account for wage escalation. Botting anticipated that the Project would be complete in 2004, so Botting included line items for two years of escalation: "ESCAL 7/02-7/03" and "ESCAL 7/03-7/04." These line items were included in three separate scopes: plumbing (line 160 and 161); HVAC (line items 217 and 218); and process piping (line items 274 and 275). (Burrus Aff., ¶ 7)

8. The labor rate contingency included in Botting's first sub-bid was calculated based upon the following historical costs, which costs represented the most current data available at the time Botting submitted its first sub-bid on January 19, 2001:

| | |
|---|---|
| 1998 to 1999: | $1.20 per hour |
| 1999 to 2000: | $1.24 per hour |
| 2000 to 2001: | 0 |

(Burrus Aff., ¶8)

9. Based on these historic costs, Botting estimated the wage rate increase that it could reasonably anticipate from July 2002 to July 2003, and from July 2003 to July 2004, and assigned an hourly rate. The annual escalation of Botting's base labor rates was established at $1.25 for July 2002 to July 2003 and at $2.50 for July 2003 to July 2004. Finally, Botting estimated the number of labor hours that would be performed in the plumbing, HVAC, and process piping work scopes during the escalation time periods and multiplied the anticipated number of labor hours by the anticipated labor wage escalation amount. Based on this calculation, Botting arrived at an estimated wage escalation contingency of $306,575. (Burrus Aff., ¶ 9)

10. Botting submitted its first sub-bid on January 19, 2001. (Botting Aff., ¶ 3)

11. The Government elected not to award the Project based on the first solicitation. Instead, the Government modified the bid package and sent out a second solicitation, in which the contract type was changed to a Fixed-Price Contract with Economic Price Adjustment for Labor. (COD, p. 4)

12. Botting elected to submit a sub-bid for the second solicitation as well. (Burrus Aff., ¶10)

13. On October 31, 2001 the Government held a Pre-Proposal Conference to discuss the Project's second bid package and solicitation. During the Pre-Proposal Conference the Government highlighted the EPA clause in the second solicitation, but failed to point out whether or not a contingency should or could be included in bids for labor rate escalation and whether such an inclusion would result in a penalty:

> Just to talk about that just a little bit more, the economic price adjustment clause is new. It wasn't in our previous solicitation. What that – the intent of that is to allow contractors to bid competitively for labor rates initially, with the understanding that if rates increase in the future, that he will have a mechanism for getting additional funds to cover those increases in labor costs. That way when you have a five-year duration project or four-year duration project, you don't have to try to project out for anticipated increases. You have a mechanism built into the contract to get paid for increases in labor.

(Minutes of pre-bid proposal meeting, attached as Ex. B to Crick Aff.)

In fact, prior to the bid date and prior to receipt of the Government's August 19, 2004 letter denying Botting's request for an equitable price adjustment under FAR 52.216-4, Botting had not been provided any notice whatsoever that a contingency for labor escalation should not be included in its sub-bid or that doing so would result in complete forfeiture of the relief provided in the EPA provision. (Burrus Aff., ¶11; Dep. of Marie McDonald, p. 21, attached as Ex. C to Crick Aff.; Dep. of Kevin Williams, pp. 56-57, 60, attached as Ex. E to Crick Aff.)

14. The Contracting Officer required no warranties or certifications from any bidders that there was no contingency in their bid. (Burrus Aff. ¶ 11)

15. When preparing its second sub-bid, Botting elected to use the electronic format created for its first sub-bid. Botting did so by simply electronically copying the earlier estimate to use as the format for its second bid. As a result, the line items and

labels included in the first estimate, including the labels "ESCAL 7/02-7/03" and "ESCAL 7/03-7/04" were automatically transferred from the first estimate to the second estimate. (Burrus Aff., ¶12)

