IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company, Plaintiff, | No. 05-462C |
| vs. | (Judge Baskir) |
| THE UNITED STATES, Defendant. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

## Cases

Avia Group International, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557 (Fed. Cir. 1988) .......... 15

Bennett v. United States, 371 F.2d 859, 864 (Ct.Cl. 1967).......... 19, 20

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).......... 12

Craft Machine Works, Inc., 90-3 BCA ¶23095 (ASBCA 1990) .......... 21

Echelon Serv. Co., Comp. Gen. Dec. B-208720.2, 83-2 CPD ¶86 .......... 13, 16

Fermont Div., Dynamics Corp. of America, 79-1 BCA ¶13,774 ASBCA 1979 .......... 12, 13, 17

Hettich and Co., GmbH, 86-3 BCA ¶19043 (ASBCA 1986).......... 22

MAPCO Alaska Petroleum v. U.S., 27 Fed.Cl. 405 (Fed. Cl.Ct. 1992) .......... 22

National Westminister Bank PLC v. U.S., 69 Fed. Cl. 128 (2005) .......... 16

Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed.Cl. 5, 10 (1999).......... 19

Peter Kiewit & Sons Co. v. United States, 109 Ct.Cl. 390, 482 (1947) .......... 20

Southern California Edison v. United States, 58 Fed.Cl. 313, 325 (2003).......... 23

TechSearch, LLC v. Intel Corp., 286 F.3d 1360 (Fed. Cir. 2002) .......... 14

TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151 (Fed. Cir. 2004) .......... 15

United Buckingham Freight Lines v. Riss and Co., 241 F.Supp. 861, 863 (D.Col.1965).......... 23

Warner v. United States, 157 Ct.Cl. 1, 5, 301 F.2d 327 (1962) .......... 23

## Other Authorities

Cibinic & Nash, Formation of Government Contracts, at 1098-99 (3rd ed. 1998) ........ 13

## Rules

RCFC 56 ........ 12

## Regulations

48 C.F.R. §22.401 ........ 14

FAR 16.203-2 ........ 17, 18

FAR 16.203-4 ........ 19

FAR 52.216-4 ........ 22, 23

# I. OVERVIEW

W.A. Botting Company ("Botting") submitted two sub-bids to Dick Pacific/Ghemm, JV ("DPG") for work on the Bassett Hospital Replacement Project. The Government cancelled the first bid solicitation and the second bid resulted in the award of a contract to DPG and a subcontract to Botting.

Because the first solicitation issued by the Government did not contain an Economic Price Adjustment ("EPA") clause, Botting's first bid included line items for potential escalation of field labor costs over the course of the project.

The second Government solicitation contained an EPA clause for payment of labor cost increases by the Government. When Botting submitted its second bid, Botting did not include any amount for potential escalation of labor costs, but did include an amount for specialized personnel and supervision and management of the project. That amount was included within the existing line item spreadsheet cells from the previous bid with the heading "Escal". But, these amounts did not include any field labor to which the EPA applied.

It is undisputed that over the course of the job, wages increased. Accordingly, Botting submitted a claim for $1,492,106.05, which

represented the increased field labor costs which were and will be incurred by Botting through December 1, 2006.

On March 11, 2005, the Contracting Officer denied Botting's claim, taking the position that the line items titled "Escal" was a contingency for increased labor costs, and that by her interpretation of the contract, such inclusion precluded Botting from receiving any recovery under the EPA clauses.

The Government refused to pay Botting its claimed amount, or even any amount, despite the fact that the Government had no evidence to create any issue of fact that the amount of $315,151.00 included in the Botting bid was for field labor escalation.

To the contrary, the undisputed evidence is from Botting personnel, which establishes the nature of the amounts included. The Government cannot create an issue of fact by simply disputing the veracity of that evidence, without coming forth with any evidence to establish controverting facts.

Irrespective, however, of the Government's position that the $315,151.00 was a contingency amount for increased labor costs, Botting's contract required the Government to pay an economic price adjustment under FAR 52.216-4, the EPA clause incorporated into Botting's contract,

when the contractor experienced field labor cost increases, as did Botting here. While the Government is required to ensure that contingency allowances already contained in a bid are not duplicated when paying an EPA, no regulation allows the Government to sanction a contractor for including a contingency by not paying any amount whatsoever – the Government must simply subtract the duplication from the total cost increase incurred and pay the remainder.

