No. 05-462
Judge Baskir

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DICK PACIFIC/GHEMM, JV,
on behalf of W.A. Bottling Company,
Plaintiffs,

v.

THE UNITED STATES OF AMERICA,
Defendant.

# DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-2377

October 2, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

PAGE

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I. Standards Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II. Defendant Is Entitled to Summary Judgment Because Botting Cannot Demonstrate That It Did Not Include Escalation In Its Bid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III. As A Matter of Law, Botting's Inclusion Of Escalation In Its Bid Precludes Plaintiff From Receiving Any Relief . . . . 25

A. The FAR Provisions Contained In The Contract Must Be Interpreted In Accordance With The Rules Of Regulatory Interpretation, Not Contract Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B. The FAR Expressly Prohibits Duplicative Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV. It Is Premature For The Court To Rule As To The Quantum Of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## TABLE OF AUTHORITIES

### CASES

**PAGE(S)**

American Transparents Plastics Corp.,
83-2 Comp. Gen. 539 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Auer v. Robbins,
519 U.S. 452 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Beta Sys v. United States,
838 F.2d 1179 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Bowles v. Seminole Rock & Sand Co.,
325 U.S. 410 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Bromley Contracting Co. v. United States,
15 Cl. Ct. 100 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cathedral Candle Co. v. U.S. Int'l Trade Comm'n,
400 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Celotex Corp v. United States,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Craft Machine Works, Inc., ASBCA No. 35,167,
90-3 BCA 23 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 34

Dalton v. Cessna Aircraft Co.,
98 F.3d 1298 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

DynCorp Information Systems, LLC v. United States,
58 Fed. Cl. 446 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fermont Div., Dynamics Corp of America,
79-1 BCA ¶ 13,774 ASBCA No. 21949 (1979) . . . . . . . . . . . . 12, 13

Gonzales v. Oregon,
__ U.S. __, 126 S.Ct. 904 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . 26

Honeywell, Inc. v. United States,
228 Ct. Cl. 591 F.2d 182 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Lockheed Corp. v. Widnall,
113 F.3d 1225 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 25

Lockheed Martin Corp. v. United States,
50 Fed. Cl. 550 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Mapco Alaska Petroleum, Inc., v. United States,
27 Fed. Cl. 405 (1992) . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32, 34

McDonnell Douglas Corp. v. United States,
37 Fed. Cl. 295 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Morrison-Knudsen Co., Inc., v. United States,
427 F.2d 1181 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

O'Connor v. United States,
308 F.3d 1233 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 11

Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,
984 F.2d 1182 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 17

Plantation Landing Resort, Inc. v. United States,
30 Fed. Cl. 63 (1993), aff'd, 39 F.3d 1197 (Fed. Cir. 1994),
cert. denied, 514 U.S. 1095 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 17

Raitport v. United States,
33 Fed. Cl. 155 (1995), aff'd, 74 F.3d 1259 (Fed. Cir. 1996) . . . . . 17

Santa Fe Engineers, Inc. v. United States,
801 F.2d 379 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 12

Telex Communications, Inc. v. United States,
40 Fed. Cl. 703 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Tesoro Hawaii Corp. v. United States,
405 F.3d 1339 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 26, 31

## STATUTES & REGULATIONS

48 C.F.R. § 15.403-4(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

48 C.F.R. § 16.101(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

48 C.F.R. pt. 16.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

48 C.F.R. § 16.203-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

48 C.F.R. § 16.203-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

48 C.F.R. § 16.203-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 29, 30, 32, 33

48 C.F.R. pt. 16.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

48 C.F.R. § 52.215-2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

48 C.F.R. § 52.216-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 37

48 C.F.R. § 52.216-4(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

DFARS § 215.404-2(a)(i)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## MISCELLANEOUS

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

John Cibinic, Jr. & Ralph c. Nash, Jr.,
Formation of Government Contracts, (2d ed. 1985) . . . . . . . . . . . . . 28

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| DICK PACIFIC/GHEMM, JV,<br>on behalf of W.A. Bottling Company, | ) | |
| Plaintiff, | ) | No. 05-462C |
| v. | ) | (Judge Baskir) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that this Court enter summary judgment in favor of the defendant because there is no genuine issue of material fact that W.A. Bottling Company ("Botting") included escalation for labor costs in its bid, and that, as a matter of law, the inclusion of such a contingency in its bid bars Botting from receiving any further recovery under the Economic Price Adjustment ("EPA") clause for labor that is included in this fixed price contract.

In support of defendant's motion, we rely upon the complaint and answer, the following brief, the parties' consolidated statement of uncontroverted facts, and the attached appendix.

## STATEMENT OF THE ISSUES

1. Whether the United States is entitled to summary judgment, because Botting cannot demonstrate that it did not include a contingency allowance for labor cost escalation in its bid.

2. Despite the inclusion of a contingency allowance for labor cost escalation in its bid, whether Botting may recover labor escalation costs in excess of the amount of its escalation contingency allowance.

## STATEMENT OF THE CASE

### I. Nature of the Case

On or about April 11, 2005, plaintiff Dick Pacific/GHEMM JV ("Dick Pacific") filed a complaint with this Court upon behalf of one of its subcontractors, Botting. In its complaint, Dick Pacific alleges that Botting had experienced increased labor costs on a construction project for the Government, and that Botting was purportedly entitled to recover these costs pursuant to an EPA clause for labor that was included in the

contract. Dick Pacific asserts three different possible causes of action for this one claim: equitable adjustment, breach of contract, and quantum meruit.

