DEPARTMENT OF THE ARMY
U.S. ARMY ENGINEER DISTRICT, ALASKA
P.O. BOX 6898
ELMENDORF AFB, ALASKA 99506-6898

REPLY TO
ATTENTION OF:

**CERTIFIED MAIL**

March 11, 2005

Office of Counsel (FTW171B-2130)

Ronald Young, Project Executive
Dick Pacific/GHEMM, JV
P.O. Box 35490
Fort Wainwright, AK 99703-0490

Re: Contract DACA85-02-C-0004, EPA Wage Escalation Claim for Botting (Case 83)

Dear Mr. Young:

Enclosed are my Findings of Fact and Contracting Officer's Decision (COD) regarding your claim for EPA Wage Escalation Claim for Botting (Case 83), DACA85-02-C-0004, Bassett Hospital Replacement, Fort Wainwright, Alaska.

If you have any questions about the enclosed COD, please contact Mr. Gregory Vanagel of our Office of Counsel at (907) 753-2532.

Sincerely,

Claudette M. McDonald
Claudette M. McDonald
Contracting Officer

Enclosure

# FINDINGS OF FACT TO ACCOMPANY CONTRACTING OFFICER'S DECISION

## Case 83, W.A Botting – EPA Wage Escalation Claim

**CONTRACT NUMBER:** DACA85-02-C-0004

**NAME AND ADDRESS OF CONTRACTOR:** Dick Pacific/GHEMM JV.
P.O. Box 35490
Ft. Wainwright, AK 99703-0490

**DATE OF CONTRACT:** 19 February 2002

**CONTRACT DESCRIPTION:** Bassett Hospital Replacement
Ft. Wainwright, Alaska

Construct a 32-bed, approximately 25,000 square meter multi-story replacement hospital to support the military, dependent and retiree population of Fort Wainwright, Fort Greely, Eielson AFB, and remote military sites north of the Alaska range. The project includes health care facilities for internal medicine, general surgery, EENT, orthopedics and gynecology, pediatrics and family practice. Other departments include emergency services, radiology, pathology, food service, physical therapy, pharmacy, labor and delivery, dental treatment, and staff administration. The work includes construction of the facility including offices, briefing rooms, storage, maintenance areas, restrooms, shower rooms, life support, mechanical rooms, landscaping, parking lots and site utilities.

**ORIGINAL CONTRACT AMOUNT:** $178,289,000.00

**AMOUNT OF DISPUTE:** $1,566,711.37

**THE DISPUTE:**

Prime contractor, Dick Pacific/Ghemm, JV (DPG) submitted a claim on behalf of their mechanical subcontractor W.A. Botting Company (Botting). Botting contends entitlement to an economic price adjustment for labor in the amount of $1,492,106.05. Botting contends this amount represents escalation of labor wage rates encountered to date and anticipated to be encountered in the future. DPG has added a 5% administration fee bringing the total claim to $1,566,711.37.

The Government contends Botting included a contingency for labor escalation in their bid estimate for work under this contract and is therefore precluded from an economic price adjustment (EPA) under FAR 52.216-4, Economic Price Adjustment—Labor and Material.

**PERTINENT CORRESPONDENCE:**

1. Reserved
2. Reserved
3. Contractor Serial Letter No. 75-2600-00009-01227, dated January 3, 2005.
4. Government Serial Letter No. FTW171B-1940, dated October 26, 2004.
5. Contractor Serial letter No. 75-2600-00009-01059, dated September 20, 2004.
6. Government Serial Letter No. FTW171B-1870, dated September 3, 2004.
7. Contractor Serial Letter No. 75-2600-00009-01038, dated August 26, 2004.
8. Government Serial Letter No. FTW171B-1847, dated August 19, 2004.
9. W.A. Botting Unserialized Letter to DCAA, dated July 19, 2004.
10. Contractor Serial Letter No. 75-2600-00009-00954, dated July 8, 2004.
11. Government Serial Letter No. FTW171B-1745, dated July 1, 2004.
12. Contractor Serial Letter No. 75-2600-0009-00947, dated June 28, 2004.
13. Government Serial Letter No. FTW171B-1723, dated June 23, 2004.
14. Contractor Serial Letter No. 75-2600-00009-00680, dated December 30, 2003.
15. Contractor Serial Letter No. 75-2600-00009-00664, dated December 16, 2003.
16. Government Serial Letter No. FTW171-1238, dated November 24, 2003.
17. Contractor Serial Letter No. 75-2600-00009-00462, dated May 8, 2003.
18. Contractor Serial Letter No. 75-2600-00009-00165, dated August 13, 2002.
19. Government Serial Letter No. FTW171B-126, dated July 17, 2002.

