IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

No. 05-462-C

DEPOSITION UPON ORAL EXAMINATION OF

MICHAEL BURRUS

Monday, July 18, 2006



7f63da8d-0356-4191-88c9-99f1e262f880

everything to where we at least have a budget for every line item in our bid, so we have an overall idea of how large the project is going to be.
Q And you specifically recall doing that the night before Botting's second sub-bid was due?
A I do, because we do that on every job. That's still what we do. We try not to leave the office until we have a complete package ready the night before.
Q How long does it usually take?
A Could take a really long time. It could be late. Sometimes later than other times.
Q Kind of a late-night, extra-cups-of-coffee sort of late?
A Perhaps, yes. Dinner and that kind of thing.
Q Do you know if it was a late night on the Botting second bid?
A I don't recall.
Q You say Botting inadvertently -- when cost information was entered in the second estimate, Botting inadvertently left off all the ESCAL line items at the amount included in the first estimate?
A Correct, because we had copied from the electronic version of one to two, we -- those line items were left in the second bid proposal.
Q How did you discover that?
A We were just doing our review on bid day with Pete and

the team during a few quiet moments. We were all getting through this one more time.
Q And what did you do when you discovered that?
A We had a discussion. Pete and I, in particular, had a discussion. He said, Hey, I don't believe that we need to be having escalation in the job, and so we had a discussion about that. And we clearly agreed, based on the contract documents, that escalation was not required in this project.
Q Did you look at the contract documents at that time?
A Someone on our bid team did. Pete and I were discussing a lot of things about our proposal. The question came up, and someone on our team did look that up, or they read it orally. I don't recall. But we clearly had that discussion if it was required or not.
Q Do you know who would have looked that up?
A I don't know who. It could have been either Janelle or Karen or Jason. I'm just trying to think -- I can't recall who all else would have been. There's a lot of people in and out of our bid room.
Q And when you've listed a bunch of names, when you say Karen, that's Karen Langeberg?
A Mm-hm (answers affirmatively).
Q When you say Janelle, it's Janelle?
A Bruhn.

Q Bruhn. Thank you. And Jason would be Jason McDonald?
A McDonald.
Q All right. Thank you. Do you know if you have any document showing the ESCAL line items reduced to zero, if you have any copies of a bid sheet?
A I have not seen any copies. Again, because we keep the most current version.
Q So just try to summarize what you've said. On bid day you had discovered that there were -- that the ESCAL lines were still included, and you testified that you discussed this with Pete, and that someone in the bid team looked up and determined whether -- looked up whether or not escalation was included in the contract. And then you zeroed the lines out?
A And it could have been Pete that looked that up as well since we was at the pre-bid conference. But we had a very clear discussion on, Is this required or is this not required.
Q Was there any disagreement about that?
A On my part because I didn't know that that clause was in the contract, that escalation was not required there, so it's like when we came to agreement, let's get it out of here.
Q So you initially disagreed?
A Didn't disagree. It was just new information.



7f63da8d-0356-4191-88c9-99f1e262f880

ESCAL line items?
A You couldn't tell that by looking at this, because it didn't change the description at the time. But I know what happened in the bid room, the discussions that we had.
Q And did you specifically decide to put that on the ESCAL lines?
A The discussion was, we don't need escalation in the bid, but we needed to add a range of money as previously stated in here. And whether that was redlined by myself or verbally given to the person operating the computer terminal, I don't recall how that information got to them.
Q Do you specifically remember adding the ODJC cost to ESCAL lines?
A I remember the discussion to get the 300-plus thousand dollars into the bid, and where those were put in. I wasn't sitting at the computer to see exactly where that went in. As long as we got the dollars into the bid, I didn't really care where it got placed.
Q Is there a reason why you didn't put these ODJC costs on the ODJC sheet?
A The only reason was we're trying to eliminate from having to page through multiple pages during bid day when there's a lot of activity, trying to get to work as much

