No. 05-462
Judge Baskir

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DICK PACIFIC/GHEMM, JV, on behalf of W.A. Botting Company,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

ROBERT H. CRICK, ESQ.
WINSTON & CASHATT
Attorneys for Plaintiff
1900 Bank of America Financial Center
601 West Riverside
Spokane, WA 99201
Phone: (509) 838-6131
Fax: (509) 838-1416

October 13, 2006

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| I. | STATEMENT OF THE CASE | 1 |
| II. | LAW | 2 |
| | A. The Government has not established as a matter of law that Botting included wage escalation in its bid, and in fact, the only evidence established that it did not do so. | 2 |
| | B. Irrespective of whether the $315,551 was a wage increase contingency, Botting is entitled to recover wage escalation costs in excess of $315,511 as a matter of law. | 5 |
| | 1. The FARs on which the Government relies were not part of the contract. | 6 |
| | 2. The Government does not have unfettered discretion to interpret the law, and the Government's interpretation of the applicable contract provisions and regulations do not authorize any sanction against Botting. | 9 |
| | 3. The DCAA Audit Manual also provides no support for the Government's position. | 13 |
| | 4. Botting seeks no award of a specific quantum at this time. | 15 |
| III. | CONCLUSION | 16 |

# TABLE OF AUTHORITIES

## Cases

Bowels v. Seminole Rock & Sand Co.,
325 U.S. 410 (1995) 11

Bowen v. Georgetown University Hosp.,
488 U.S. 204 (1988) 10

Cathedral Candle Company v. U.S. Int. Trade Commission,
400 F.3d 1352 (Fed. Cr. 2005) 10,11

Craft Machine Works, Inc.,
90-3 BCA 23 (ASBCA No. 35,167 1990) 8, 12

Craft Machine Works, Inc.,
90-3 BCA 23,095 (ASBCA No. 35,167 1990) 12

Dairla-Bardales v. INS,
27 F.3d 1 (1st Cir. 1994) 12

Mapco Alaska Petroleum,
27 Fed. Cl. 405 (1992) 8,12

Morrison-Knudsen Co. v. United States,
427 F.2d 1181 (Ct. Cl. 1970) 7

## RULES AND STATUTES

FAR 52.216-4 6

FAR §16.203-2 8

FAR §16.203-2(a) 8,9

## I. STATEMENT OF THE CASE

The Government's Statement of the Case reveals no new facts or evidence which would entitle it to summary judgment, and fails to raise issues which preclude the relief Dick Pacific/Ghemm, JV on behalf of W.A. Botting Company, (Botting) requests in its own summary judgment.

First, the Government does not dispute that the FAR regulation outlining the Economic Price Adjustment (EPA) which was included as a term of the contract is wholly silent on the effect of a contractor including some portion of contingency for wage increase in its bid. Similarly, the Government does not dispute that no other provision of the contract documents specifically prohibits a contractor from including a wage increase contingency, even where the contract contains an EPA, nor does the contract provide for any consequence to the contractor in including any wage increase contingency in its bid when an EPA is utilized. Likewise, the Government does not dispute that at the pre-bid conference, contractors were not verbally informed that inclusion of any wage increase contingency in their bid would prohibit them from obtaining an economic price adjustment in the event they were awarded the contract. Instead, the Government notes only that it "was indicated" at the pre-bid conference that the intent of the EPA clause was to allow contractors to bid competitively

for labor rates initially, with the understanding that if rates increased, there would be a mechanism to cover those labor costs and the contractor would not have to try to project out for anticipated increases. (See, Government's Brief, pp. 5-6)

Thus, nowhere in its Statement of the Case does the Government refute the undisputed fact that in neither written or verbal communications, nor in the terms of the contract, was Botting told, or did Botting contract, to forfeit all future EPA amounts if it included a wage increase contingency in its bid.

## II. LAW

### A. The Government has not established as a matter of law that Botting included wage escalation in its bid, and in fact, the only evidence established that it did not do so.