16. On the morning of the day Botting's second sub-bid was due, Mr. Pete Botting, Chairman and Chief Executive Officer of the company, began working with Botting's estimating team to review and finalize the second sub-bid. (Botting Aff., ¶6)

17. While reviewing the computer model for Botting's second sub-bid, Mr. Botting found that sheets 3, 4 and 5 still included the $306,575.00 wage escalation contingency from Botting's first sub-bid. This was because when Botting's estimating team entered cost information into the second sub-bid the night before the sub-bid was due, they inadvertently left the "ESCAL" line items at the amount included in the first sub-bid. Mr. Botting and the estimating team discussed that the amounts in those line items were no longer needed because of the EPA clause in the second solicitation, and the line items were reduced to zero. (Botting Aff., ¶11; Burrus Aff., ¶14)

18. Upon further review, Mr. Botting also saw that sheet No. 7 of the computer model, which included ODJC costs, had already been finalized by the estimating team and the amounts had been carried forward from sheet No. 7 to sheet No. 1, the final bid sheet. ODJC is the line item where Botting normally includes its cost estimate for general condition items, as well as for certain specialty items such as supervisor per diem, supervisor travel allowance, premium for the cost of supervisors not available at the project location, and the like. (Botting Aff., ¶6)

19. When reviewing the estimating team's worksheets, Mr. Botting determined that the amount listed in the estimate for ODJC still did not, in his estimation, have

sufficient costs for specialized personnel for supervision and management of the Project, even though due to increased time required to complete the Project and other reasons, the ODJC amount had been increased from the $3,087,893.00 in the first sub-bid to $4,171,996.00 in the second sub-bid. (Botting Aff., ¶ 18)

20. Because of the limited labor market in Fairbanks, Mr. Botting anticipated that Botting would need to bring in from the lower states certain specialized personnel, including a Project Manager, Assistant Project Manager, Project Superintendent, and Project Engineer, who would demand higher than scale wage rates and would also require incidental costs such airfare, moving expenses, and housing expenses. As a result, Mr. Botting instructed Botting's estimating team to add between $300,000 and $400,000 to the sub-bid for these costs. (Botting Aff., ¶9; Burrus Aff., ¶14)

21. The work duties of Botting's Project Manager, Assistant Project Manager, Project Superintendent, and Project Engineer positions are entirely managerial. Botting's supervisory and management positions are office positions. Individuals employed in these positions devote no time to the performance of manual or physical work and are compensated on a salary basis (exclusive of board, lodging or other expenses). (Botting Aff., ¶10)

22. Because of time constraints in the final bid preparations, as well as the fact that on recent jobs Botting's estimating software had failed to carry sheet No. 7 forward to the final recap sheet, Mr. Botting and the estimating team decided to include the additional special personnel costs in the existing ESCAL bid line items. This was done by adding manhours to the ESCAL items and by leaving the prior rates of $1.25

and $2.50 in the worksheet, which then spread the cost throughout the recap sheets in bid items 160, 161, 217, 218, 274 and 275. (Botting Aff., ¶12; Burrus Aff., ¶16)

23. Thus, although these bid line items were labeled "ESCAL," the line items did not contain amounts for labor wage escalation contingency and strictly encompassed additional ODJC costs. (Botting Aff., ¶15; Burrus Aff., ¶17)

24. The hourly labor cost included in Botting's first sub-bid, including the $306,575.00 for escalation, was a blended rate of $51.67 per hour. The second sub-bid resulted in a blended rate of $50.59 per hour and did not include any cost for escalation, but did include ODJC costs of $315,151.00 for specialized labor, per diem, and the like. When the ODJC costs are removed and placed in their proper budget cost category, the hourly labor rate in Botting's second sub-bid is $49.17 per hour. (Botting Aff., ¶14)