Nothing in Botting's contract, nor federal law, allows the Government to require Botting to forfeit the entirety of its labor escalation costs, which were calculated at $1,492,106.05 (through December 1, 2006) because Botting allegedly included a $315,151.00 contingency for labor costs in its bid. At best, the Government may reserve the issue of whether there was a "duplicative" contingency, but as a matter of law, Botting is entitled to recover the amounts which the Government does not claim are duplicative, in an amount to be quantified pursuant to the terms of the contract at the completion of the project.

## II. STATEMENT OF FACTS

This is a brief summary of the uncontroverted facts which are fully contained in the Consolidated Statement of Uncontroverted Facts ("CSUF").[1]

DPG was the prime contractor to the United States Government on a construction project known as Bassett Hospital Replacement. (CSUF, ¶1, App. p. 1) The project was bid twice and the Government only issued an award on the second bid. (CSUF, ¶¶3, 4, App. pp. 6, 16) Botting provided a sub-bid to DPG on both solicitations issued by the Government. (CSUF, ¶4, App. p. 16)

The first solicitation did not contain an Economic Price Adjustment ("EPA") clause. (CSUF, ¶3, App. p. 6) As a result, in the first sub-bid Botting provided, it included field labor escalation costs in the amount of $306,575.00. (CSUF, ¶¶7-9, App. pp. 16-17)

The second Government solicitation changed the contract type to a Fixed-Price Contract with Economic Price Adjustment for Labor and Botting

[1] The citations are to the paragraphs of the Consolidated Statement of Uncontroverted Facts originated by Plaintiff; Defendant will be adding its contesting facts to that pleading, and it will be filed by October 27, 2006 as outlined in the Joint Status Report filed August 25, 2006.

submitted a sub-bid to DPG on that solicitation as well, under the revised set of specifications. (CSUF, ¶¶3, 4, 11, App. pp. 6, 16)

In the second solicitation, the Government utilized a fixed price contract with an economic price adjustment provision because there were questions about the stability of the labor conditions that would exist during the extended period of contract performance. (FAR 16.203-2) When the Government determines that it will utilize an EPA, it is required to insert a clause substantially the same as the clause outlined at FAR 52.216-4, which requires the Government to adjust the amount due a contractor based on increased labor costs. Here, the Government included a modified version of that clause in the second bid solicitation. (CSUF, ¶25, App. pp. 70-71)

During the Pre-Proposal Conference for the second solicitation, the Government advised the bidders that the solicitation now included an Economic Price Adjustment clause. (CSUF ¶13, App. pp. 47-50) During that meeting, the Government did not provide any notice or warning that bidders who included a labor escalation contingency would be deemed ineligible for an economic price adjustment. (CSUF ¶13, App. pp. 47-50) Nor did the Government's project specifications require that bidders

warrant or certify that no contingency was included in their bids. (CSUF, ¶14, App. p. 18)

When Botting was preparing its second bid, Botting did not include any labor escalation cost in its bid. (CSUF, ¶23, App. pp. 20, 40) Late in the bidding process, Pete Botting did, however, instruct his bidding team to include an amount for potential increased costs for specialized labor, such as a project manager, assistant project manager, project superintendent, and project engineer as well as for travel and subsistence costs for workers traveling to and from the job from out of the area. (CSUF, ¶¶18-20, App. pp. 19, 38-39) An amount of $315,151.00 was thus included on the existing bid lines, which were entitled “Escal”. Because of the hectic pace prior to submission of a bid and the use of existing documents which had been keyed into computer programs, no new heading was assigned to that amount. (CSUF, ¶¶22-23, App. pp. 19-20, 40)

Botting was ultimately awarded the contract, which incorporated the EPA clause FAR 52.216-4, requiring the Government to negotiate a price adjustment of the rate of pay for labor increased or decreased during contract performances. (CSUF, ¶25, App. pp. 70-71) That clause and the remainder of the contract are wholly silent on the issue of the effect of an inclusion of a labor contingency. (CSUF, ¶25, App. pp. 70-71)

Botting personnel set up a project budget after the award which reflected an amount anticipated to be incurred for the cost of specialty cost items such as supervisor per diem, supervisor travel expenses, premium for the cost of supervisors not available in the Fairbanks area, and the like. (CSUF, ¶27, App. pp. 40-41) No labor escalation contingency budget item was set up, tracked, or paid. Instead, the monthly job cost reports identified and measured only the specialty cost items. (CSUF, ¶27, App. pp. 40-41)