The Government filed its answer to the complaint on August 9, 2005.

## II. Statement Of Facts

The Government entered into a contract with Dick Pacific on February 19, 2002, to construct the Bassett Hospital Replacement on Fort Wainwright, Alaska. Notice to Proceed was issued on March 14, 2002, and the original contract completion date was June 17, 2006.

The Government has issued two solicitations for the Bassett Hospital project. The first solicitation was for firm fixed-price contract without an EPA clause. Due to the high prices received from the offerors, the first solicitation was cancelled. In the second solicitation, the contract type was revised in several respects, including a change from a fixed-price contract to a fixed price contract with an EPA for labor. CLIN 0011 of the Proposal Schedule included in the solicitation and the awarded contract states:

> Base line items 0001 and 0002 are subject to clause 52.216-4, Economic Price Adjustment-Labor and Material. Established labor rates and fringes as set forth for laborers and mechanics in Davis-Bacon General Wage Decision Number AK010001 and AK010006, dated 10/19/01, in

> section 0700A are subject to Adjustment. The quantities of labor allocable to each line item shall be established during the pre-award DCAA audit. Government evaluated EPA adjustments will be reflected as sub-line item under 0011 after contract award.

Def. App. 4.[1]

Contract Section 0100, Instructions, Conditions and Notice to Offerors, Paragraph 13, Volume III, Price Proposal, advises the contractor that cost information will be required in order to assist the Defense Contract Audit Agency ("DCAA") in the establishment of a baseline quantity of labor for future economic price adjustments. Paragraph 13.A.3, Subcontracts and Other Direct Costs, extends the requirement for a labor breakdown to subcontractors. Def. App. 5-6.

FAR section 52.216-4, Economic Price Adjustment-Labor and Material is included in the contract. Per paragraph (c)(1):

> Any adjustment shall be limited to the effect on unit prices of the increases and decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) Changes in rates or unit prices other than those shown in the Schedule, or (ii) Changes in the

[1] "Def. App. __" refers to the appendix attached to defendant's cross-motion for summary judgment and response to plaintiff's motion for summary judgment.

> quantities of labor of those established in the baseline pre-award audit.

Pl. App. 70.[2] See 48 C.F.R. § 52.216-4.

FAR section 16.203, Fixed-Price Contracts with Economic Price Adjustment, is the prescription for FAR section 52.216-4 and provides guidance regarding the contracting officer's administration of fixed-price contracts with EPA clauses. FAR section 16.203-2(a) states:

> In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

48 C.F.R. § 16.203-2(a).

A pre-bid conference was held on October 31, 2001, and the EPA clause was discussed. At this conference, the Government indicated that, "the intent of that [the inclusion of the EPA clause] is to allow contractors to bid competitively for labor rates initially, with the understanding that if rates increase in the future, that he will have a mechanism for getting additional funds to cover those increases in labor costs. That way when you have a

---

[2] "Pl. App. __" refers to the appendix attached to plaintiff's motion for summary judgment.

five-year duration project or a four-year duration project, you don't have to try to project out for anticipated increases." Pl. App. 50.

The contract was awarded to Dick Pacific on February 19, 2002. Def. App. 2. At that point, a pre-award audit to establish a labor quantity baseline had not been completed. On March 4, 2002, the contractor advised the Government that they were still in the process of finalizing subcontract agreements and were unable to "complete this part of the audited items." To allow notice to proceed on the contract, Dick Pacific indicated they would submit cost information for subcontractors prior to starting any subcontracting activities. Def. App. 7-8. Contract notice to proceed was issued on March 14, 2002.

On May 16, 2002, Dick Pacific and Botting entered into their initial subcontract for mechanical work from contract notice to proceed ("NTP") through February 28, 2003 (the first construction season.) A separate subcontract agreement for Phase 2, November 14, 2003 through project completion, was also dated May 16, 2002. Def. App. 9-14.

On July 17, 2002, the Government advised Dick Pacific that all subcontracts in excess of $500,000 would be audited to determine the quantities of labor subject to EPA. Def. App. 15. In response, on August

13, 2002, Dick Pacific forwarded some initial audit cost information for Botting. The documents provided were the summary sheets from Botting's bid day labor estimate and the Plumbers and Pipefitters Local 375 Labor Agreement for 1997-2002. Def. App. 16-17 (attachments omitted). On May 8, 2003, Dick Pacific forwarded a notice of wage escalation from Botting. Botting indicated a wage increase of $2.15/hour for an estimated 200,000 plumber and steam fitter labor hours or an estimated $430,000.00 increase to the contract amount. Def. App. 18-21.

On August 19, 2004, the Government notified Dick Pacific that Botting's bid estimate appeared to include escalation for labor costs. Specifically, lines 160, 161, 217, 218, 274 and 275 of their bid estimate indicated an amount for escalation related to labor hours for lead foreman, journeyman and apprentice. A review of Botting's bid estimate revealed line items entitled "ESCAL 7/02-6/03" ($1.25/hr) and "ESCAL 7/03-6/04" ($2.50/hr) on their recap sheets for Plumbing, HVAC and Process. On each sheet, the hours to which the "ESCAL" is applied equate to the total number of direct labor/mechanic hours estimated for that category of work. The Government requested that Botting provide an explanation for these line items. Def. App. 22-23.