20. Contractor Serial Letter No. 001, dated March 4, 2002.

**PERTINENT CONTRACT CLAUSES AND SPECIFICATIONS:**

21. Federal Acquisition Regulation (FAR) 16.203, Fixed-Price Contracts with Economic Price Adjustment.
22. Federal Acquisition Regulation (FAR) 22.401, Definitions.
23. Federal Acquisition Regulation (FAR) 52.216-4, Economic Price Adjustment—Labor and Material (Jan 1997)
24. Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES (Dec 1998).
25. Solicitation, Offer and Award (SF1442), dated 19 February 2002 and attached Proposal Schedule
26. Contract Section 0100, Instructions, Conditions and Notice to Offerors; Paragraph 13, Volume III Price Proposal.
27. Contract Section 0700A, Davis-Bacon General Wage Decision Nos. AK010001 and AK010006, dated 10/19/01.

**PERTINENT CONTRACT DRAWINGS:**

None.

**OTHER PERTINENT DOCUMENTS:**

28. Memorandum for Record, dated 4 November 2004.
29. Electronic mail (email) message from Kevin Williams (DCAA) to John Solem (Botting), dated July 9, 2004; Subject: Receipt of W.A. Botting Information.
30. Electronic mail (email) message from Kevin Williams (DCAA) to John Solem (Botting), dated June 29, 2004; Subject: W.A. Botting Baseline Audit Request.

31. Dick Pacific/Ghemm Subcontract Agreements with W.A. Botting Company, dated May 16, 2002.

32. W.A. Botting Bid Estimate, printed 2/21/02.

33. Transcript of Pre-Bid Conference on October 31, 2001.

**FINDINGS OF FACT:**

The Government entered into a contract with Dick Pacific/Ghemm JV (DPG) on February 19, 2002 to construct the Bassett Hospital Replacement on Fort Wainwright, Alaska. Notice to Proceed was issued on March 14, 2002 and the original contract completion date was June 17, 2006.

The Government had issued two solicitations for this project. The first solicitation was for a normal firm fixed-price contract and did not contain an economic price adjustment clause. Due to the high prices received from the offerors, the first solicitation was cancelled. In the second solicitation, the contract type was revised to a fixed-price contract with an economic price adjustment for labor. CLIN 0011 of the Proposal Schedule included in the solicitation and the awarded contract states:

> Base line items 0001 and 0002 are subject to clause 52.216-4, Economic Price Adjustment—Labor and Material. Established labor rates and fringes as set forth for laborers and mechanics in Davis-Bacon General Wage Decision Number AK010001 and AK010006, dated 10/19/01, in section 0700A are subject to Adjustment. The quantities of labor allocable to each line item shall be established during the pre-award DCAA audit. Government evaluated EPA adjustments will be reflected as sub-line item under 0011 after contract award.

Per FAR 22.401, "laborers or mechanics" includes workers whose duties are manual or physical in nature, as distinguished from mental or managerial; apprentices and trainees; working foremen and any person performing the duties of laborer or mechanic regardless of any contractual relationship alleged to exist between the contractor and the individual.

Contract Section 0100, Instructions, Conditions and Notice to Offerors, Paragraph 13, Volume III Price Proposal, advises the contractor that cost information will be required in order to assist the Defense Contract Audit Agency (DCAA) in the establishment of a baseline quantity of labor for future economic price adjustments. Paragraph 13.A.3, Subcontracts and Other Direct Costs, extends the requirement for a labor breakdown to subcontractors.

FAR 52.216-4, Economic Price Adjustment—Labor and Material is included in the contract. Per paragraph (c)(1):

> Any adjustment shall be limited to the effect on unit prices of the increases and decreases in the rates of pay for labor (including fringe benefits) in the Schedule. There shall be no adjustment for (i) Changes in rates or unit prices other than those shown in the Schedule, or (ii) Changes in the quantities of labor of those established in the baseline pre-award audit.

FAR 16.203, Fixed-Price Contracts with Economic Price Adjustment, is the prescription for FAR 52.216-4 and provides guidance regarding the contracting officer's administration of fixed-price contracts with EPA clauses. FAR 16.203-2(a) states:

> In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

A pre-bid conference was held on October 31, 2001 and the EPA clause was discussed (page 29-30 of transcript). As indicated by the Government, "the intent of that [the inclusion of the EPA clause] is to allow contractors to bid competitively for labor rates initially, with the understanding that if rates increase in the future, that he will have a mechanism for getting additional funds to cover those increases in labor costs. That way when you have a five-year duration project or a four-year duration project, you don't have to try to project out for anticipated increases.".

The contract was awarded on February 19, 2002. At that point, a pre-award audit to establish a labor quantity baseline had not been completed. On March 4, 2002, in Serial Letter No. 001, the contractor advised the Government that they were still in the process of finalizing subcontract agreements and were unable to "complete this part of the audited items". To allow notice to proceed on the contract, DPG indicated they would submit cost information for subcontractors prior to starting any subcontracting activities. As an example, DPG stated that "we would not start any mechanical work until cost information on the mechanical sub is submitted". Contract notice to proceed was issued on March 14, 2002.