from the front view sheets as possible.
Q Outside of having to page through various pages on bid day, would there have been any other problems with adding it to the ODJC sheet?
A Other than we were consistently looking at a number that when you're looking at the front sheet on the ODJC, it's pulling. We try to freeze all the back pages as much as possible. You get used to as you're printing out the top two sheets, you get used to seeing that number, and you don't want to see these numbers changing around a lot on the back, in particular, with your general conditions. We spend a lot of time trying to work through that. It's a big number.
Q Staying with the Exhibit 4 for a little bit. If you could turn to Page 7. That's the ODJC sheet. There's a figure there at the bottom right-hand corner of $4,171,996. Where does that figure go?
A It pulls forward to the front sheet on Line 35. The -- that's the total, the million, 901,890 pulls into the Labor column. Then the expense -- the two million, two seventy -- pulls into the expense column; and then the grand total extends across and totals on the front sheet on Line 35.
Q Does it pull forward anywhere else? Does that figure move anywhere else?

Q About what time do you have to get your numbers to the prime?
A We typically try to get it to them 30 minutes before it closes, but that's usually -- we're really happy if we can do that.
Q Now, what would be involved in modifying the descriptions of line items? How do you do that in the computer?
A It's not a difficult thing to do. It's an Excel spreadsheet. Type text into the cell.
Q But it just wasn't done?
A It wasn't done.
Q Doesn't it take more time to break up a $300,000 figure into six separate items with hour costs and breaking it down to those calculations than simply adding it into one place in the sheet?
A Yes, that would take more time to do that. But again, the person entering the information may have had something set up to be able to do it quicker.
Q So the person to talk to about why it was done that way would be the person entering the information?
A Yeah.
Q New exhibit. You can put that away for now.
(Exhibit Number 11 marked for identification.)
Q Have you seen Exhibit 11 before today?
A I've -- I believe I have.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 05-462-C |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DEPOSITION UPON ORAL EXAMINATION OF

PETE BOTTING

Monday, July 17, 2006

Q You didn't give the estimating team a specific number or...?

A No, because I gave them a range to work with. Maybe they can find something they can tweak or whatever. If they know what I'm looking for, they can come back and say, Hey, how about this, how about that. What do you think. It's a fairly cooperative atmosphere in our bid room. There's not just somebody hollering commands. It's like, Oh, my God, what do we do now.

Q Did you tell them how to work it into the bid sheet?

A I did not. I gave them the total numbers and asked them to get it in there somehow.

Q Did they offer any suggestions to you about how to work them into the bid sheet?

A I don't recall that they did. They said they had taken care of most of it and I was off to something else.

Q If we could go to Paragraph 11.

A Yes.

(Pause in proceedings.)

A Yes.

Q My question is actually going to be pretty simple. First of all, it says, We discussed the amounts in those line amounts, in the third sentence. Bottom of the page.

A Mm-hm (answers affirmatively), yes.

Q Who's we?

A Would have been the estimating team, probably Michael and myself, possibly some of the other folks in the room.
Q Okay.
A And again, in the setting, we're at a big table like this one with seven or eight people around it. I don't just talk to Michael. I say, Hey, we don't need to do this. We don't need to do that. So it's an open communication form.
Q In this paragraph you say that when you were reviewing the second sub-bid you saw they still had included the $306,575 amount that had been included in the first sub-bid?
A Yes.
Q Had you talked to them before about not including the escalation?
A I don't recall that coming back from Anchorage after the pre-bid meeting if it was really discussed or not. It may or may not have been. And it really wasn't pertinent until we got our final number put together.
Q But you do recall talking to them on the bid day about--
A On the bid day that we no longer--
Q --escalation?
A --needed it per the change in the solicitation for the project.
Q And who would you have talked to about that? You said

-- Michael Burrus?
A Michael Burrus.
Q Anyone else?
A He would have been the primary person to make sure he and I were on the same page and then it would get taken care of.
Q Were you ever talking directly to Karen Langeberg, or was it generally you would talk to Michael and he would --
A Well, Karen on this bid was running the equipment sheet, so my discussions with her would have been, Are we done? Do you have the chillers? You got the boilers? You got the stuff in? What the hell is going on? You got all the details, and why don't you have the number figured out yet?
Q Yes.
A But I believe Janelle was running the bid-day computer. She was actually doing the input, and she may have been a part of that discussion.
Q Okay.
A Whoever was running the bid-day computer would have -- would be the person who would have been -- my memory isn't that clear, but I believe Janelle was the one doing it that day.
Q All right. Going to go to Paragraph 12.
A All right.