Botting presented the testimony of Mr. Pete Botting and Mr. Michael Burris to establish that the $315,151.00 included on the "Escal" line item of its bid was not labor escalation, but instead reflected other anticipated job costs for specialized personnel costs. The Government admits that this testimony establishes that Botting did not intend to place any labor escalation in its bid, but argues that there is no additional evidence to support that claim:

> The uncontroverted facts may support that there may have been an intent, but do not support that the intent was ever effectuated.

(Government Brief, p. 21)

While the Government has submitted pages of argument, and its interpretation of the inferences that it chooses to draw from the evidence Botting has presented, it has failed to submit any factual information which controverts those facts that Botting have supplied.

The testimony of Mr. Botting and Mr. Burris is evidence from persons in the bid room at the time of the last minute bid calculations, and consists of facts, not conclusions. That others may have testified to a lack of recollection does not create any dispute on the facts that Botting has presented. The undisputed facts remain that Botting executives, Mr. Botting and Mr. Burris had a last minute conversations on Bid Day to the effect that there was a clause in the contract under which the Government assumed the burden for labor escalation and as such, Botting did not have to put in a contingency for escalation.

In its prior bid, Botting had an amount of $306,575.00 for labor escalation. Due to the last minute rush of bid day, the bid pages for Labor Escalation, which had been submitted in the prior bid, still had the same escalation figures as the original bid.

According to Mr. Burris, this information was "zeroed" out and a new figure was placed in that bid sheet. The new figure was not meant for wage escalation however; it was intended for Other Direct Job Costs (ODJC). (Aff. of M. Burris, p. ¶13; Plaintiff's App., p. 19)

This direct evidence is supported by the inferences that can be drawn by other evidence presented by Botting, as outlined in its original brief in support of its motion for summary judgment. The Government's argument that Botting cannot produce any witness that actually physically made this change, and there was no "contemporaneous evidence" to support the testimony of Mr. Burris and Mr. Botting, does not create an issue of fact to defeat Botting's motion for summary judgment, nor does it entitle the Government to summary judgment on this issue. The Government's claim that there is no "contemporaneous" evidence to support the testimony of Mr. Botting and Mr. Burris first presumes that such additional evidence is necessary. Botting is entitled to investigate the events surrounding the hectic bid day and provide evidence which supports its evidence which may have occurred **after** bid day. Moreover, the Government's inferences from the other evidence is not proof, and ignores the other evidence offered by Botting without refuting it. For example, it is undisputed that the original bid included a labor escalation amount of $306,575, but in second bid, the

dollar amount was $315,551; there is no explanation by the Government on why the figures would be different if they both constituted labor escalation.

In addition, the Contracting Officer was presented with evidence that Botting, after award, budgeted $315,000 from the ESCAL bid format into OJDC, where it should have been in the first place; ultimately, $300,000 was both budgeted and expended on specialized personnel costs.

Furthermore, the bidding process is highly competitive, and the project would be awarded to the low bidder. A contractor has no incentive to put extra amounts that it does not need into the bid. It was never in Botting's interest to leave in excess of $300,000 in the bid which was covered by an EPA clause and risk coming in higher than other bidders without escalation, and not being awarded the project. Botting simply had no reason to increase its bid unnecessarily.

These inferences from the evidence are as valid as the Government's and ultimately support the testimony of Mr. Botting and Mr. Burris.

**B. Irrespective of whether the $315,151 was a wage increase contingency, Botting is entitled to recover wage escalation costs in excess of $315,151 as a matter of law.**

The Government's assertions that FAR provisions or DCAA manual provisions provides that Botting is precluded from recovery of any amount of wage escalation because it allegedly included wage increase

contingency in its bid fails to accurately analyze the law, or the facts of this case. The FARs on which the Government would rely to deny Botting's claim were not included in the contract, either expressly or impliedly, and Botting was never bound to any such provisions. Moreover, the regulations cited by the Government unambiguously fail to support the Government's case, and the Government's interpretation of the law for the purposes of this litigation is not entitled to deference because it is not supported by the unambiguous terms of the regulation, or any relevant agency interpretations.