25. Botting was awarded the contract, which incorporated FAR 52.216-4, which provided:

> ECONOMIC PRICE ADJUSTMENT—LABOR AND MATERIAL (JAN 1997)
>
> (a) The Contractor shall notify the Contracting Officer if, at any time during contract performance, the rate of pay for labor (including fringe benefits) in the Schedule either increases or decreases. The Contractor shall furnish this notice within 60 days after the increase or decrease, or within any additional period that the Contracting Officer may approve in writing, but not later than the date of final payment under this contract. The notice shall include the Contractor's proposal for an adjustment in the contract unit price to be negotiated under paragraph (b) of this clause, and shall include, in the form required by the Contracting Officer, supporting data explaining the cause, effective date, and amount of the increase or decrease and the amount of the Contractor's adjustment proposal.
>
> (b) Promptly after the Contracting Officer receives the notice and data under paragraph (a) of this clause, the Contracting Officer and the Contractor shall negotiate a price adjustment in the contract unit prices and its effective date. However, the Contracting Officer may postpone the negotiations until an accumulation of increases and decreases in the labor rates (including fringe benefits) and unit prices of materials shown in the

Schedule results in an adjustment allowable under subparagraph (c)(3) of this clause. The Contracting Officer shall modify this contract (1) to include the price adjustment and its effective date and (2) to revise the labor rates (including fringe benefits) as shown in the Schedule to reflect the increases or decreases resulting from the adjustment. The Contractor shall continue performance pending agreement on, or determination of, any adjustment and its effective date.

(c) Any price adjustment under this clause is subject to the following limitations:

(1) Any adjustment shall be limited to the effect on unit prices of the increases or decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) Changes in rates or unit prices other than those shown in the Schedule, or (ii) Changes in the quantities of labor of those established in the baseline pre-award audit.

(2) No upward adjustment shall apply to supplies or services that are required to be delivered or performed before the effective date of the adjustment, unless the Contractor's failure to deliver or perform according to the delivery schedule results from causes beyond the Contractor's control and without its fault or negligence, within the meaning of the Default clause.

(3) There shall be no adjustment for any change in rates of pay for labor (including fringe benefits) which would not result in a net change of at least 0.5 percent of the then current total contract price. This limitation shall not apply, however, if, after final delivery of all contract line items, either party requests an adjustment under paragraph (b) of this clause.

(4) The aggregate of the increases or decreases in any contract unit price made under this clause shall not exceed 10 percent of the original unit price.

(5) The Contracting Officer may examine the Contractor's books, records, and other supporting data relevant to the cost of labor (including fringe benefits) and material during all reasonable times until the end of 3 years after the date of final payment under this contract or the time periods specified in Subpart 4.7 of the Federal Acquisition Regulation (FAR), whichever is earlier.

Nothing in the language of the FAR contract clause prohibits a contractor from recovering an EPA if some amount of contingency for escalation was included in its bid.

(Bassett Hospital Project Contract Specifications, pp. 41-42, attached as Ex. D to Crick Aff.)

26. That clause by its terms applied to labor costs; laborers and mechanics are defined as those whose duties are manual or physical in nature as distinguished from management, executives, supervisory, administrative or professional personnel. Davis Bacon Wage Determinations; 48 CFR 22.40.

27. When Botting set up its budget after having been awarded the mechanical subcontract on the Project, Botting did not set up a labor escalation contingency budget item. Instead, as was Botting's intent on bid day, Botting's budget reflected an amount to pay the cost of ODJC items such as supervisor per diem, supervisor travel allowance, premium for the cost of supervisors not available in the Fairbanks area, and the like. Monthly job cost reports throughout the life of the Project identify and measure the performance of these cost items. (Botting Aff., ¶13)

28. Botting's pricing for its second sub-bid did not include a contingency for escalation of labor wage rates over the course of construction. At the time of submitting its bid, Botting expected to receive a price adjustment under the Economic Price Adjustment clause for any wage rate escalation. (Botting Aff., 15)

29. The Government was under an obligation to conduct a pre-performance audit of the bid prior to award; this is in order to set a baseline amount for later calculation of the EPA amount. (Dep. of Kevin Williams, pp. 60-61, 82-83 attached as Ex. E to Crick Aff.; FAR 16.203-2(b)) The Government did not conduct the audit, but had the audit been conducted, and the Government believed there was a contingency, it

simply would have been deducted from the proposed contract amount prior to the award. (Depo. of Kevin Williams, pp. 60—61, attached as Ex. E to Crick Aff.)