Botting submitted its claim for the increased labor price of $1,492,106.05 which was calculated through December 1, 2006. (CSUF, ¶¶31, 32, App. pp. 3, 42)[2] The Contracting Officer, over the Government's Resident Engineer's objections, denied payment, based solely on her interpretation of a FAR provision which requires the Contracting Officer to ensure that he or she is not paying any duplicative amounts for wage increases. The Contracting Officer based her denial on her interpretation of the provision that if a contractor has included a contingency in its bid, no matter how large or small, that contractor is

[2] The project is now nearing completion, and the entirety of the increased field labor costs will be quantifiable pursuant to the terms of the contract at the completion of the project.

prohibited from recovering any amounts it incurred in increased labor costs. (CSUF, ¶34, App. pp. 3-13, 53-54, 56)

Now, years after having incurred these costs and having provided all of its records to the Government, Botting remains unpaid on the claim originally submitted, and for amounts of increased labor costs incurred since that claim was submitted.

## III. LEGAL ARGUMENT

It is undisputed that Botting's subcontract is a Fixed-Price Contract with EPA for Labor. Under the contract's EPA provision, Botting is to receive an upward or downward adjustment to the fixed subcontract price based on changes in labor rates. There is no dispute that Botting's labor rates have increased since its sub-bid was submitted on December 11, 2001. (CSUF ¶¶30-31, App. pp. 41-42)

Instead of complying with its contract and compensating Botting for its increased labor costs, however, the Government takes the position that Botting included a contingency for labor rate escalation in its sub-bid, and should as a result be sanctioned and denied the relief of an EPA altogether. The Government's position finds no support in fact or law and, most importantly, finds no support under DPG's contract with the Government.

**A. Botting's bid did not include an amount for field labor wage escalation.**

The Government, to defeat summary judgment, must first create a genuine issue of fact that Botting included a contingency for field labor wage escalation costs in its bid. RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To the extent the amount included under the headings "Escal 7-02-7-03" and "Escal 7-03-7-4," are not labor contingency costs, the Government's position wholly fails.

The Government, by challenging whether Botting's bid includes a contingency for field wage labor rates, assumed the burden of proof with respect to whether a contingency exists. Fermont Div., Dynamics Corp. of America, 79-1 BCA ¶13,774 ASBCA 1979. This is a burden the Government cannot overcome, because Botting has presented undisputed evidence concerning the contents of its bid, which the Government cannot contradict.

The undisputed facts surrounding what was, and was not, included in the Botting bid are established by the testimony of Pete Botting, Chairman and Chief Executive of Botting, and Michael Burrus, Executive Vice President for Botting. (CSUF, ¶¶15-24, App. 18-20, 38-41) Both Mr. Botting and Mr. Burrus were specifically involved in the computation of Botting's sub-bid on the Bassett Hospital Project. Both outlined the facts

surrounding the inclusion of $315,151.00 into the bid, and both testified that the amount was inserted as additional anticipated costs for specialized personnel and other similar costs, and not for field labor escalation.

Botting job records reflect that the $315,151.00 was included in the project budget as "other direct job costs," and was tracked as such monthly. The scope of escalation provisions is limited to the cost items expressly covered by the provision. As a result, even where a contractor warrants its bid to not include contingencies, the warranty and contract escalation provision do not apply to cost items outside of the escalation provision's scope. Cibinic & Nash, Formation of Government Contracts, at 1098-99 (3rd ed. 1998), citing Echelon Serv. Co., Comp. Gen. Dec. B-208720.2, 83-2 CPD ¶86; Fermont Div., Dynamics Corp., 79-1 BCA ¶13,774 (ASBCA 1979).

In this case, Botting's subcontract with DPG defines the cost items to which the EPA applies. The EPA by its own terms was to apply only to wages for "labor costs." (CSUF, ¶25, App. 70-71) "Laborers or mechanics" are defined as those whose duties are manual or physical in nature (including those workers who use tools or who are performing the work of a trade), as distinguished from mental or managerial. The definition excludes

workers whose duties are primary executive, supervisory, administrative or professional. (CSUF, ¶26)

Amounts included in Botting's sub-bid under the headings "ESCAL 7/02-7/03" and "ESCAL 7/03-7/04," are amounts allocated for the payment of moving expenses, housing expenses, and travel expenses of Botting's Project Manager, Assistant Project Manager, Project Superintendent, and Project Engineer. (CSUF, ¶¶19-23, App. pp. 19-20, 38-40) The work duties of these individuals are entirely managerial and do not meet the criteria of 48 C.F.R. §22.401, and were not included in the wage escalation claim. (CSUF, ¶¶19-23, App. pp. 19-20, 38-40)