On August 26, 2004, Botting responded by indicating that the "ESCAL" lines were used to include an additional estimated labor cost that was over and above the cost of raw labor estimates for performing the individual work items. Botting also indicated that the "additional cost estimate was an amount required for the hiring of specialized personnel from outside the local area who would command a pay rate higher than local scale, as well as an allowance for food, housing, and the like." Botting maintained that "there was no allowance for escalation included in [Botting's] bid." Def. App. 24-26. On September 3, 2004, the Government asked Botting to identify the "specialized" labor positions they intended to hire from outside the local area and to provide the calculations to support the additional costs they were estimating. Def. App. 27. Botting responded in a letter dated September 20, 2004, and indicated that "the amount included within the bid for such costs was a lump sum estimate, based upon years of experience working in the industry and in remote and sparsely populated locations." Botting alleged that examples of the costs are "the additional wages paid to supervisory and other personnel imported from Seattle and Anchorage and other locations, the cost to house and feed those individuals, the cost of transporting them back and forth

between their home base and the jobsite, and other similar costs associated with remote locations." Botting stated that the total estimate for these costs was $676,751.00. Def. App. 28-30.

A teleconference to discuss the issue of escalation was held on October 4, 2004. Participants included Dick Pacific, Botting, counsel for Botting, DCAA and the United States Department of the Army, Corps of Engineers. Pete Botting, the Chairman and Chief Executive Officer of Botting, alleged that the costs entered under the ESCAL line items represented an amount intended to compensate for an underestimation of the amount required to hire specialized personnel from outside the local area as well as an allowance for subsistence. Mr. Botting alleged that an additional amount of approximately $380,000 had to be incorporated into their bid just as the bid was being finalized for submission. According to Mr. Botting, this amount should have been incorporated into the Other Direct Job Costs ("ODJC") but they were unable to make the entries into that estimate sheet due to problems with the estimating software. To get those dollars included, they were entered under the ESCAL lines instead. Mr. Botting alleged that in the last minutes of bid preparation, they failed to

change the title of the ESCAL lines. The total amount added under ESCAL was $315,151. Def. App. 33, 45-46.

On October 26, 2004, the Government denied Botting's request for an EPA adjustment based on the inclusion of an apparent contingency for labor. The Government concluded that Botting's contention regarding the ESCAL was not supported by their bid estimate and no other contemporaneous documentation to support Botting's allegation had been provided. Def. App. 31-32.

A Government Memorandum for Record was generated on November 4, 2004 to document the shifting explanations received from Botting regarding the ESCAL in their bid. Initially, Botting verbally told the Government that the ESCAL was for labor rate increases which occurred between the first and second times the Bassett project was bid. Def. App. 34-35. On August 26, 2004, Botting indicated that the ESCAL was an additional estimated labor cost that was over and above the raw labor estimates included in the bid for the individual work items for hiring specialized workers from outside the local area. Def. App. 24-26. During the teleconference on October 4, 2004, Botting stated that the additional costs were related to the higher wages, subsistence and travel associated

with hiring the project manager, project engineer and superintendent from outside the local area. Def. App. 33-35.

Botting requested a Contracting Officer's Decision on their eligibility for an EPA adjustment. The request was submitted by Dick Pacific in Serial Letter No. 75-2600-0009-01227, dated January 3, 2005, and was certified by Dick Pacific in accordance with the Contract Disputes Act. See Def. App. 37. A final decision denying Dick Pacific's claim was issued on March 11, 2005. Def. App. 36-48. This suit followed.

## ARGUMENT

### I. Standards Of Review

Summary judgment is proper if no genuine question of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp v. United States, 477 U.S. 317, 322 (1986). A fact qualifies as "material" if it would affect the outcome of the case. Anderson, 477 U.S. at 248. The burden of showing the absence of a genuine question of material fact rests with the movant, and the court must view all evidence in the light most favorable to the non-movant, resolving all doubts in that party's favor. O'Connor v. United States, 308 F.3d 1233 (Fed. Cir. 2002).

After the moving party has met its burden, the non-movant "must proffer countering evidence sufficient to create a genuine issue of factual dispute." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987). The non-movant's burden is to set forth specific facts that generate issues for trial. This burden "is not met by reliance on its pleadings alone, or by conclusory allegations and generalizations." Bromley Contracting Co. v. United States, 15 Cl. Ct. 100, 105 (1988). The non-movant must present sufficient evidence of a dispute as to "material fact such that the trier of fact could reasonably find in favor of the non-movant." Id. at 105. Here, there is no genuine dispute between the parties regarding the material facts, and upon the undisputed facts of record, the United States is entitled to judgment as a matter of law.

Contrary to this well-settled standard of review on a motion for summary judgment, Dick Pacific argues at the outset that the Government possesses an initial burden of establishing that Dick Pacific's bid did not include escalation. Pl. Mot. Summ. J. 12. Dick Pacific cites to an Armed Services Board of Contract Appeals case in support of this proposition, Fermont Div., Dynamics Corp of America, 79-1 BCA ¶ 13,774 ASBCA No. 21949 (1979). Board decisions, however, do not bind this Court, especially

when they are contrary to well-settled law. See Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 561 (2001). While some deference may be given to the board's sound legal analysis, Fermont cites to no law in support of shifting the burden to the Government. Indeed, it is not entirely clear that Fermont articulates a burden shifting rule. In Fermont, the contractor's bid contained a warranty that the bid contained no contingency (as is not the case here). It is possible to read Fermont as providing that when one party meets its burden, then the other party must set forth evidence in support of any challenge, consistent with the procedures for summary judgment.