On May 16, 2002, DPG and Botting entered into their initial subcontract for mechanical work from contract notice to proceed (NTP) through 2/28/03 (the first construction season). A separate subcontract agreement for Phase 2, 11/14/03 through project completion, was also dated May 16, 2002. Their scope of work included firestopping, duct fire protection, seismic protection, fuel storage systems, welding pressure piping, thermal insulation, plumbing, hot-water heating systems, steam generating system, refrigerated air conditioning system, air supply-ventilation-exhaust systems, testing and balancing, and commissioning. No cost information for the audit of Botting was submitted at that time.

In Serial Letter No. FTW171B-126, dated July 17, 2002, the Government advised DPG that all subcontracts in excess of $500,000 would be audited to determine the quantities of labor subject to EPA. In response, DPG Serial Letter No. 75-2600-00009-00165, dated August 13, 2002, forwarded some initial audit cost information for Botting. The documents provided were the summary sheets from Botting's bid day labor estimate and the Plumbers and Pipefitters Local 375 Labor Agreement for 1997-2002.

On May 8, 2003, in Serial Letter No. 75-2600-00009-00462, DPG forwarded a notice of wage escalation from Botting. Botting indicated a wage increase of $2.15/hour for an estimated 200,000 plumber and steam fitter labor hours or an estimated $430,000.00 increase to the contract amount.

In Serial Letter No. FTW171B-1238, dated November 24, 2003, Botting was advised that DCAA considered the information submitted by Botting to be sufficient to start the process of establishing baseline labor rates and quantities for adjustment under the EPA clause. DPG Serial Letter No. 75-2600-0009-00664, dated December 16, 2003, forwarded a letter from Botting in which Botting revised their estimated labor wage increase to $980,947.02 and also misconstrued the Government's previous letter as indicating that the information submitted to date was sufficient to *complete* the EPA process. DPG Serial Letter No. 75-2600-00009-00680 (December 30, 2003) forwarded a corrected EPA estimate from Botting in the amount of $942,628.05.

On or about May 19, 2004, DCAA had an entrance conference with Botting regarding their labor audit. DCAA requested access to Botting's complete bid to include lower-tier subcontractor bid documents. On June 23, 2004, the Government advised DPG that several contractors, including Botting, had not responded to DCAA's requests for information. On June 28, 2004, DPG requested that the Government either confirm completion of Botting's audit or send a copy of the outstanding information. In response, DCAA sent an email to Botting on June 29, 2004 and reiterated their request that Botting provide baseline labor hours and rates by labor category for verification against their bid estimate.

Government Serial Letter No. FTW171B-1745, dated July 1, 2004, formally recapped discussions between DCAA and Botting and advised that Botting had still not provided their

baseline direct labor hours and rates, by labor category, or their lower-tier subcontractor bid documents. Until all information was submitted, DCAA could not complete the baseline audit of Botting's bid. Botting later provided lower-tier subcontractor information and labor rate breakdowns via DPG on July 8, 2004 (Serial Letter No. 75-2600-00009-00954).

On July 9, 2004, DCAA acknowledged receipt of the lower-tier subcontractor information and the labor rate detail provided by Botting but indicated that Botting still had not provided baseline labor hours and rates by labor category. On July 19, 2004, Botting provided the requested information via a letter to DCAA.

On August 19, 2004, in Serial Letter No. FTW171B-1847, the Government notified DPG that Botting's bid estimate appeared to include escalation for labor costs. Specifically, lines 160, 161, 217, 218, 274 and 275 of their bid estimate indicated an amount for escalation related to labor hours for lead foreman, journeyman and apprentice. A review of Botting's bid estimate revealed line items entitled "ESCAL 7/02-6/03" ($1.25/hr) and "ESCAL 7/03-6/04" ($2.50/hr) on their recap sheets for Plumbing, HVAC and Process. On each sheet, the hours to which the "ESCAL" is applied equate to the total number of direct labor/mechanic hours estimated for that category of work. The Government requested that Botting provide an explanation for these line items.

DPG Serial Letter No. 75-2600-00009-01038 (August 26, 2004) provided a response from Botting that the "ESCAL" lines were used to include an additional estimated labor cost that was over and above the cost of raw labor estimates for performing the individual work items. Botting also indicated that the "additional cost estimate was an amount required for the hiring of specialized personnel from outside the local area who would command a pay rate higher than

local scale, as well as an allowance for food, housing, and the like". Botting maintained that "there was no allowance for escalation included in WAB's bid".