(Pause in proceedings.)

A Yes, I've reviewed it.

Q It says, first sentence, "...the estimating team decided to insert the additional ODJC costs requested in the ESCAL bid line items, rather than attempt to create new line items." Did they talk to you about that before they did it, or was that a decision they made on their own?

A They may have. I had made the request to add, you know, between three to four hundred thousand dollars to the bid. They may have said, Hey, look, you said we could take this out. Can we leave it in? Probably did get discussed. I don't recall exactly all the details. I was looking to get money added to the cost of the job and I didn't particularly tell them how to do it.

Q So how do you know that they had decided to add them to the ESCAL bid line items?

A They said they had it covered. They'd covered an approximate amount of what we were looking for. And I'm not sure they would have told me where they actually put it. They probably did, but I don't recall that conversation specifically.

Q At the time they wouldn't have told you or...?

A They probably did. But there's a tremendous amount of information and communication that's kind of crazy in the bid room.

Q It says that you were looking to increase the cost to bring certain specialized personnel for supervision. Do you know why they wouldn't have, for example, put those costs on the supervision sheet, Page 6?
A They probably -- they could have possibly. I don't know. I would be guessing. I don't know.
Q Who would be the person to talk to about that?
A Michael.
Q In supervision if you look at Page 6 of Exhibit 4.
A Yes.
Q Exhibit 4, I want to make sure.
A I'm on Exhibit 4. I have it. I'll cover the other one up.
Q There are two lines, other 1 and other 2.
A Correct.
Q Do you know why they wouldn't have put it on either of those lines?
A I do not.
Q All right. So when you say in your affidavit that they decided to insert the ODJC cost in the ESCAL line, you don't know why they did that?
A I do not know.
Q All right. Did you ever see a version of Exhibit 4 that had the escalation line zeroed out?
A To make sure I understand your question, where they'd

have the zero amount in there for hours?
Q Exactly.
A Or dollars.
Q For hours or dollars, yes.
A I don't recall seeing one.
Q Okay. You do recall, however, telling them to zero it out?
A Yes, I do recall advising the bid team that escalation was not required per the solicitation.
Q Well, if you never saw one with that zeroed out, how do you know that they did that?
A As we go through from -- this job bid at 5 p.m., terrible time. From probably 11 o'clock on, we will run these top few sheets of the estimate probably 25 times. We destroy -- because we don't want to be grabbing the wrong one at the last minute and, say, okay somebody is on the phone, I've got a calculator in front of me. I'm not waiting for the computer, I know what I can do. So we destroy them. They're torn in half and thrown away. So I don't recall if I saw one with zero on it or not. I may or may not have.
Q Do you prepare sheets like this a few days in advance sometimes?
A We -- on large projects like this, we do, yes. And as I said earlier, this job was probably plugged out the night

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | No. 05-462-C |

DEPOSITION UPON ORAL EXAMINATION OF

JASON McDONALD

Wednesday, July 19, 2006

A It's a bid package for Bassett Army Hospital.
Q And do you know if you worked on preparing the bid package for Bassett Hospital?
A I did not work on preparing the bid package for Bassett Hospital.
Q All right. I'm going to show you what's been previously marked as Exhibit 4. Take a second and look over that.
(Pause in proceedings.)
A Okay.
Q Have you seen Exhibit 4 before today?
A Yes, I have.
Q And what is it?
A It's the rebid for Bassett Army Hospital.
Q And did you do any work on preparing the rebid--
A No, I did not.
Q --for Bassett Hospital? Did you have any involvement on the first bid for Bassett Hospital?
A The first bid I had absolutely no involvement on.
Q Did you have any involvement on the rebid for Bassett Hospital?
A The rebid for Bassett Hospital I was in the bid room running faxes, helping them pick up the excess phone calls, and that's pretty much it.
Q Did you do any data entry for the rebid on Bassett Hospital when you were in the bid room?