**1. The FARs on which the Government relies were not part of the contract.**

The Government's analysis of the appropriate standard for interpretation of regulations which are incorporated into a contract fails to recognize that the FARs on which it relies here are **not** incorporated into the Botting contract.

The EPA clause which is actually contained in the parties' contract is a modification of FAR 52.216-4 which outlines the procedure the contractor must follow to obtain its EPA. (Botting App., p. 70) It is undisputed that FAR 52.216-4 does not instruct the contractor not to place any contingency in the bid, and does not require a warranty that the bid does not include any contingency, nor does it deny the contractor all recovery of any wage

escalation claim if such a contingency is placed in his bid. As originally noted, that portion of the contract and the FAR neither states nor implies that a contractor would be sanctioned for including a contingency.

Lack of any provisions creating a contractual obligation to warrant that no contingency is included significantly alters the situation at bar from any of the other cases cited by the Government. Although the Government dismisses that factor as unimportant, the few courts addressing an EPA all specifically note that the escalation clauses utilized had a warranty as part of the terms. In Morrison-Knudsen Co. v. United States, 427 F.2d 1181 (Ct. Cl. 1970) (Government Brief, pp. 32-33), the escalation clause contained in the contract for potential increases in taxes contained the following terms:

> (b) ... with respect to any Federal Excise tax or duty ... if a statute takes effect after the contract date and –
>
> > (1) results in the contractor being required to pay or bear the burden of any such Federal Excise tax or duty ... the contract price shall be increased by the amount of such tax ... ***provided*** **the contractor warrants in writing that no amount for such newly imposed Federal Excise tax or duty ... was included in the contract price as a contingency**. (Emphasis added)

Morrison-Knudsen, 427 F.2d at 1182, n.2.

The Morrison-Knudsen court goes on to identify five factors a contractor must prove to be entitled to an increase in the contract amount,

one of which is that no amount was included as a contingency. 427 F.2d at 1183. That same warranty obligation is required by the contracts in both Craft Machine Works, Inc., 90-3 BCA 23 (ASBCA No. 35,167 1990) and Mapco Alaska Petroleum, 27 Fed. Cl. 405 (1992), and it lacks logic to argue that those specific contractual obligations do not impact the court's decisions on the availability of a EPA adjustment when a contractor has included a contingency which he was contractually bound to exclude.

The FAR on which the Government actually relies to argue that no contingency may be included, FAR §16.203-2(a), was not included in the contract, nor does it create any obligation on the part of the contractor as a matter of law. The Government admits that FAR §16.203-2 provides "guidance" for the Contracting Officer on how to administer fixed price contracts, and which instructs the Contracting Officer to "insure that contingency allowances are not duplicated" by inclusion in both the base price and the adjustment requested under an EPA. (Defendant's Brief, p. 5) It does not create any legal obligations for the contractor. The Government interpretation of regulations which do not even form the basis for the parties' contract cannot alter the contractual remedies and rights of the parties here.

**2. The Government does not have unfettered discretion to interpret the law, and the Government's interpretation of the applicable contract provisions and regulations do not authorize any sanction against Botting.**

The regulations cited by the Government do not provide any basis as a matter of law to deny Botting's claim based on the inclusion of a wage increase contingency; the Government cannot interpose its own interpretation of those regulations to add terms to regulations which simply do not exist.

First, the Government admits that some ambiguity must exist before agency interpretation will even be relevant:

> If a regulation is ambiguous, as a general rule the Court will defer to an agency's interpretations of the regulations it promulgates, **as long as the regulation is ambiguous** and the agency's interpretation is neither plainly erroneous nor inconsistent with the regulation. (Emphasis added)

(Government's Brief, p. 26)

The administrative regulation in question is not "ambiguous." It is clear:

> [I]n establishing the base level from which adjustment will be made, **the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause**.

FAR §16.203-2(a).