30. Botting's total labor escalation cost is calculated based on Botting's union agreements, which call for annual increases in wage rates. These union agreements specify the following increases from the base wage rate used by Botting in its sub-bid:

| | |
|---|---|
| July 1, 2001 to July 1, 2002: | $2.15 per hour over base rate |
| July 1, 2002 to July 1, 2003: | $4.90 per hour over base rate |
| July 1, 2003 to July 1, 2004: | $7.90 per hour over base rate |
| July 1, 2004 to July 1, 2005: | $10.90 per hour over base rate |
| July 1, 2005 to July 1, 2006: | $12.40 per hour over base rate |

(Botting Aff., ¶16)

31. Botting has incurred additional labor costs due to wage escalation, for which Botting has not been compensated. The estimated field labor base rate included in Botting's second sub-bid was derived from the wage rate in effect at the time Botting submitted its second sub-bid to DPG, just as instructed by the specifications. Botting has or will experience the following wage rate escalations by the end of this Project:

| | |
|---|---|
| July 1, 2001 to July 1, 2002: | $4,858.89 |
| July 1, 2002 to July 1, 2003: | $221,241.49 |
| July 1, 2003 to July 1, 2004: | $744,859.20 |
| July 1, 2004 to December 24, 2004: | $253,306.46 |
| December 27, 2004 to July 1, 2005: | $248,000.00 |
| July 1, 2005 to December 1, 2006: | $19,840.00 |
| TOTAL ESCALATION COST: | $1,492,106.05 |

(Botting Aff., ¶17)

32. Botting submitted its claim for labor escalation costs of $1,492,106.05 to Contracting Officer Marie MacDonald and requested her decision on December 29, 2004.

33. The Government denied Botting's claim because the Contracting Officer did not believe that no contingency for labor escalation was included. As a result, based solely on the language of FAR 16.203-2, and the Contracting Officer's interpretation of that language, the Contracting Officer denied the entirety of Botting's claim because she believed Botting's bid reflected some amount of contingency for labor escalation. (COD, Ex. A to Crick Aff.; Dep. of Marie MacDonald, pp. 36, 18-19, Ex. C to Crick Aff.; Depo. of Kevin Williams, pp. 18-19, Ex. E to Crick Aff.) FAR 16.203-2 provides:

> In establishing the base level from which adjustments will be made, the Contracting Officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment required by the contractor under economic price adjustment clause.

DATED this 29th day of June, 2006.

//s//

ROBERT H. CRICK, ESQ
WINSTON & CASHATT
Attorneys for Plaintiff
1900 Bank of America Financial Center
601 West Riverside
Spokane, WA 99201
(509) 838-6131 telephone
(509) 838-1416 facsimile

Of Counsel:

PATRICK A. SULLIVAN, ESQ
JOHN H. GUIN, ESQ
WINSTON & CASHATT
1900 Bank of America Financial Center
601 W Riverside Ave.
Spokane, WA 99201
(509) 838-6131
(509) 838-1416 facsimile

ERIK D. EIKE, ESQ.
707 Richards Street, Suite 201
Honolulu, HI 96813
(808) 537-5950
(808) 537-5955 facsimile

CERTIFICATE OF FILING

I hereby certify that on this 29th day of June, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

//s//

ROBERT H. CRICK
1900 Bank of America Financial Center
601 West Riverside Avenue
Spokane, WA 99201
(509) 838-6131 telephone
(509) 838-1416 facsimile