Thus, based on the undisputed testimony regarding the creation of the Botting bid, and the parties' job records during contract performance, the Government cannot meet its burden to establish that a genuine issue of fact exists that the $315,151.00 is actually a field labor escalation cost. Unsupported or conclusory averments are insufficient to avoid a summary judgment. TechSearch, LLC v. Intel Corp., 286 F.3d 1360 (Fed. Cir. 2002). A non-movant must do more than merely raise some doubt as to the existence of a material fact in opposing a summary judgment; evidence must be forthcoming from the non-movant which would be sufficient to require submission to a jury of disputes over the facts. Avia Group

International, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557 (Fed. Cir. 1988).

In this instance, Contracting Officer Marie McDonald has testified that she bases her contention that a contingency exists in the bid solely on her disbelief of Mr. Botting's testimony. (CSUF, ¶34, App. pp. 53-54, 56) However, summary judgment should not be denied simply because the opposing party asserts that the movant's witnesses are not to be believed. TypeRight Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151 (Fed. Cir. 2004).

The Government has no evidence to refute the facts and, as a result, it has not met its burden. Summary judgment is appropriate in Botting's favor for an order declaring that it is entitled to the field labor wage escalation costs, to be quantified at the completion of the project.

**B. Irrespective of the alleged inclusion of a labor contingency, no issue of fact exists to preclude judgment for Botting on the remainder of its actual costs, reserving the contingency amount for trial.**

Irrespective of a determination of whether the line item for $315,151.00 is a labor contingency, no dispute exists that the actual field labor wage costs increased, and Botting is entitled to judgment in that amount, even if the Court reserves the issue of the existence of a contingency for later determination. This issue is based wholly on the

construction of a FAR and is thus an issue of law for the Court. See National Westminister Bank PLC v. U.S., 69 Fed. Cl. 128 (2005) ("the proper interpretation of a regulation or agency guideline . . . presents a question of law that the court must resolve").

An analysis of the contract documents in their entirety establishes that Botting was not prohibited from including a contingency in its bid, nor instructed that, if it did so, the EPA clause would be of no force and effect. No provision of the Government's Invitation for Bids, and no provision of Botting's subcontract, express or implied, required Botting to warrant the subcontract price included no contingency for field labor wages subject to escalation. Moreover, neither during the October 31, 2001 pre-bid conference, nor at any other time prior to or after Botting submitting its second sub-bid, did a Government representative request that Botting's sub-bid exclude field labor wage contingency, or that Botting warrant the same. (CSUF, ¶13, App. pp. 18, 55, 61-63) Contracting agencies commonly require a warranty that bids contain no contingency; it is in this fashion the Government can ensure no duplication in the bid process. See, e.g., Echelon Serv. Co., Comp. Gen. Dec. B-208720.2, 83-2 CPD ¶86 (escalation clause required bidders to warrant that the prices submitted for the option periods did not include any allowances to cover increases in

costs for which the escalation clause provided an adjustment); Fermont Div., Dynamics Corp. ASBCA No. 21,949, 79-1 BCA ¶13,774 (pursuant to contract, appellant warranted that its bid for the option quantities includes no price contingency). If the presence of contingencies simply barred a contractor from any recovery of an EPA amount, such warranties would be unnecessary.

Here, despite no warranty, Botting's bid contains no contingency for field labor wage escalation. (CSUF, ¶23, App. pp. 20, 40) Nevertheless, even if the $315,151.00 is found by the Court to be a contingency, Botting's contract did not require a warranty that the subcontract price includes no contingency for field labor wages subject to escalation.

Contrary to the Government's position, no federal regulation provides that a contractor will be denied all recovery under an EPA provision if a contingency was included in its bid. The Contracting Officer and the DCAA Chief Auditor both admit that they rely solely on the terms of FAR 16.203-2 and merely imply from its terms that Botting must be denied over $1.4 million in claims because the Government contends that Botting included a $315,151.00 contingency. (CSUF, ¶34, App. pp. 3-13, 53-54, 56, 59-60) That FAR provision neither states nor implies that a contractor would be so sanctioned for including a contingency, and the Government

interpretation of that provision is wholly unreasonable. Instead, FAR 16.203-2 simply outlines the obligations of a Contracting Officer to ensure that the Government does not pay twice for the same cost. In reality, it places no burden or prohibition on a bidding contractor at all.