As noted above, it is well settled that the party moving for summary judgment has the burden of demonstrating that there is no material fact at issue. Thus, to the extent that Dick Pacific moves for summary judgment, the initial burden is on them to demonstrate an entitlement to judgment in their favor. Similarly, to the extent that the Government moves for summary judgment, the Government possesses a similar initial burden. Only after a movant demonstrates that their entitlement does the burden shift to the non-moving party to demonstrate a genuine issue of material fact.

## II. Defendant Is Entitled to Summary Judgment Because Botting Cannot Demonstrate That It Did Not Include Escalation In Its Bid

On their face, Botting's bid sheets plainly include escalation. Specifically, lines 160, 161, 217, 218, 274 and 275 of their bid estimate indicated an amount for escalation related to labor hours for lead foreman, journeyman and apprentice. A review of Botting's bid estimate revealed these line items entitled "ESCAL 7/02-6/03" ($1.25/hr) and "ESCAL 7/03-6/04" ($2.50/hr) on Botting's recap sheets for Plumbing, HVAC and Process. Pl. App. 31-33. The total escalation amount included in these 6 lines is $315,151. See Pl. App. 43.

Moreover, the escalation amount contained in the bid sheets is not a random sum, but is a figure directly related to labor hours included elsewhere on the bid sheet. For each of the three relevant recap sheets, the hours to which the "ESCAL" is applied equate to the total number of direct labor/mechanic hours estimated for that category of work. For example, the total number of direct labor hours on the plumbing recap sheet is 68,558, the total number of hours of ESCAL for that sheet is 68,559. See Pl. App. 31. The total number of direct labor hours on the HVAC recap sheet is 65,507, the total number of hours of ESCAL for that sheet is 65,507. See Pl. App. 32. Finally, the total number of direct labor

hours on the process recap sheet is 14,241, the total number of hours of ESCAL for that sheet is 14,241. See Pl. App. 33.

Dick Pacific, however, asserts that the Court should ignore the unambiguous documents, and instead conclude, consistent with the declarations of Pete Botting and Michael Burris, that the columns entitled "ESCAL" were not escalation. In support of its motion for summary judgment, Dick Pacific submitted the sworn affidavit of Pete Botting, company chairman and chief executive officer, in which he sets forth the alleged events that occurred on bid day of Botting's second sub-bid. Mr. Botting asserts that the estimating team decided to insert additional Other Direct Job Costs ("ODJC") for certain specialty items such as supervisor per diem, supervisor travel allowance, premium for the cost of supervisors by adding man hours in the bid line items labeled ESCAL, bid items 160, 161, 217, 218, 274, and 275. The purported reason for placing these costs in these six line items previously used to include labor escalation in their original bid was because of time constraints in the final bid preparation and the fact that they had been having trouble with their bidding program carrying forward sheet no. 7 ("ODJC") items. Pl. App. 35;

Def. App. 97.[3] Mr. Botting claims that the line item labels of ESCAL were not revised due to lack of time. Pl. App. 38-40 (Affidavit of Pete Botting).

Similarly, Dick Pacific also proffered in support of its motion the sworn affidavit of Michael Burrus, company executive vice president/business development, in which he alleges that on bid day the amounts included in Botting's second sub-bid in the line items labeled ESCAL were reduced to zero, and inserted in its place were additional anticipated costs for specialized personnel. The stated reason for inclusion of these costs in these six separate line items was because Botting was at the time experiencing difficulty with entries in the ODJC portion of the software carrying over to the final recap sheet, and placing them in the ESCAL line items was an attempt to accurately reflect those costs in the overall bid amount. Entry of these costs in the ESCAL line items purportedly reduced the possibility of a clerical mistake. Mr. Burrus also stated that Botting simply did not have the time to go in and modify the descriptions of the line items due to time constraints for finalizing the estimate. Pl. App. 19-20 (Affidavit of Michael Burrus).

---

[3] Because the "ODJC" caption is not visible on the bid sheet appended to plaintiff's motion, the Government has filed a clearer copy of sheet no. 7 with its appendix.

Dick Pacific's argument that escalation was not included in its bid is solely premised upon the statements of Mr. Botting and Mr. Burris. Such conclusory, self-serving statements by themselves, however, are insufficient to create a genuine issue of material fact on this point. Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed. Cir. 1993) ("merely conclusory statements or completely insupportable, specious, or conflicting explanations or excuses will not suffice to raise a genuine issue of fact"); see Raitport v. United States, 33 Fed. Cl. 155, 161 (1995), aff'd, 74 F.3d 1259 (Fed. Cir. 1996); Plantation Landing Resort, Inc. v. United States, 30 Fed. Cl. 63, 68 (1993), aff'd, 39 F.3d 1197 (Fed. Cir. 1994), cert. denied, 514 U.S. 1095 (1995).

Indeed, the deposition testimony of Messrs. Botting and Burrus clearly indicates that neither declarant was in a position to make anything other than unsupported, conclusory statements regarding the bid sheets. While both declarations present a clearly defined set of events occurring on bid day, the depositions made clear that both declarants were not directly involved in making any changes to the bid sheets. Although Michael Burrus testified at deposition that he and Mr. Botting discussed the fact that wage escalation did not need to be included in the second

sub-bid, he also testified that he had not seen any copies of the second sub-bid showing the ESCAL line items reduced to zero. Def. App. 62-64 (Dep. of Michael Burrus). Mr. Burrus also testified that he was not at the computer to see exactly where the additional ODJC were placed in the bid, and did not really care where it got placed as long as they got the dollars placed in the bid. Def. App. 65. Mr. Burrus's testimony is inconsistent with, and does not support, his sworn statement, in which he affirmatively states:

> As a result, on bid day, Botting first eliminated contingency amounts from the "ESCAL" bid line items. Then, after identifying its need to increase ODJC costs, Botting inserted its additional anticipated costs for specialized personnel into the "ESCAL" line items.