On September 3, 2004, the Government asked Botting to identify the "specialized" labor positions they intended to hire from outside the local area and to provide the calculations to support the additional costs they were estimating.

Botting responded under cover of DPG Serial Letter No. 75-2600-0009-01059, dated September 20, 2004, and indicated that "the amount included within the bid for such costs was a lump sum estimate, based upon years of experience working in the industry and in remote and sparsely populated locations". Botting alleged that examples of the costs are "the additional wages paid to supervisory and other personnel imported from Seattle and Anchorage and other locations, the cost to house and feed those individuals, the cost of transporting them back and forth between their home base and the jobsite, and other similar costs associated with remote locations". Botting stated that the total estimate for these costs was $676,751.00.

A teleconference to discuss the issue of escalation was held on October 4, 2004. Participants included DPG, Botting, counsel for Botting, DCAA and the COE. Mr. Pete Botting alleged that the costs entered under the ESCAL line items represented an amount intended to compensate for an underestimation of the amount required to hire specialized personnel from outside the local area as well as an allowance for subsistence. Mr. Botting alleged that an additional amount of approximately $380,000 had to be incorporated into their bid just as the bid was being finalized for submission. According to Mr. Botting, this amount should have been incorporated into the Other Direct Job Costs (ODJC) but they were unable to make the entries into that estimate sheet due to problems with the estimating software. To get those dollars included, they were entered under the ESCAL lines instead. Mr. Botting alleges that in the last

minutes of bid preparation, they failed to change the title of the ESCAL lines. The total amount added under ESCAL was $315,151.

On October 26, 2004, the Government denied Botting's request for an EPA adjustment based on the inclusion of an apparent contingency for labor. Botting's contention regarding the ESCAL was not supported by their bid estimate and no other contemporaneous documentation to support Botting's allegation had been provided.

A Government Memorandum for Record was generated on November 4, 2004 to document the explanations received from Botting regarding the ESCAL in their bid. Initially Botting verbally told the Government that the ESCAL was for labor rate increases which occurred between the first and second times the Bassett project was bid. In DPG Serial Letter No. 75-2600-0009-01038, Botting indicated that the ESCAL was an additional estimated labor cost that was over and above the raw labor estimates included in the bid for the individual work items for hiring specialized workers from outside the local area. During the teleconference on October 4, 2004, Botting stated that the additional costs were related to the higher wages, subsistence and travel associated with hiring the project manager, project engineer and superintendent from outside the local area.

Botting has requested a Contracting Officer's Decision on their eligibility for an EPA adjustment. The request was submitted by DPG in Serial Letter No. 75-2600-0009-01227, dated January 3, 2005, and was certified by DPG in accordance with the Contract Disputes Act.

**CONCLUSION:**

The purpose of issuing a contract with an EPA clause is to divide the risk of economic uncertainty between the contractor and the Government. Without an EPA clause, a contractor must submit a higher bid that includes a contingency to cover unexpected increases in costs. By

including an EPA clause in the solicitation, the Government is assured of not having to pay a contingency for long-term market fluctuations since the EPA clause provides a mechanism for covering those unanticipated costs separately. However, it does not provide a guarantee that the contractor will receive an adjustment. The FAR prohibits the inclusion of contingencies in both the base contract price and in an adjustment requested under the economic price adjustment clause. FAR 16.203-2(a) specifically requires the contracting officer to ensure that contingency allowances are not duplicated.

This contract contains an EPA clause that has been specifically limited to labor as stated in CLIN 0011 of the proposal schedule. Only base line items 0001 and 0002 are subject to the EPA clause and only the established labor rates and fringes set forth for laborers and mechanics in Davis Bacon Wage Decisions AK010001 and AK010006 are subject to adjustment. Botting's bid estimate includes line items that are labeled ESCAL that apply increases of $1.25/hr and $2.50/hr to their direct labor hours for labor categories classified as laborers or mechanics by FAR 22.401 (lead foreman, journeymen and apprentice). Additionally, each of the bid recap sheets that include the ESCAL lines, also include lines entitled "SPCL PREM", "TRAV EXP" and "SUBSIST" which were not utilized even though the additional cost was presumably for additional wages, costs for housing and food and costs for transportation for employees hired from outside the local area. As such Botting's bid estimate, and therefore DPG's base price for mechanical work, appear to include a contingency for labor on all of Botting's laborer or mechanic hours. Since FAR 16.203-2(a) prohibits the duplication of contingency, the contractor is not entitled to an EPA adjustment on the baseline direct labor hours included in Botting's bid.

For the above stated reasons, I find that this claim must be, and hereby is, denied.

This is the final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, 7th Floor, Falls Church, Virginia 22041. If you decide to appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the contracting officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

11 Mar 2005 — Date

Claudette M. McDonald (signature)

Claudette M. McDonald
Contracting Officer