A No, I did not.
Q Did you run any calculations for the rebid on Bassett Hospital?
A I don't remember. I could have double checked some numbers or something when asked to do that. We do that all the time. Somebody needs a check and maybe two or three people run the calculations on the thing just to get double and triple checks.
Q You said you were in the bid room on rebid, was that your first involvement with the Bassett Hospital?
A Yes.
Q You didn't attend a pre-bid meeting for the rebid of Bassett Hospital?
A I did not, no.
Q All right. You're lucky. You're probably going to be quick. What do you recall about, if anything, about bid day for the rebid on Bassett Hospital?
A Nothing. It was something I was brought into the day of the bid to help run faxes and take phone calls. I was still pretty new, so...
Q Did you have anything else going on at the same time?
A I was probably working on another bid.
Q When you were in the bid room for the Bassett Hospital rebid, do you recall any conversations about an EPA clause?

A No.
Q Do you recall any conversations about adding costs for supervisor per diem, supervisor travel allowance or premium for the cost of supervisors?
A Nope, I don't recall any conversations at all.
Q After bid day, did you have any involvement with the Bassett Hospital project?
A I was asked to put through -- the second takeoff through estimation and but that was probably close to -- well, I can't even tell you, six months to a year later.
Q What is the second takeoff?
A That's our foreman's estimate. It comes to us on strip sheets, we call it, and tells how many 90s and 45-degree fittings and pieces of pipe there are and we run it through to do a comparison to the estimate. But we never got to that point on that project. We never got the full second takeoff. It kind of ended halfway through it. That happens on a lot of projects.
Q Do you know why?
A Time. The idea of a second takeoff is to get your -- help get your materials and sort it out by areas so you can set up job cost codes and things like that.
Q Who would you have been working with, if anyone, on the second takeoff?
A Nobody. John mailed it down from Fairbanks. He just

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 05-462-C |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

DEPOSITION UPON ORAL EXAMINATION OF

KAREN LANGEBERG

Wednesday, July 19, 2006

A No.

Q All right. There's a note there at the bottom of Page 5 which says, Formula pulled Lines 274 and 275. That was by mistake. Skewed factor. Oops. Do you know what that means or...?

A I do not know what that means, other than whoever was looking at this did find a mistake.

Q Okay. That's fine. Now, let's turn to Page 3 of this document. On Page 3 of Exhibit 4 there is -- under labor hour modifications, Line 160 and 161, there are entries for escalation for the cost -- well, let's focus on Line 160. There's an entry, ESCAL 7, slash, 02 to 6, slash, 03 and the cost column lists $25,709. Do you know what Line 160 represents?

A On the second bid, to the best of my recall, it did not represent escalation. And I believe that that's where we ended up putting some money to compensate for extra costs that we perceived that we needed to include in the job towards the end of the bid before we were turning the number in.

Q Do you know what those extra costs were?

A I was not specifically a part of that conversation.

Q Okay. Do you remember if you entered in, typed in the figures on Line 160?

A Do I remember if I typed them in?

Q Yes.
A Is that what you said? I do not remember.
Q You said your recall is that that does not represent escalation; why not?
A When this job rebid, we made a copy of the original bid-day package because the job did not change that much. So instead of having to re-enter all of these items back here on the equipment pages and the rough pages, we made a copy of the original bid. We just copied it over and made some minor adjustments. I think there's a material escalation price increase written on this in several places that there weren't before. And so when we made a copy of that, all of the previous changes had been carried over to this bid form.
Q Okay. And if the changes were carried over, how is it that that means that Line 160 and Line 161 wouldn't represent escalation?
A We didn't change the description on -- those line items didn't get changed.
Q Why not?
A I don't know.
Q Do you recall deleting escalation costs from the bid sheet?
A I do not recall that because I probably was not working on the bid-day package.