There is nothing ambiguous about this language. If the contractor puts $100,000.00 in its bid and claims for $1,000,000 in wage escalation costs, the contracting officer is charged with eliminating the duplication of the $100,000.00. Nowhere in the regulations themselves is the term "penalty" "forfeiture" or "sanction" used, if there is duplication. The duplication is simply to be eliminated. This regulation on which the Government relies simply does not provide that a contractor is prohibited from recovering amounts of escalated labor costs in excess of a contingency he included in the bid. The Government is not entitled to add to the regulations under the guise of "interpretation."

Moreover, the Government fails to point to any agency interpretation which actually supports its argument here. The Government cites FAR provisions, but does not establish any policy, prior to adjudication of this matter, to which the deference standard can be applied. Courts will not apply the principle of administrative-deference to "agency litigating positions" that are wholly unsupported by regulations, rulings, or administrative practice. Bowen v. Georgetown University Hosp., 488 U.S. 204 (1988). And unlike Cathedral Candle Company v. U.S. Int. Trade Commission, 400 F.3d 1352 (Fed. Cr. 2005), on which the Government relies to claim that even a litigation position is entitled to deference, there is

no extraneous policy statements from the agency here. The Contracting Officer involved here is not relying on any long standing policy on a specific regulation; in fact, no one working for the Government on this project even had any past experience with a labor escalation clause. (Deposition of Madonna Southcott, p. 45, ll. 14-18; Deposition of Marie Mc Donald, pp. 8, ll. 7-9, Plaintiff's Supp. App., pp. 4,7) If each contracting officer's decision is automatically controlling, there will be little need for any appeal provisions relative to those decisions.

Even if the Government could identify a specific interpretation supporting its position, deference to an agency's interpretation does not give unfettered discretion to the Government to determine the law. Agency deference is limited by legal principles, and where agency interpretation conflicts with the language of statutes or regulations or is erroneous, the law will not provide the deference that the Government argues. See, Bowels v. Seminole Rock & Sand Co., 325 U.S. 410 (1995) (administrative interpretation controlling only when it is not plainly erroneous or inconsistent with the regulation). Again, unlike the facts of Cathedral, the Government here does not purport to define terms contained in a statute or regulations, but instead would create an entirely new provision which with

no notice or agreement, could deprive a contractor of millions of dollars of job costs.

Finally, the Government's interpretation of these regulations has not historically been consistent, and is thus entitled to no deference. See, Dairla-Bardales v. INS, 27 F.3d 1 (1st Cir. 1994) (law prohibits an agency from adopting significantly inconsistent positions that result in conflicting lines of precedent). Agency interpretation cannot change on a case-by-case basis in order to allow contracting officers, or others administering government contracts, to simply decide what they may like to do on any given day. As noted in Botting's original brief, the Government has taken the opposite position in previous cases, arguing that a contractor should put a contingency if it wanted to protect itself an against inappropriate escalation provision. See, Craft Machine Works, Inc., 90-3 BCA 23,095 (ASBCA No. 35,167 1990); Mapco Alaska Petroleum v. U.S., 27 Fed. Cl. 405 (1992). The Government's position that it cannot be held to past positions underscores the lack of any real administrative policy here.

Even in this case the Government's position is inconsistent. Kevin Williams, the DCAA auditor, has testified that if a pre-award audit had been done, the contractor would not have been denied the right to make an EPA claim if an escalation amount was found, the contract price would have

simply been reduced. Apparently that is an interpretation of the FAR which allows the auditor and Contracting Officer to simply avoid duplication by subtraction of the escalation amount, rather than imposing a sanction of denying any future claims based on the EPA.

As a result, the Government cannot establish that as a matter of law that these regulations have been consistently interpreted in a fashion that it now espouses, and no deference is to be accorded the Government's current interpretation, in light of the terms of the parties' contract and the lack of ambiguity in the regulations themselves.