FAR 16.203-2(a) provides that if a contingency is identified, the Contracting Officer may reduce the total EPA by the contingency amount:

> In establishing the base level from which adjustment will be made, **the contracting officer shall ensure that contingency allowances are not duplicated** by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

FAR 16.203-2(a) (emphasis added).

By its clear terms, FAR 16.203-2(a) provides no authority for the Contracting Officer to deny Botting's EPA claim in full based on the alleged $315,151.00 contingency. To be sure, the FAR council, in drafting FAR 16.203-2(a), could easily have expressly required Contracting Officers to impose a sanction where a contingency is included in a fixed-price contract with an EPA clause, but declined to do so. Rather, FAR 16.203-2(a) provides that in such case the Contracting Officer is only to **"ensure that contingency allowances are not duplicated,"** meaning the contingency amount is to be subtracted from the total EPA amount and the remainder is to be paid to the contractor.

FAR 16.203-4(c)(4)(ii) reinforces the point that contingency amounts in fixed-price contracts with Economic Price Adjustment provisions are to be subtracted from EPAs, providing that costs improperly claimed should simply not be included in the EPA:

> In negotiating adjustments under the clause, the contracting officer shall…[n]ot include in adjustments any indirect cost (except fringe benefits as defined in 31.205-6(m)) or profit.

The FAR provisions, when read together, clearly instruct the Contracting Officer to reduce adjustments as necessary, but do not empower the Government to deny the contractor's EPA claim entirely; such a reading is unreasonable. Conversely, Botting's reading of the contract is reasonable, and that interpretation is entitled to prevail over any competing interpretation by the Government.

The law is well settled in the arena of government contracting that, where a contractor's interpretation of an ambiguous contractual obligation is reasonable, such interpretation will prevail over one advanced by the Government, since the Government drafted the contract. Nielsen-Dillingham Builders, J.V. v. United States, 43 Fed.Cl. 5, 10 (1999). It is not essential that a contractor demonstrate that its position is the **only** reasonable one. Bennett v. United States, 371 F.2d 859, 864 (Ct.Cl. 1967). The test is whether or not the contractor's interpretation standing alone is

reasonable. Bennett, 171 F.2d at 861. Once a contractor shows that its interpretation was reasonable, and that it relied on such interpretation in preparing its bid, the document will be given the meaning which is more favorable to the contractor since the contractor did not draft the contract. Peter Kiewit & Sons Co. v. United States, 109 Ct.Cl. 390, 482 (1947).

In this instance, Botting's interpretation of the FAR provision and the EPA clause incorporated into its contract is a reasonable one, which this Court must enforce. The plain language of the FARs encourages the Government to ensure that duplicate amounts are not paid to a contractor for increased labor costs. Even the Government's auditor testified that the FAR clause on which the Contracting Officer relied to reject Botting's claim could be read to simply mean that any contingency should be subtracted to avoid duplication when paying an EPA, and that he "could see both sides of the argument." (CSUF ¶29, App. pp. 65-66) He also testified that, normally, a pre-award audit would have been conducted and, if an escalation contingency was found, it would have simply been subtracted from the proposed contract amount—the alternative relief Botting seeks here. (CSUF ¶29, App. pp. 63-64) Secondly, the Resident Engineer on the project interprets the clause to require only deduction, not any preclusion from all payment for the EPA. (CSUF ¶35, App. p. 74) To the

extent increased labor costs were included in Botting's bid, they may simply be reduced from the overall amount of the claim, which accomplishes the purpose of assuring that no duplication is paid.

In contrast, the Government's interpretation of the FAR and the contract is wholly unreasonable. The Government would read into the FARs additional language that does not exist and require a harsh sanction against a contractor who has no legal or contractual obligation not to include a contingency in this instance. The Government's interpretation would be to deny a contractor all increased costs if so little as a dollar of contingency was placed in the bid. (CSUF ¶34, App. p. 60) The Government cannot establish by the language of the FAR that this is the unambiguous meaning of this provision. In fact, the Government has made the argument in other settings that when an EPA fails to provide for a sufficient rate of escalation, it is incumbent on the contractor to have placed a contingency in the bid for the amounts which might not be covered by the EPA in order to protect itself. Craft Machine Works, Inc., 90-3 BCA ¶23095 (ASBCA 1990). While the Board refused to decide the issue of the appropriateness of the Government including an EPA **and** encouraging contingencies, it is clear that the FAR provision is not being routinely interpreted by the Government itself. The Government has continued to

argue that a contractor is at fault for failing to bid high enough to cover unexpected deviations in the price escalation allowed by the Government under an EPA. MAPCO Alaska Petroleum v. U.S., 27 Fed.Cl. 405 (Fed. Cl.Ct. 1992).[3] Thus, past history also establishes that the clause is ambiguous and Botting is entitled to enforcement of its reasonable interpretation.