Pl. App. 19 (Affidavit of Michael Burrus).

Mr. Botting's deposition testimony is similarly revealing. Regarding the addition to their bid of the additional ODJC, Mr. Botting testified that he did not tell anyone how to work these costs into the bid sheet, but that he just "gave them the total numbers and asked them to get it in their somehow." Def. App. 69 (Dep. of Pete Botting). When asked if any suggestions were offered about how to work them into the bid sheet, he stated: "I don't recall that they did. They said they had taken care of most

of it and I was off to something else." Id. His sworn affidavit affirmatively represented that "the estimating team decided to insert the additional ODJC costs… in the ESCAL bid line items, rather than attempt to create new line items," and describes in more detail how this was accomplished. Pl. App. 40 (Affidavit of Pete Botting) However, at his deposition, when queried how he knew that the team had decided to add those costs to the ESCAL bid line items, he responded:

> They said they had it covered. They covered an approximate amount of what we were looking for. And I'm not sure they would have told me where they actually put it. They probably did, but I don't recall that conversation specifically.

Def. App. 72. Despite his statement in his affidavit that he discussed that escalation should be reduced to zero because of the existence of an EPA clause in the second solicitation, Mr. Botting testified at deposition that he didn't recall seeing a bid sheet where this was done. Def. App. 73-74.

In addition to Messrs. Botting and Burrus, the other employees present in the bid room on bid day for the second sub-bid for this project were Janelle Bruhn, Jason McDonald, and Karen Langeberg. Janelle Bruhn testified at deposition that she does not recall being involved in any discussions regarding eliminating any escalation cost from the second bid,

does not recall deleting escalation costs or being asked to fill in something in the escalation columns in the second sub-bid, and that she does not recall being asked to add specific costs into the second sub-bid for special items such as supervisor per diem, supervisor travel allowance or premium for the cost of supervisors. Def. App. 85, 88-91 (Dep. of Janelle Bruhn). Jason McDonald testified at deposition that he was in the bid room on bid day to run faxes and take excess phone calls, but that he did not do any data entry for the Bassett rebid, and that he does not recall any conversations that day about an EPA clause or about adding costs for supervisor per diem, supervisor travel allowance, or premium for the cost of supervisors. Def. App. 76-78 (Dep. Of Jason McDonald). Karen Langeberg testified at her deposition that she was not part of a conversation on bid day to put extra costs in the second sub-bid, does not recall typing in any figures in the line item labeled "ESCAL," does not recall deleting escalation costs from the bid sheet, and does not recall being told to delete escalation costs from the second sub-bid, and does not know that they were actually deleted. Def. App. 80-82 (Dep. of Karen Langeberg). Karen Langeburg also testified that she does not recall a conversation

where someone in the bid room was told to delete escalation from the bid. Def. App. 83.

The uncontroverted facts can, at most, be said to support a conclusion that a discussion may have occurred in the bid room between Pete Botting and Michael Burrus that escalation should be removed from Botting's second sub bid. However, the facts do not support that it was ever done, since the individual purportedly having done so has not, and apparently cannot, be identified, nor can anyone present in the bid room who would have had the responsibility for data entry and making the changes affirmatively say that they saw that it had been done. The declarations also may support a finding that a discussion occurred between Messrs. Botting and Burrus that additional ODJC in the range of $300,000 and $400,000 needed to be added to the bid; however, they similarly do not support that this amount was added to the ESCAL line items, since no one can be identified as, nor does anyone in the bid room have any recollection of, having done so. The uncontroverted facts may support that there may have been an intent, but do not support that the intent was ever effectuated.

As noted above, there are specific ODJC line items on bid sheet no. 7 for the costs that Dick pacific asserts that it inserted in the six "ESCAL" lines. Def. App. 97. More specifically, there are line items for project manager, project assistant manager, and project engineer (369, 370, 371); housing for project manager, project assistant manager, and project engineer (379, 380, 381); and travel for project manager, project assistant manager, and project engineer (382). Id. Dick Pacific's proffered explanation as to why the additional ODJC were inserted in the ESCAL line items of Botting's bid rather than on the ODJC sheet (or elsewhere) also lacks consistency and logical rationality. The purported reason for this odd placement was that the ODJC bid sheet had been experiencing problems with the estimating software carrying forward to the final bid recap sheet, and that if Botting entered the information into a different location, they reduced the possibility of a clerical mistake. Pl. App. 19, 40; Def. App. 45-46. However, Mr. Burrus testified at deposition that the only reason they were not placed on the ODJC sheet was to eliminate having to page through multiple pages during bid day and to try to work from the front sheets as much as possible. Def. App. 65-66. Pete Botting stated that the

estimating team decided to insert the ODJC costs in the ESCAL bid line items rather than attempt to create new line items. Pl. App. 40.

These explanations are, quite simply, unconvincing. Botting's bid spreadsheet contains line items on sheet 1, line 41, labeled CUT/ADD, and line 42, ARB CUT/ADD, that would have been used to insert the additional costs at the last minute. Def. App. 86-87, 91 (Dep. of Janelle Bruhn). This would have been on the "front sheet" and would have minimized entries on multiple pages, the stated desire of Mr. Burrus, and could have been added on one line item rather than on six. This could have been done as a single entry and not as a revision to the manhour entries on the ESCAL line items in six separate locations, each involving mathematical formulas the results of which had to be carried forward to the bid recap sheet.