Q Do you recall being told to delete escalation cost from the bid-day sheet?
A I was not told, no.
Q Then how do you know they were deleted?
A I guess I do not personally know that they actually were deleted.
Q That's fair. That's all I can ask from you today. You talked about putting money in for extra costs that perceived to be needed to be included in the bid. You don't specifically -- just so I'm clear, you don't specifically know what those extra costs were?
A I don't.
Q Okay. And you don't remember -- well, never mind.
MR. MAGER: If we could go off the record.
(Recess taken from 9:51 to 10:05 a.m.)
MR. MAGER: Let's go back on the record.

E X A M I N A T I O N - (Continuing)

BY MR. MAGER:
Q I had a few additional questions for you. Do you recall ever attending a presolicitation or pre-bid conference for the second rebid on the Bassett Hospital project?
A I did not.
Q Okay. Do you know if someone from Botting did?
A Pete Botting.

bid room working on other pieces of the puzzle, so I was, you know, listening with half of an ear and you just hear conversation going on. And I do know that they discussed that they were talking -- Pete was discussing that it was not required in the second bid or that we were not to put any pay adjustments in the second bid. Pay increase, I guess you would want to call them.

Q Do you know what Mr. Burrus said to Mr. Botting in reply?

A I do not recall.

Q Do you recall if they reached a consensus with regards to what needed to be done with regards to the EPA clause in preparing the pre-bid?

A I can't say that I remember them actually, you know, word for word, but it would be my assumption in normal circumstances if somebody says something is not needed in a bid, then we would not put it in a bid unless someone would come up with a reason wrong -- why that was wrong and we actually needed to put it in the bid.

Q Can you recall them telling someone to delete any escalation costs from the bid?

A I don't recall that specific conversation.

Q Okay. In preparing the second rebid on the Bassett Hospital project, did you personally at any point review the Federal Acquisition Regulations regarding economic price adjustments?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company, ) | |
| Plaintiff, ) | |
| vs. ) | No. 05-462-C |
| UNITED STATES OF AMERICA, ) | |
| Defendant. ) | |

DEPOSITION UPON ORAL EXAMINATION OF

JANELLE BRUHN

Wednesday, July 19, 2006





0b0c902f-f53e-473c-aee5-a3c7d62ab235

with Pete doing the manpower schedule. And pulled together -- there was several volumes' worth of information that each general contractor had to provide, but that required information from subcontractors, so I was the one that compiled that information and got it to Kiewit and Dick Pacific and I think Absher was the third one.
Q You said "first bid," did you work on a second bid for the Bassett Hospital project?
A Just the bid day, that day I was in the bid room involved.
Q You said you were in the bid room involved just bid day; what were you doing in the bid room?
A I usually run the bid-day package and sit at the computer.
Q So sit at the computer. Would you be entering information in--
A Yes.
Q --to the computer? You said you worked with Pete on the first bid doing a manpower schedule. What is a manpower schedule?
A We took, I believe we worked off of Kiewit's -- they had a preliminary schedule, and we took their activities and plotted them out on a timeline, took our estimated man-hours, plugged those in, came up with, based on their

Q All right. So what does Line 41 cut, slash, add -- I'm not sure you said what exactly that is.

A At one point, usually early in the morning of the bid, we quit inputting equipment quotes into the Excel package because the equipment never comes apples, apples, oranges, it's always a mix and you can't evaluate it electronically. We run a manual spreadsheet, so at one point we stop putting information into the bid package and it's all done off of a hand spreadsheet. And close to the final bid time when Karen has all of her holes filled with all the quotes she was anticipating, she runs her totals, does a delta, we confirm base number to base number, then she tells me what her cut and add is based from that morning's number was, if the equipment has gone up or down.

Q Okay.

A Because a lot of times we'll plug numbers, we'll put a guess in so we kind of have a ballpark. And those numbers will, you know, they bounce around, so usually within the last half-hour of the bid, she has all her numbers in instead of trying to go back through and change pages of information, we do one cut and add. And this time our number went up $1 million from what we had plugged in in the morning.

Q Then what is Line 42 A-R-B cut, slash, add?