**3. The DCAA Audit Manual also provides no support for the Government's position.**

The Government's argument that the DCAA Audit Manual should be used to interpret this regulation also fails. First, the DCAA Audit Manual is not incorporated into this contract either by reference or otherwise, nor is the DCAA the agency charged with interpreting government procurement regulations. In fact, Kevin Williams testified that the interpretation is solely the Contracting Officer's responsibility, and the DCAA's role is "strictly advisory." (Williams Dep., p. 99; Plaintiff's Supp. App., p. 10)

Moreover, the DCAA requirements would not preclude a contractor from obtaining an EPA even if it included a wage increase contingency. The Government admits that a pre-award audit is expected under the

DCAA manual, but that no such pre-award audit was conducted here. DCAA Auditor Kevin Williams specifically testified that had the audit occurred after award of the bid and the alleged contingency was discovered, he would have simply reduced the contract amount by the amount of contingency found in the bid. Mr. Williams testified:

> A. ... and the way the clause should be used is from the standpoint that if it had had an audit before the contract was awarded, they could remove whatever escalation or contingency costs were in there, and we would not be in this position right now.
>
> Q. So that really comes back to what I just said earlier. If, at award time, the Government would have said 'Kevin, come in and look at this.' Kevin comes in, looks at it and says 'oh, there's $300,000 escalation in here.' Then the Government, presuming from what you said, the Government would reduce Botting's contract by $300,000?
>
> A. I believe that's what would have happened.

(Williams Dep., pp. 60-61; Plaintiff's App., pp. 65-66)

Ultimately then, the DCAA audit materials do not provide any basis for complete denial of Botting's claim based on the inclusion of escalation amounts. Had escalation been found, prior to award, the Government would not have rejected the bid, rescinded the contract award, or prohibited the contractor from making an EPA claim after the job was performed. It simply would have reduced the amount.

There is simply no difference between a pre-award audit, and a post-award audit. The interpretation of the regulations remains the same, and confirms that the goal is to avoid duplication, which is accomplished here by reducing the EPA amount by $315,151. The end result under both circumstances is **exactly the same**, and the Government cannot establish that its own interpretations of DCAA regulations requires the complete sanction of Botting of $1.4 million because a $300,000 amount was perceived to be escalation in the bid.

**4. Botting seeks no award of a specific quantum at this time.**

Botting's motion for summary judgment sought an order declaring that it is "entitled to the field labor wage escalation costs to be quantified at the completion of the project." (Plaintiff's Memorandum, p. 15) In its conclusion, Botting asserts only that it is entitled to either an EPA in the "full amount incurred," or an order declaring it is entitled to the difference between the increased amounts incurred less any contingency. (Plaintiff's Memorandum, pp. 24-25) The amounts incurred have not been quantified and Botting does not seek a monetary judgment in a specific amount at this time.

## III. CONCLUSION

For the foregoing reasons, Botting requests the court grant its motion for summary judgment and deny the Government's motion for summary judgment.

DATED this 13th day of October, 2006.

WINSTON & CASHATT

//s//

ROBERT H. CRICK, ESQ
WINSTON & CASHATT
Attorneys for Plaintiff
1900 Bank of America Financial Center
601 West Riverside
Spokane, WA 99201
(509) 838-6131 telephone
(509) 838-1416 facsimile

Of Counsel:

PATRICK A. SULLIVAN, ESQ
JOHN H. GUIN, ESQ
WINSTON & CASHATT
1900 Bank of America Financial Center
601 W Riverside Ave.
Spokane, WA 99201
(509) 838-6131
(509) 838-1416 facsimile

ERIK D. EIKE, ESQ.
707 Richards Street, Suite 201
Honolulu, HI 96813
(808) 537-5950
(808) 537-5955 facsimile

## CERTIFICATE OF FILING

I hereby certify that on this 13th day of October, 2006, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

//s//

ROBERT H. CRICK
1900 Bank of America Financial Center
601 West Riverside Avenue
Spokane, WA 99201
(509) 838-6131 telephone
(509) 838-1416 facsimile

88446