Ultimately, by inserting FAR 52.216-4 into the second solicitation, the Government got what it was seeking – a lower project cost. The Government saved the money it needed to in order to be within budget, and it awarded a contract subsequent to the second round of bidding. Now, some four years after receiving the benefit it bargained for, the Government is trying to get out of paying the burden that it promised to bear. The contract and the law do not allow such actions by the Government. Hettich and Co., GmbH, 86-3 BCA ¶19043 (ASBCA 1986).

Botting was not provided any notice whatsoever that the inclusion of any labor wage contingency in its bid would result in sanctioning, as well as the current litigation. At this late date, it is simply unfair for the Government

---

[3] In both MAPCO and Craft, the contractor was required to warrant that no contingency for labor existed, which supports the court's decision that contingencies were prohibited. No such warranties were required or made here, and the factual setting of these cases were focused on the appropriate measure of the EPA rate.

to take the position that Botting somehow forfeited amounts earned under its subcontract because of an alleged contract requirement on which the contract documents and the entire Federal Acquisition Regulations are silent. Generally, courts abhor a forfeiture and require more than what the Government has provided here. See United Buckingham Freight Lines v. Riss and Co., 241 F.Supp. 861, 863 (D.Col.1965); Warner v. United States, 157 Ct.Cl. 1, 5, 301 F.2d 327 (1962).

Botting has borne the burden of compensating its field labor crew at higher and higher rates than it was instructed to, and did, include in its sub-bid. Botting is being forced by the Government's inaction to fund the job out of its own pocket. Government contracting should not be that unfair. Southern California Edison v. United States, 58 Fed.Cl. 313, 325 (2003) (Government owes a duty of good faith and fair dealing to its contracts).

FAR 52.216-4 contained in Botting's contract provides that Botting is to be compensated for its field labor cost increases, and Botting should be so compensated. Botting is thus entitled, at a minimum, to a summary judgment order, declaring that Botting is entitled to recover its field labor wage escalation costs incurred by Botting to the close of the project, less $315,151.00 the Government contends Botting included in its sub-bid as a contingency for field labor wage escalation, as a matter of law. The parties

can then litigate the issue of whether the $315,151.00 was actually a contingency for field labor wage increase.

## IV. CONCLUSION

Amounts included in Botting's sub-bid under the headings "ESCAL 7/02-7/03" and "ESCAL 7/03-7/04" are amounts allocated to pay moving expenses, housing expenses, and travel expenses of Botting's management personnel on the project, and thus have no effect on the operation of the EPA, FAR 52.216-4. Botting is, as a result, entitled to an EPA in the full amount incurred.

Alternatively, relevant FAR provisions make clear that in the event a labor wage contingency does exist, the contingency amount is to be subtracted from the EPA amount. Thus, if issues of fact preclude a declaration that Botting is entitled to the full EPA amount, Botting is entitled,

at a minimum, to a declaration that it is entitled to the difference between increased labor rate costs incurred, less the alleged contingency.

DATED this 31st day of August, 2006.

//s//
ROBERT H. CRICK, ESQ
WINSTON & CASHATT
Attorneys for Plaintiff
1900 Bank of America Financial Center
601 West Riverside
Spokane, WA 99201
(509) 838-6131 telephone
(509) 838-1416 facsimile

Of Counsel:

PATRICK A. SULLIVAN, ESQ
JOHN H. GUIN, ESQ
WINSTON & CASHATT
1900 Bank of America Financial Center
601 W Riverside Ave.
Spokane, WA 99201
(509) 838-6131
(509) 838-1416 facsimile

ERIK D. EIKE, ESQ.
707 Richards Street, Suite 201
Honolulu, HI 96813
(808) 537-5950
(808) 537-5955 facsimile

CERTIFICATE OF FILING

I hereby certify that on this 31st day of August, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

//s//

ROBERT H. CRICK
1900 Bank of America Financial Center
601 West Riverside Avenue
Spokane, WA 99201
(509) 838-6131 telephone
(509) 838-1416 facsimile