Nor can Dick Pacific explain the failure to also revise the "ESCAL" labels, an easy task to perform involving the simple entry of text into a cell in the spreadsheet. Mr. Burrus admitted that it was not a difficult thing to modify the descriptions of the line items in their bid Excel spreadsheet, and that it would simply involve typing text into a cell. Def. App. 67. This was confirmed by Janelle Bruhn. Def. App. 90-91. Indeed, if there was no time to revise the ESCAL labels it makes little sense that Dick Pacific would

take the time to take break this additional ODJC cost up into six unequal portions, divisible by $1.25 or $2.50, to be inserted in the "ESCAL" lines, rather than simply add the full amount to the "CUT/ADD" lines.

Further, even after the bid date, Dick Pacific continued to include the ODJC costs in its baseline labor costs, rather than converting these costs to ODJC costs. For example, in preparing its "original bid breakdown" on March 11, 2002, Botting continued to maintain the ODJC total labor as $1,901,890 and the ODJC expense as $2,270,107, rather than adding in the $315,151 that Dick Pacific now alleges was ODJC costs to these figures, and subtracting the same amount from its labor baselines. Def. App. 49-50.

Finally, Botting has not and can not produce any contemporaneous documents to support its claim that the "ESCAL" lines were anything other than escalation.

In summary, Dick Pacific argues that the Court must ignore the plain language of the bid sheets and suspend logic to hold that the rows entitled escalation were actually not escalation, but ODJC, based upon its two conclusory declarations. Botting's argument is without merit. At best, Botting may be able to demonstrate a subjective intent on the part of Mr.

Botting and Mr. Burris to have escalation removed from its bid. However, Botting cannot demonstrate that it actually removed escalation from its bid, and that the columns entitled "ESCAL" are anything other than they purport to be.

Accordingly, we respectfully request that the Court grant the Defendant's cross-motion for summary judgment and hold that Botting included escalation in its bid. We further respectfully request that Botting's motion for summary judgment as to whether or not Botting included escalation in its bid be denied. In the event that the Court determines that the Government has not met its burden on summary judgment , we respectfully request that Botting's motion for summary judgment as to whether or not Botting included escalation in its bid be denied.

## III. As A Matter of Law, Botting's Inclusion Of Escalation In Its Bid Precludes Plaintiff From Receiving Any Relief

### A. The FAR Provisions Contained In The Contract Must Be Interpreted In Accordance With The Rules Of Regulatory Interpretation, Not Contract Interpretation

Regulations are interpreted as statutes, by focusing upon their plain meaning. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414-15 (1945) (focusing on the "plain words of the regulation"); Lockheed Corp. v. Widnall, 113 F.3d 1225, 1227 (Fed. Cir. 1997) ("To interpret a regulation

we must look at its plain language and consider the terms in accordance with their common meaning."). If the regulation is unambiguous, no further inquiry is usually required. Tesoro Hawaii Corp. v. United States, 405 F.3d 1339, 1347 (Fed. Cir. 2005).

If a regulation is ambiguous, as a general rule, the Court will defer to an agency's interpretations of the regulations it promulgates, as long as the regulation is ambiguous and the agency's interpretation is neither plainly erroneous nor inconsistent with the regulation. See Gonzales v. Oregon, __ U.S. __, 126 S.Ct. 904, 914 (2006); Bowles v. Seminole Rock, 325 U.S. 410, 413-14 (1945) ("[In] an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation. Our only tools, therefore, are the plain words of the regulation and any relevant interpretations of the Administrator."). Such agency interpretations may be made even during the very proceeding that has become the subject of the Court's review. See Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1364 (Fed. Cir. 2005) ("That generous degree of deference is

due to an agency interpretation of its own regulations even when that interpretation is offered in the very litigation in which the argument in favor of deference is made.") (citing Auer v. Robbins, 519 U.S. 452 (1997)).

Dick Pacific incorrectly treats the interpretation of the FAR provisions as matter of contract interpretation and argues that any ambiguity in these FAR provisions must be interpreted in its favor pursuant to the doctrine of contra proferentem. However, Dick Pacific ignores the fact that this Court is interpreting a FAR regulation, not merely a contract, which must be interpreted according to the rules of regulatory interpretation. The Court of Claims has clearly stated "that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation." Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 596, 661 F.2d 182, 186 (1981). See also Santa Fe Engineers, Inc. v. United States, 801 F.2d 379 (Fed. Cir. 1986) (rejecting the application of contra proferentem to procurement regulations); DynCorp Information Systems, LLC v. United States, 58 Fed. Cl. 446, 458 (2003). Accordingly, Dick Pacific's attempt to apply ordinary principles of contract interpretation to the interpretation of FAR provisions contained in the contract must be rejected.

## B. The FAR Expressly Prohibits Duplicative Contingencies

The FAR generally allows for two broad types of Government contracts: fixed-price contracts and cost-reimbursement contracts. 48 C.F.R. § 16.101(a). See 48 C.F.R. Pt 16.2 (fixed-price contracts); Pt. 16.3 (cost-reimbursement contracts).

In a firm fixed-price contract, the contractor is bound to complete work "at a fixed amount of compensation once adjusted regardless of costs of performance." McDonnell Douglas Corp. v. United States, 37 Fed. Cl. 295, 298 (1997) (quoting JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 715 (2d ed. 1985)). The contractor bears the risk of loss should its actual costs exceed the price of the contract, and accordingly must price the contract to account for any economic uncertainty. See Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir. 1996).