A That's an arbitrary cut or an add. And that is a gut feeling that is -- that Pete Botting and Michael Burrus come up with, they -- based on where they feel the market is. And that is done -- this is one of the very last numbers that they play with.
Q So they'll usually add that in at the very last minute?
A Very last. And if they think they can get more of a buyout on equipment or subcontractors or if they think that -- I don't know what they think, but they feel that they can take a cut or an add.
Q Now, are you the one who is usually entering in these figures?
A Typically, yes.
Q All right. I'm going to show you what's previously been marked as Exhibit 4. Can you take a minute and review this document?
A Okay.
(Pause in proceedings.)
A Okay.
Q Have you seen this document before today?
A Yes.
Q And what is it?
A It is the final bid-day package on the second bid.
Q And were you involved in preparing this final bid package for the second bid?

A Yes.
Q I know you've gone over this, but what exactly were you doing in preparing this?
A This one I was a lot less involved. I came down the day of bid and just did the data entry of the final changes.
Q When you say "the data entry of the final changes," does that mean you came in towards the end of the bid day or you were there for the entire bid day?
A I probably went in at about 10. I don't even remember what time this bid. I was not as heavily involved in this preparation as the first one.
Q Okay. Do you know if you performed any calculations in preparing the second bid that were not in the first bid?
A I may have. I don't recall.
Q Okay. That's fair. Do you recall doing anything with regards to the second bid that you hadn't done in the first bid, other than being involved on bid day?
A No.
Q Okay. At the bottom of Page 1 on the left-hand side what I'm guessing would be Line 56, but it's blacked out by it looks like a binder clip hole or something. It says "Final Bid Day Package Absher." Who is Absher?
A Absher Construction.
Q All right. And would the final bid-day package for Absher be the same as the final bid-day package for Dick

Pacific?

A I don't recall.

Q Do you have any reason to believe that Dick Pacific and Absher would have had different bid-day packages?

A I don't recall, but it...

Q Do you typically have different bid-day packages for different general contractors?

A It's not typical, but it's not unusual.

Q When you say "it's not unusual," can you recall, or do you know under what circumstances you would have separate bid-day packages for different general contractors?

A If they have a different schedule, because each contractor can develop their own schedule, if one schedule has just a better flow.

Q But you can't specifically recall if you had different bid-day packages for Absher and Dick Pacific?

A I don't recall.

Q Okay. If you could turn to Page 3 of this packet. At Line 160--

A Mm-hm (answers affirmatively).

Q --there is a figure there, there's a column labeled ESCAL. There's a number of hours, a rate, and a cost. Do you know what that cost represents?

A I know there's -- I don't recall this changing.

Q When you say you don't recall this changing, what do you

mean?
A I know there's been discussion as to what that was for.
Q Okay.
A And I was not involved in those conversations.
Q So, for example, do you recall ever being involved in any discussions regarding eliminating any escalation cost from the second bid on the Bassett Hospital?
A I don't recall that.
Q Do you recall deleting any escalation costs from the second sub-bid on the Bassett project?
A I don't.
Q Okay. That's fair. Do you recall being asked to fill something in in the escalation columns on the second sub-bid?
A I don't.
Q Okay. Do you recall ever being asked to change the labels on Line 160 or 161?
A No, I don't recall.
Q What would be involved in changing the labels on Line 160 or Line 161?
A How would I have gotten that information?
Q How would you change that label?
A It's Excel. I would have just typed over it or deleted it.
Q Does it take a long time to do or is it easy?

A It's easy.
Q Do you recall being asked to add specific costs into the second sub-bid for special items such as supervisor per diem, supervisor travel allowance or premium for the cost of supervisors?
A No, I don't recall.
Q And do you recall adding costs for supervisor per diem, supervisor travel allowance or premium for the cost of supervisors?
A No.
Q If you were adding that, where would you usually add that in to these sheets?
A It depends on where they want to see those costs, if they want them as labor or if they want them in ODJC.
Q If you wanted to, at the last minute add, let's say $300,000 to a bid at the last minute, could you simply add that in at the column Line 42 or Line 41?
A Yes.
Q And what impact would that have on the rest of the bid sheet? Would adding those figures at the last minute cause a problem anywhere else in the bid sheet?
A I don't know. I've never done that.
Q Okay. That's fair. Do you recall any computer glitches or problems that you were experiencing in the computer system at the time you were preparing the Bassett