The FAR, however, also permits the use of a fixed price contract with an economic price adjustment for specific contingencies. Specifically, "a fixed-price contract with economic price adjustment provides for upward and downward revision of the stated contract price upon the occurrence of specified contingencies." 48 C.F.R. § 16.203-1(a) ("description"). A fixed

price contract with an economic price adjustment ("EPA") allows the parties to share the risk of economic uncertainty for certain factors, while maintaining other costs as fixed. See Beta Sys v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988).

The FAR further provides that

> A fixed-price contract with economic price adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract.

48 C.F.R. § 16.203-2 ("application") (emphasis added). In other words, the FAR provides that an EPA clause serves as a replacement for "contingencies that would otherwise be included in the contract price."

In accordance with the proscription, FAR section 16.203-2(a) bars the duplication of contingency allowances. Specifically, the FAR states that

> [i]n establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

48 C.F.R. § 16.203-2(a) (emphasis added). It is notable that the language of the FAR prohibits the duplication of "contingency allowances" themselves, rather than the duplication of prices or costs. Nor does the plain language of this section forbid the duplication of "amounts," as Dick Pacific asserts.

The DCAA Contract Audit Manual (January 2002), available at http://www.dcaa.mil/index.html, further supports the interpretation that the focus of the regulation is to avoid duplicating "contingency allowances," rather than mere costs. Specifically, section § 9-804, Proposed Economic Adjustments – Evaluation Techniques and Considerations, provides that, in auditing an adjustment, DCAA should take care to ensure that "economic factors already contained in the original price proposal are not duplicated." Def. App. 57 (emphasis added). DCAA has long held this interpretation of the limits of the EPA clause. See, e.g., Def. App. 58-60 (DCAA Contract Audit Manual (January 1996)). While DCAA's long standing interpretation of its audit mandate is not dispositive, it further supports the interpretation that the FAR forbids the duplication of allowances rather than costs.

Consistent with this language, this Court has noted that the inclusion of contingencies in a bid is inconsistent with the EPA clause. Mapco

Alaska Petroleum, Inc., v. United States, 27 Fed. Cl. 405, 413 (1992), abrogated by on other grounds by Tesoro Hawaii Corp. v. United States, 405 F.3d 1339 (Fed. Cir. 2005). Similarly, in Craft Machine Works, Inc., ASBCA No. 35,167, 90-3 BCA 23,095 (1990), the Armed Services Board of Contract Appeals stated that the purpose of the EPA clause was to eliminate contingencies from the bid and to cover them separately under the EPA clause.

This Court in Mapco also noted that "[c]ourts and boards that have addressed [the] question have universally found that the purpose of the EPA clause is to divide the risk of economic uncertainty between the parties." Mapco Alaska Petroleum, Inc., 27 Fed.Cl. at 413. Thus, the clause is not intended to remove all of the risk of cost increases from a contractor. Where contingencies for the very items the clause is intended to address are included in the contractor's pricing for the work, the risk for those items have already been accounted for and should not be subject to adjustment under the clause.

Although the Armed Services Board, in Craft Machine Works, Inc., did not decide the issue at that time, it did explain that the Government's contention that the contractor should have included contingencies not

covered by the EPA clause raised serious questions as to the consistency of that suggestion with the language of FAR section 16.203-2(a). Craft Machine Works, Inc., ASBCA No. 35,167, 90-3 BCA 23,095 (1990). The Court in Mapco cited the same regulation and held that the prohibition on contingencies set forth in FAR section 16.203-2(a) is absolute, stating that the "compulsory nature of the regulation's prohibition on contingencies could not be more unambiguous." Mapco Alaska Petroleum, Inc., 27 Fed. Cl. at 414 (emphasis added). In so holding, the Court rejected prior case law based on a previous version of the applicable regulation that prohibited contingencies but only to the extent that they were covered by the EPA clause. Id. at 414 n. 11 (citing American Transparents Plastics Corp., 83-2 Comp. Gen. 539 (1983)).

In a similar case, dealing with an escalation clause covering possible increases in Federal excise taxes, the Court of Claims explained that the self-evident purpose and goal of the EPA clause is to discourage contractors from loading up their prices with contingencies for fear that some tax might later be held not to be covered by its escalation provision. Morrison-Knudsen Co., Inc., v. United States, 427 F.2d 1181 (1970). In light of this purpose and goal, the court broadly defined what would fall

subject to the clause so as to allow the inclusion of contingencies that a strict interpretation would place outside the clause. Id. at 415-16. Contrary to the purpose of the clause, a narrow interpretation would encourage contractors to include contingency costs that, depending on the interpretation of the clause, may not be included under the EPA.

The prohibition on contingencies in FAR section 16.203-2(a) has also been applied in instances where the contractor appears to frustrate the purpose of the provision. In Telex Communications, Inc. v. United States, 40 Fed. Cl. 703 (1998), the contractor interpreted the contract to allow for a consumer price index (CPI) adjustment to a price that had already been adjusted for the CPI. The court found that to interpret the CPI adjustment clause to result in double counting does not comport with either the regulation or logic and is not reasonable. Id. at 711.

As shown above, Botting included a contingency allowance for escalation in its sub bid. Having made such a choice, Botting cannot now avail itself of the benefits of the EPA clause without defeating the purpose of the inclusion of an EPA clause: to prevent the inclusion of like contingencies.

In an effort to avoid this result, Dick Pacific attempts to distinguish Mapco and Craft Machine Works by noting that, in both cases, the contractor had certified that his bid contained no contingencies. In the present case, Botting made no such certification. However, the conclusions in Mapco and Craft Machine Works were based upon an interpretation the unambiguous language of the FAR, not upon the terms of the solicitation. Accordingly, the lack of a certification is a distinction without relevance.

Dick Pacific also notes that, in Mapco and Craft Machine Works, the Government had urged this Court and the board to adopt an interpretation permitting a contractor to include contingencies in his bid. The Government, however, lost this argument in both cases, approximately a decade prior to the present contract. In any event, the Government should not be penalized for adopting the interpretation of this Court and the board.

Dick Pacific is correct that the prohibition on duplicate contingencies may occasionally have harsh results, especially if a contractor has seriously underestimated its contingency. However, under the interpretation proposed by Dick Pacific (that a contractor is only precluded from recovering the amount of any contingency), the entire purpose of

including an EPA is frustrated, and no risk sharing exists. Under Dick Pacific's interpretation, a contractor that includes a $1,500,000 contingency, but experiences no escalation, receives a $1,500,000 windfall. If there is a $500,000 price decrease (allowing the Government to recover the amount of the decrease), the contractor receives a $1,000,000 windfall. In the event of a $2,000,000 increase, the contractor receives an extra $500,000 to cover extra costs. In such situations, all the risk is placed upon the Government, rather than shared by the parties, and the addition of duplicative contingency allowances are not eliminated, but rather would be encouraged. The Government does not receive the benefit of the bargain, a reduction in base contract prices, through the use of an EPA.

In contrast, under the Government's interpretation, a contractor has a choice. He can estimate a contingency, and thus lose the right to an EPA, or share the equally risk with the Government through the EPA clause. This interpretation is consistent with the unambiguous language of the FAR, the purpose of the EPA clause, and the prior rulings of the Court and Board. Accordingly, Botting should not be permitted to take advantage of

the EPA provision and recover labor escalation costs in excess of the amount of its escalation contingency allowance.

## IV. It Is Premature For The Court To Rule As To The Quantum Of Damages

In the parties' joint status report, the parties agreed that liability should be bifurcated from quantum. However, in the event that Dick Pacific has changed this position, and intends for the Court to issue a ruling relative to quantum in response to its motion for summary judgment, such a ruling would be premature.

Assuming that Dick Pacific were to prevail on the merits in this matter, the Court does not have before it uncontroverted, material facts upon which it could make a quantum determination. Botting's EPA request contained estimated hours for wage rate increases anticipated to occur from the time it filed its claim through December 1, 2006. Work continues to date, after the actual contractual completion date. Botting has not submitted a revised EPA request based upon actual costs incurred to date. Where actual costs have been incurred, a quantum determination should be premised on those costs and not an estimate.

Moreover, a baseline audit has not been completed for Botting. The Defense Contract Audit Agency ("DCAA"), the agency requested by the

Corps to assist in verifying the baseline labor rate, did not complete its baseline audit once a determination was made that Botting appeared to have included wage escalation in its bid. Def. App. 93-96 (Dep. of Kevin O. Williams, pp. 7-10.). FAR section 52.216-4, Economic Price Adjustment-Labor and Material is included in the contract. Per paragraph (c)(1):

> Any adjustment shall be limited to the effect on unit prices of the increases and decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) Changes in rates or unit prices other than those shown in the Schedule, or (ii) Changes in the quantities of labor of those established in the baseline pre-award audit.

48 C.F.R. § 52.216-4(c)(1). Thus, per mandate of the FAR clause incorporated into the contract, a baseline must be established prior to determining the amount of wage escalation Botting may be entitled to recover.

Nor has an audit of the wages increase requested by Botting been performed. This audit is necessary to verify that the claimed wage increases were actually incurred in the amounts stated, and for the number of labor hours stated, as well as to determine that the increases are related to changes in the Davis Bacon published wage rates, versus, for instance,

increases mandated by a union agreement that may differ from those Davis Bacon increases. An audit would also verify that unallowable costs have not been included in the request. Defense Federal Acquisition Regulation Supplement ("DFARS") Part 215.404-2(a)(i)(A) provides that the contracting officer should consider requesting field pricing assistance for fixed priced proposals exceeding the cost or pricing data thresholds. For requests under the EPA clause of this contract exceeding the $550,000 threshold requiring the submission of cost and pricing data pursuant to FAR Part 15.403-4(a)(1), it is the practice of the contracting officer to obtain that field pricing assistance through DCAA audit. FAR clause 52.215-2(c), Audit and Records - Negotiation, which was incorporated into this contract, authorizes the contracting officer, or an authorized representative, to examine and audit all of the contractor's records, including computations and projections, related to the proposal, discussions, and pricing for a modification, if the contractor has been required to submit cost and pricing data. Thus, pursuant to regulation and the contract in this case, and consistent with practice related to other requests under the EPA clause at issue, the contracting officer is clearly

authorized to audit Botting's request, currently in the amount of $1,492,106.05, which exceeds the cost and pricing requirement threshold.

## CONCLUSION

For these reasons, the United States respectfully requests that this Court enter summary judgment in favor of the defendant and dismiss plaintiffs' complaint. In the alternative, defendant respectfully requests that the Court deny plaintiff's motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-2377

October 2, 2006

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 2nd day of October, 2006, a copy of the foregoing "DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice